ACCEPTED
12-13-00379-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
2/6/2015 3:35:13 PM
CATHY LUSK
CLERK

**12-13-00379-CV**

**IN THE TWELFTH COURT OF APPEALS
TYLER, TEXAS**

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
2/6/2015 3:35:13 PM
CATHY S. LUSK
Clerk

**MARTHA N. HILL AND GARY HILL**
*Appellants*

**Vs.**

**WINNON EARL SWORD**
*Appellee*

**An Appeal from the 114th Judicial District Court of Smith County**

**APPELLANTS' MOTION FOR REHEARING**

**SHACKELFORD, MELTON, MCKINLEY
AND NORTON, LLP**

**Joseph G. Chumlea**
SBN 04241500
*jchumlea@shackelfordlaw.net*
**Frances A. Smith**
SBN 24033084
*fsmith@shackelfordlaw.net*
**3333 Lee Parkway, Tenth Floor**
**Dallas, Texas 75219**
**214-780-1436**
**Fax: 214-889-9736**

**FLOWERS DAVIS, PLLC**

**Julie P. Wright**
SBN 00794883
*jpw@flowersdavis.com*
**Lead Counsel for Appellants**
**1021 ESE Loop 323**
**Suite 200**
**Tyler, Texas 75701**
**903-534-8063**
**Fax: 903/534-1650**

**ATTORNEYS FOR APPELLANTS**

## TABLE OF CONTENTS

Table of Contents .............................................................................................. ii

Index of Authorities ....................................................................................iii-iv

Issues Presented ...............................................................................................1

**ISSUE NO. 1:** **This Court failed to properly apply the analysis set forth by our Texas Supreme Court in *Sims*, and incorrectly determined that the new note executed by the Hills in 2011 was not a new extension of credit which had to satisfy the provisions of Section 50 of our Constitution in order to create a valid lien on the Hills' homestead.**

**ISSUE NO. 2:** **This Court erred in holding that the fourteen new obligations imposed on the Hills by Sword's 2011 Deed of Trust did not, by themselves, constitute a new extension of credit which had to satisfy the provisions of Section 50 of our Texas Constitution in order to create a valid lien on the Hills' homestead.**

**ISSUE NO. 3:** **This Court's decision ignores and fails to comport with the agreement and intentions of the parties, as expressed in the four corners of the 2011 Agreed Judgment, the 2011 Note and Deed of Trust, and the Rule 11 Agreement and Stipulation of the Parties executed in the underlying suit.**

Argument and Authorities....................................................................................2

Conclusion and Request for Relief ....................................................................18

# INDEX OF AUTHORITIES

*Burkhardt v. Lieberman*, 159 S.W.2d 847
(Tex. Comm'n App. 1942)...............................................................14, 17

*Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118 (Tex. 1996) ...............12

*Lincoln v. Bennett*, 138 Tex. 56, 156 S.W.2d 504 (Tex. 1941) .........................14, 17

*McGeorge v. Van Meter*, 358 S.W.2d 580 (Tex. 1962).............................................7

*Sims v. Carrington Mortg. Services, L.L.C.*,
440 S.W.3d 10 (Tex. 2014).............................................. 2, 3, 4, 5, 8, 9, 10, 18

*State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430 (Tex. 1995) ........................12

*Texas Land & Loan Co. v. Blalock*, 13 S.W. 12 (Tex. 1890)............................14, 17

*Valence Operating Co. v. Dorsett*, 164 S.W.3d 656 (Tex. 2005)............................11

## STATUTES AND RULES

TEX. CIV. PRAC. & REM. CODE § 37.001 *et.seq.* .....................................................13

TEX. R. APP. P. 9.4(i)(1) ...........................................................................................19

TEX. R. APP. P. 9.4(i)(2)(D)........................................................................................19

## CONSTITUTIONAL PROVISIONS

TEX. CONST. art. XVI § 50............................................... 2, 3, 4, 7, 8, 9, 11, 14, 17

TEX. CONST. art. XVI § 50(a) ......................................................................................6

TEX. CONST. art. XVI § 50(a)(1)-(8)......................................................................2, 11

TEX. CONST. art. XVI § 50(a)(4)...............................................................................6, 7

TEX. CONST. art. XVI § 50(a)(6).................................................................4, 5, 10, 18

Tex. Const. art. XVI § 50(a)(6)(P)..................................................................11

**SECONDARY SOURCES**

BLACK'S LAW DICTIONARY 1299 (6th ed. 1990) .......................................................5

www.dictionary.com ......................................................................................13

www.thesaurus.com ......................................................................................13

**12-13-00379-CV**

---

**IN THE TWELFTH COURT OF APPEALS**
**TYLER, TEXAS**

---

**MARTHA N. HILL AND GARY HILL**
*Appellants*

**Vs.**

**WINNON EARL SWORD**
*Appellee*

---

**An Appeal from the 114th Judicial District Court of Smith County**

---

**APPELLANTS' MOTION FOR REHEARING**

---

TO THE HONORABLE TWELFTH COURT OF APPEALS:

COME NOW, Gary and Martha Hill, Appellants (the Hills), and file this Motion for Rehearing of the Court's Opinion and Judgment rendered on January 7, 2015, and request that the Court consider the following issues:

### ISSUES PRESENTED

This Court erred in three significant respects, resulting in an erroneous judgment which does not comport with the expressed intentions of the parties, with precedential law, or the Texas Constitution.

1

**ISSUE NO. 1:** This Court failed to properly apply the analysis set forth by our Texas Supreme Court in *Sims,* and incorrectly determined that the new note executed by the Hills in 2011 was not a new extension of credit which had to satisfy the provisions of Section 50 of our Constitution in order to create a valid lien on the Hills' homestead.

**ISSUE NO. 2:** This Court erred in holding that the fourteen new obligations imposed on the Hills by Sword's 2011 Deed of Trust did not, by themselves, constitute a new extension of credit which had to satisfy the provisions of Section 50 of our Texas Constitution in order to create a valid lien on the Hills' homestead.

**ISSUE NO. 3:** This Court's decision ignores and fails to comport with the agreement and intentions of the parties, as expressed in the four corners of the 2011 Agreed Judgment, the 2011 Note and Deed of Trust, and the Rule 11 Agreement and Stipulation of the Parties executed in the underlying suit.

## ARGUMENT AND AUTHORITIES

**ISSUE NO. 1:** This Court failed to properly apply the analysis set forth by our Texas Supreme Court in *Sims*, and incorrectly determined that the new note executed by the Hills in 2011 was not a new extension of credit which had to satisfy the provisions of Section 50 of our Constitution in order to create a valid lien on the Hills' homestead.

The constitution protects homesteads from forced sales, except in eight limited circumstances. TEX. CONST. art. XVI §50(a)(1)-(8). If the loan does not meet one of those exceptions, and satisfy all of the constitutional criteria included within that exception, the attempted lien against the homestead is invalid. *Id.*

2

This Court framed the issue as "whether the 2011 documents constitute a refinance of a valid lien on a homestead (as Sword contends) or an extension of credit (as the Hills urge)." (Slip Op. p.2)  In attempting to apply the decision by the Supreme Court in *Sims* to the facts at hand, this Court has made several significant errors.  *Sims v. Carrington Mortg. Servs., LLC*, 440 S.W.3d 10 (Tex. 2014).

As stated by the *Sims* Court:

"…the restructuring of a home equity loan that, …involves capitalization of past-due amounts owed under the terms of the initial loan and a lowering of the interest rate and the amount of installment payments, *but does not involve the satisfaction <u>or</u> replacement of the original note, an advancement of new funds, or an increase in the obligations created by the original note,* is <u>not</u> a new extension of credit that must meet the requirements of Section 50."

*Id.* at 17 (emphasis added).  Per the Supreme Court's language, a restructuring of a home equity loan that <u>does involve</u> any <u>one</u> of the following: 1) satisfaction of the original note; 2) replacement of the original note; 3) an advancement of new funds; <u>or</u> 4) an increase in the obligations created by the original note... <u>is a **new**</u> <u>extension of credit that must meet the requirements of Section 50.</u>  *Id.*

It must be noted at the outset that, unlike this case, in *Sims* it was undisputed that the original extension of credit complied with Section 50 and thus originally created a valid lien upon the homestead.  *Id.* at 18.  Nevertheless, even assuming *arguendo* that the 2004 and 2006 notes and deeds of trust complied with Section

3

50 and originally created valid homestead liens (which they did not), the creation of the 2011 note and deed of trust constituted a new extension of credit as defined by *Sims*, which needed to meet the requirements of Section 50 in order to create a valid lien upon the Hills' homestead property.

Despite undisputed evidence that the original notes were replaced with a new note, (CR 113-14) and that the Hills were burdened with fourteen new obligations in the accompanying deed of trust (CR 96-107), this Court, citing *Sims*, concluded "… that the 2011 promissory note is a renewal and extension of the 2004 and 2006 notes, and does not satisfy *and* replace them such that the 2011 restructuring constitutes a new extension of credit" which must meet the requirements of Section 50(a)(6) of art. XVI of the Texas Constitution. (Slip Op. pp. 6-7).

First, this Court erred, per the clear holding in *Sims*, by requiring both the satisfaction *and* replacement of the original promissory note in order for the Hills' loan to be a new extension of credit subject to the requirements of art. XVI, Section 50(a)(6) of the Constitution. (Slip Op. p. 4). Those requirements were listed by the Supreme Court in the disjunctive, and either of them alone constitutes a new extension of credit which must meet the requirements of Section 50(a)(6). *Sims,* 440 S.W.3d 10, 17. This Court defined and addressed satisfaction, while ignoring replacement, and treated them as being one-and-the-same. They are not.

4

Unlike satisfaction (which this Court defined as the fulfillment of an obligation (Slip. Op. 4)), replacement means to take the place of. BLACK'S LAW DICTIONARY 1299 (6th ed. 1990).

Here, it cannot be disputed that the 2011 Promissory Note was intended to, and did in fact, take the place of the previous promissory notes. All amounts previously owing under the 2004 and 2006 notes were included in the 2011 note, plus some additional monies. Unlike *Sims,* where the original notes were left in place/ intact, the Hills and Sword executed the 2011 Agreed Judgment awarding a monetary judgment to Sword which included the outstanding balances on the 2004 and 2006 promissory notes, (CR 35-39), and then entered into yet another new note for payment of the debt to Sword (CR 113-14).

The Rule 11 Agreement discussed above provides evidence of clear intent to replace the old promissory notes with the 2011 Promissory Note. (CR 415-518) It states that the 2011 Note "was in renewal and extension of the balance owed by Plaintiffs to Sword under the terms of the agreed judgment signed by Plaintiffs on February 27, 2011…. Because the 2011 Note renewed and extended the balance owed by Plaintiffs to Sword under the 2011 Judgment, the debt represented by the 2011 Judgment was merged into the 2011 Note." (CR 415). It was error for this court to require both satisfaction *and* replacement in order to have a new extension of credit under Section 50(a)(6), and error for the Court to ignore the fact that the

previous notes were replaced with the 2011 Promissory Note constituting a new extension of credit.

Instead of correctly recognizing the transaction as a new extension of credit, this Court determines that it was a refinance of a valid lien on a homestead as allowed by Section 50(a)(4) (the provision relied upon by Sword). However, again, the analysis is flawed. For Section 50(a)(4) to apply, the refinance must be for one of the eight specific items allowed by the constitution if the loan will be secured by the parties' homestead. That is, the purpose of the refinance must independently meet the criteria of Section 50(a).

This Court seems to be attempting to rely upon the language contained in the 2011 Deed of Trust and in the 2011 Agreed Judgment as support for its conclusion that the 2011 transaction is for a refinance of a <u>valid lien upon homestead</u>. This is incorrect for two reasons.

First, and most fundamental, in order for the transaction to qualify under Section 50(a)(4), the transaction itself must pass constitutional scrutiny. It must be "valid" as defined by the constitution when the refinance is done – meaning that it qualifies as one of the eight allowable debts which can be secured by a homestead. Here, the transaction fails to qualify – as it is undisputed that the purpose of the refinance was to pay off a money judgment arising from default on a business loan, and not one of the eight enumerated items under the constitution.

6

Second, neither of the documents to which the Court makes reference, ever concluded that these were <u>valid liens upon homestead</u>.  They were noted to be valid, perfected, enforceable, but never, in any document were they recognized to be homestead liens. Because they were not.

As further support of its conclusion that the transaction was a refinance of a lien against a homestead under Section 50(a)(4), this Court placed improper and undue emphasis upon two words contained in the 2011 Deed of Trust "renewal" and "extension" and incorrectly relies upon *McGeorge v. Van Meter,* 358 S.W.2d 580, 581 (Tex. 1962)  as authority that "[s]imilar language for renewing and extending promissory notes has been approved by the Texas Supreme Court. *Id.* at 581.  Such reliance is misplaced.  In *McGeorge* the note itself was renewed and extended, with original terms left intact. *Id.*  Here, the parties executed a brand new note, and the language used by the parties in the 2011 Deed of Trust proves that the parties did not intend to renew and extend the <u>old notes</u>.  The 2011 Note and Deed of Trust were given to renew and extend <u>sums left owing and unpaid</u> from the two old notes, and in renewal and extension of the <u>balance owed</u> under the agreed judgment – but under a new note with different terms and with different and greater obligations.

**ISSUE NO. 2:** **This Court erred in holding that the fourteen new obligations imposed on the Hills by Sword's 2011 Deed of Trust did not, by themselves, constitute a new extension of credit which had to satisfy the provisions of Section 50 of**

**our Texas Constitution in order to create a valid lien on the Hills' homestead.**

As stated in *Sims*, any increase in the obligations created by the original note is sufficient, by itself, to create a new extension of credit that must meet the requirements of Section 50. As compared to the 2004 and 2006 notes and deeds of trust, the 2011 Note and Deed of Trust placed *fourteen new obligations* upon the Hills. (Slip Op. pp. 5-6). In concluding that the fourteen new obligations imposed upon the Hills did not constitute a new extension of credit, this Court appears to have imposed its own requirement that such obligations must be monetary. In so doing, it has misapplied the definitions set out in *Sims* to the facts of this case. This Court held that the "items cited by the Hills do not afford them a new right to assume a <u>debt</u>" and that "[t]he only <u>debt</u> secured by the deed of trust lien on the property under the 2011 restructuring is the <u>debt</u> previously existing under the earlier notes and agreed judgment." (Slip Op. p. 6) (emphasis added). That analysis focuses solely upon the amount of the debt.

The Supreme Court made no such limitation. It explained that in addition to satisfaction of a borrower's note, replacement of the note, or extension of new money to the borrower, an <u>increase in the obligations created by the original note</u> will constitute a new extension of credit. It stated that "the test should be whether the secured obligations are those incurred under the terms of the original loan." *Sims,* 440 S.W.3d at 16-17. In this instance, the fourteen new secured obligations

8

(recognized by this Court) were not created or incurred under the terms of the original loans. They are new and more onerous obligations than those contained in the original loans, and undoubtedly satisfy the Supreme Court's decision in *Sims* for determining that a new extension of credit occurred which must meet the requirements of Section 50.

Moreover, this Court's statement that "[t]he only debt secured by the deed of trust lien on the property under the 2011 restructuring is the debt previously existing under the earlier notes and agreed judgment" is untrue. (Slip Op. p. 6) Under item 4, the cross-collateralization provision, other debt to Sword does exist which is immediately captured by this new provision. Specifically, the Court first questioned whether, in fact, there exists any other debt to Sword. The record demonstrates that there was – the September 28, 2006 Note for $40,000.00, signed by Gary Hill. (CR 193.)[1] Also, the new cross-collateralization obligation did not limit itself to past debt and was enforceable to secure any new debt, which was sufficient to render it "an increase in the obligations created by the original note." *Sims*, 440 S.W.3d at 17.

The Court also concluded that, because the 2006 Deed of Trust also contained a cross-collateralization provision similar to the one in the new 2011

---

[1] The Court's Opinion, at footnote 2, incorrectly states that this Note was forgiven. The summary-judgment record does not show the Note was forgiven. Sword sued on the Note in 2011. The evidence shows that the Agreed Judgment did not include the amount of this Note (*see* Appellants' Brief, p. 4 at n. 1), but there is no evidence the debt was forgiven.

9

deed of trust, accordingly, "this is not a new obligation and not a new extension of credit." But this plainly is *not* the case for the 2004 Deed of Trust, which the Court overlooked. The 2004 Deed of Trust had no cross-collateralization clause and did not secure any other indebtedness. Accordingly, the 2011 Deed of Trust, by adding the cross-collateralization provision, certainly constituted "an increase in the obligations created by the original note[ ]" as to the 2004 Deed of Trust. This language contained in the new note/deed of trust would immediately capture the outstanding $40,000.00, an existing known debt, plus any future indebtedness to Sword.

Pursuant to *Sims v. Carrington Mortgage Services*, the fourteen new obligations constitute a new extension of credit under Section 50(a)(6).

**ISSUE NO. 3:** **This Court's decision ignores and fails to comport with the agreement and intentions of the parties, as expressed in the four corners of the 2011 Agreed Judgment, the 2011 Note and Deed of Trust, and the Rule 11 Agreement and Stipulation of the Parties executed in the underlying suit.**

In initially framing the issues for its discussion, the Court states that "[t]he Hills have not challenged, either in their briefs or at oral argument, the validity of the 2004 and 2006 deeds of trust, or that of the 2011 Agreed Judgment." (Slip Op. p. 2). If the Court perceives the Hills' lack of such challenge as an implicit recognition of the validity of the 2004 and 2006 deeds of trust, the Court is

10

misguided and indulging an erroneous assumption.[2] Nevertheless, the parties' joint execution of the 2011 Agreed Judgment (as explained herein) rendered those challenges unnecessary because it awarded a monetary judgment to Sword, validated the enforceability of Sword's liens as *judgment liens* to satisfy that judgment, but expressly protected the Hills' homestead property from execution of those liens. Moreover, the parties stipulated that the debt secured by the original deeds of trust and by the Agreed Judgment on that debt was merged into the 2011 Note. (CR 415 at ¶¶ 1 and 2.) Accordingly, as also explained herein, Sword is barred from enforcing his liens as to the Hills' homestead, as extended under the 2011 deed of trust, because they violated art. XVI, Section 50 of the Constitution.

In construing the 2011 documents, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instruments. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). Courts should examine the entire writing (in this case, writings) "to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.*

---

[2] The 2004 and 2006 deeds of trust and accompanying notes indisputably fail to satisfy the requirements of Section 50 of our Constitution. First, Sword was not a qualified lender as required under the constitutional provision. He could not make a loan creating a homestead lien unless he was doing so in favor of family members, and therefore could never, under any circumstance create a homestead lien on the Hills' property. TEX. CONST. art. XVI, § 50(a)(6)(P). Second, the loans from Sword were advancements of monies on paper to the Hills, which they never actually received, but which were instead kept by Sword and used by him in connection with the joint businesses owned by Sword and the Hills. (CR 374) The loans were not qualifying debts which could be secured by a homestead as exclusively allowed in Section 50(a)(1)-(8). Although the notes created contractual liability on behalf of the Hills for the amount of the notes, the accompanying deeds of trust did not create a valid lien against the Hills exempt homestead property.

Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Id.* Courts must look at all of the contract's parts together and be "particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract," *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995), and must presume that the parties to a contract intend every clause to have some effect. *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).

Here, the "2011 documents" referenced by this Court (Slip Op. p. 2) in reaching its decision included the 2011 Agreed Judgment, Deed of Trust and Promissory Note. The Agreed Judgment represented the agreement of the parties, and the Promissory Note and Deed of Trust were executed to carry out the terms of that Agreed Judgment. However the Court's interpretation of the "2011 documents" and holding, ignores and renders meaningless a significant provision contained in the Agreed Judgment.

It provides in relevant parts:

> … W.E. Sword, Plaintiff, have and recover of and from Gary R. Hill and Martha N. Hill, jointly and severally, the sum of $327,811.98, including the balance of the debt made the subject of this suit, all pre-judgment interest and all reasonable and necessary attorney's fees, with interest thereon at six percent (6%) per annum from date of judgment until paid, together with costs of Court in Plaintiff's behalf expended.

… Plaintiff is the holder and beneficiary of a valid, perfected and enforceable deed of trust liens against the following described real property (the "Property") and the Court hereby makes its declaratory determination pursuant to Tex. Civ. Prac. & Rem Code §37.001 et. seq. that Plaintiff's liens against the Property are valid, perfected, and enforceable…

… that the [2004 and 2006] deeds of trust covering the Property (the "Deeds of Trust) are valid and enforceable and that there are no defenses allowed by the laws of the State of Texas or otherwise against or with respect to the liens conveyed to Plaintiff…

**… notwithstanding the above, nothing herein shall constitute a waiver of any of Gary R. Hill's and/or Martha Nell Hill's homestead rights under the laws of the State of Texas.**

(CR 36-37)  The Court's holding disregards the provision regarding the Hill's homestead rights.  This provision must not only be considered and harmonized with the other provisions, but, according to the plain meaning of "notwithstanding" it must be given priority over the preceding provisions, i.e. what comes after the word notwithstanding prevails if there is a conflict with what goes before.[3]

Reading all of the provisions in harmony, as this Court is mandated to do, yields the following conclusion which gives purpose to each of the provisions: the first provision awards a money judgment to Sword; the second and third provisions recognize that his liens securing that judgment are valid and enforceable against the Property (just as an abstracted judgment lien would be).  These provisions do not recognize or create properly secured homestead liens (which can only be

---

[3] The plain ordinary meaning of notwithstanding is "in spite of" or "without being opposed or prevented by" nevertheless".  (www.dictionary.com). It also means nevertheless, at any rate, despite, in any event, in spite of, regardless of. (www.thesaurus.com).

13

accomplished by strict compliance with Section 50 of our Constitution), but rather judgment liens which may be satisfied out of the sale of the Property if it is abandoned as their homestead. In fact, nowhere in the first three provisions is the word homestead mentioned or the liens designated as homestead liens. (CR 36-37) Because they are not – they are simply judgment liens arising by virtue of the Agreed Judgment, which are attached to the Hills' Property in the event the property ceases to be their homestead.

The trial court did **not** find that the subject property was not the Hills' homestead, and such a challenge was not made by Sword. (CR 35-39) To the contrary, the Agreed Judgment implicitly recognized the homestead character of the property and expressly stated that no waiver of those rights had occurred. (CR 37). The Hills did not waive their homestead rights at any point in time, nor did they intend to. In fact, parties cannot waive their homestead rights. *Texas Land & Loan Co. v. Blalock*, 13 S.W. 12, 13 (Tex. 1890) (citations omitted); *see also Burkhardt v. Lieberman*, 159 S.W.2d 847, 852 (Tex. Comm'n App. 1942, opinion adopted); *Lincoln v. Bennett*, 156 S.W.2d 504, 506–07 (Tex. 1941). The Hills agreed to the amount of the award, they agreed to the validation of the liens against their property, but they also preserved their homestead protection as to those liens. (CR 35-39). As long as they maintain the homestead character of their property, it cannot be subject to foreclosure in satisfaction of Sword's judgment liens.

14

This is the only interpretation of the 2011 Agreed Judgment that harmonizes **all** of the provisions contained therein, and the subsequent actions of the parties, as reflected in the record support this interpretation. Following the signing of the Agreed Judgment, (even though the judgment provided that "Plaintiff is allowed such writs and processes as may be necessary in the enforcement and collection of this judgment….") (CR 37) Sword did not attempt to execute or foreclose on those liens. Instead, he had the Hills sign the new Note (89 at ¶10, 113-14) and Deed of Trust (CR 96-107) (which as explained herein below, replaced the old notes).

In 2013, when Sword attempted to foreclose upon the Hills homestead, the underlying litigation began. During that litigation, and equally significant to this Court's determination, the parties entered into a Rule 11 Agreement and Stipulation of the Parties (CR 415-418) before the Court rendered its erroneous judgment. The Rule 11 Agreement makes clear that none of the parties intended for the 2011 documents to perpetuate the 2004 or 2006 notes or deeds of trust or to waive the Hills' homestead protection. (*Id.*)

It provides in pertinent part:

1. The promissory Note dated February 28, 2011…was in renewal and extension of the balance owed by Plaintiffs to Sword under the terms of the agreed judgment signed by Plaintiffs on February 27, 2011….

2. Because the 2011 Note renewed and extended the balance owed to plaintiffs to Sword under the 2011 Judgment, the debt represented by the 2011 Judgment was merged into the 2011 Note …

15

3.      Because of the agreements set forth in paragraphs 1 and 2 above, Plaintiffs agree that the affirmative defenses of estoppel, contributory negligence, denial of conditions precedent, mutual mistake, waiver and "double recovery" asserted by Gary Hill to the Counterclaim filed against him by W.E. Sword for default in payment of the 2011 Note are withdrawn.… **Notwithstanding the foregoing sentences, nothing herein constitutes a withdrawal or waiver of any defense claimed by the Hills respecting Sword's claims to enforce any lien on property owned by the Hills.** (emphasis added).

(*Id.*) The plain language of the stipulation ties the 2011 Promissory Note solely to the balance owed under the terms of the 2011 Agreed Judgment. And again reiterates, above all else, that the Hills were not waiving their homestead rights.

When all of the provisions of each of these documents are harmonized, the conclusion **must** be that the liens acknowledged by the parties' were not homestead liens, but judgment liens which could be enforced upon any of the Hills non-exempt property or upon the subject property if it ever ceased to be their homestead. The conclusion by this Court to the contrary was erroneous.

As the Texas Supreme Court stated nearly a century ago:

The Constitution forbidding the fixing on the homestead of liens other than such as are thereby expressly permitted, no estoppel can arise in favor of a lender who has attempted to secure a lien on homestead in actual use and possession of the family, based on declarations of the husband and wife made orally or in writing contrary to the fact. To hold otherwise would practically abrogate the Constitution.

If property be homestead in fact and law, lenders must understand that liens cannot be fixed upon it, and that declarations of husband and wife to the contrary, however made, must not be relied upon. They must further understand that no designation of homestead contrary to

16

the fact will enable parties to evade the law and encumber homesteads with liens forbidden by the Constitution.

*Texas Land & Loan Co. v. Blalock*, 13 S.W. at 13; *see also Burkhardt v. Lieberman*, 159 S.W.2d at 852; *Lincoln v. Bennett*, 156 S.W.2d at 506–07.

The constitutional prohibition against placement of liens upon homesteads is longstanding, and exists for the protection of lenders and homeowners alike. As stated in the cases cited immediately above, the homestead declaration cannot be waived, and oral or written representations to the contrary are of no consequence. In other words, even if a landowner is attempting to waive his/her homestead rights in order to obtain a loan, such attempt is invalid. If a lender could simply require the debtor to agree that a lien was valid and so make it valid, then every lender would use that process and effectively render the constitutional provisions of Section 50 meaningless.

Giving full weight to all of the documents contained in the record, when analyzed within the framework of Section 50 and cases construing the scope and applicability of that constitutional provision, logic dictates that the Hills are entitled to protection of their homestead rights. They have steadfastly maintained the homestead character of their property, they have never abandoned the property, and they made certain to provide for protection of their homestead in the 2011 Agreed Judgment and the Rule 11 Agreement. They are not challenging the validity of the underlying debt they owe to Sword, or the validity or enforceability

of his lien as a judgment lien -- just his ability to foreclose upon their homestead in his effort to recover on defaulted business loans.

## CONCLUSION AND REQUEST FOR RELIEF

Here, the Hills' existing note obligations were first reduced to an agreed judgment that authorized Sword to enforce immediate collection against them. Instead of doing so, Sword and the Hills agreed to a new extension of credit on that obligation which **replaced** the previous obligations, *i.e.,* the ability to once again assume the debt (rather than pay it immediately), such that it was repayable over time under a new note, secured by a new deed of trust on the homestead. That is precisely what the *Sims* decision characterizes as a new extension of credit which must meet the requirements of Section 50(a)(6) of the Constitution.

Respectfully, this Court's Opinion and Judgment are in error and should be reconsidered and modified, such that the Hills' requested relief herein is granted.

The Hills respectfully request the Court to grant this motion for rehearing, withdraw the January 7, 2015 opinion and judgment, and render judgment in conformity with the relief previously requested by the Hills.

Respectfully submitted,

**Flowers Davis, P.L.L.C.**

**By:** */s/ Julie P. Wright*
JULIE P. WRIGHT
SBN 00794883
jpw@flowersdavis.com
LEAD COUNSEL
1021 ESE Loop 323, Suite 323
Tyler, Texas 75701
903-534-8063; Fax: 903-534-1650

**Shackelford Melton McKinley & Norton, L.L.P.**

JOSEPH G. CHUMLEA
 SBN 04241500
*jchumlea@shackelfordlaw.net*
FRANCES A. SMITH
SBN 24033084
*fsmith@shackelfordlaw.net*
3333 Lee Parkway, Tenth Floor
Dallas, Texas 75219
214-780-1436;  Fax: 214-889-9736

ATTORNEYS FOR APPELLANTS

## CERTIFICATE OF COMPLIANCE

I certify that this Motion for Rehearing complies with the limitation of TEX. R. APP. P. 9.4(i)(2)(D) because it contains 4,426 words, excluding the parts of the motion exempted by TEX. R. APP. P. 9.4(i)(1).

*/s/ Julie P. Wright*
JULIE P. WRIGHT

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing Motion for Rehearing was served by U. S. Mail, Certified, R.R.R., and/or Electronic Filing Service on February 6, 2015 on:

Mr. Scott Ritcheson
Ritcheson, Laufer & Vincent, PC
821 ESE Loop 323, Suite 530
Tyler, Texas 75701
*scottr@rllawfirm.net*

> */s/ Julie P. Wright*
> JULIE P. WRIGHT





Commission of Appeals of Texas, Section A.
BURKHARDT et ux.
v.
LIEBERMAN et al.

No. 2394-7784
Feb. 4, 1942
Motion for Rehearing Overruled March 11, 1942

Error to Court of Civil Appeals of First Supreme Judicial District.

Action in trespass to try title by Otto Burkhardt and wife against George Lieberman and another. A judgment for defendant was affirmed by the Court of Civil Appeals, 142 S.W.2d 283, and plaintiffs bring error.

Affirmed in part, reversed and remanded in part with instructions, and reversed and rendered in part.

West Headnotes

**[1] Homestead 202 115(1)**

202 Homestead
   202II Transfer or Incumbrance
      202k115 Mortgage
         202k115(1) k. In General. Most Cited Cases

Deeds of trust on a homestead given to a bank to secure payment of past and future indebtedness, not being for one of the three excepted purposes specified in Constitution, were utter nullities. Vernon's Ann.St.Const. art. 16, § 50.

**[2] Homestead 202 177(1)**

202 Homestead
   202IV Abandonment, Waiver, or Forfeiture
      202k177 Estoppel to Claim Homestead
         202k177(1) k. In General. Most Cited Cases

Acts or omissions alleged to constitute "estoppel" against claim of homestead by husband and wife must be acts or omissions of both husband and wife, and fact that husband might so have acted or failed to act under circumstances which law regards as sufficient to estop him to claim property as homestead does not estop wife unless equivalent conduct or omission is proved as to her, and if wife is not estopped, husband is not. Vernon's Ann.St.Const. art. 16, § 50.

**[3] Homestead 202 177(2)**

202 Homestead
   202IV Abandonment, Waiver, or Forfeiture
      202k177 Estoppel to Claim Homestead
         202k177(2) k. Statements and Representations Operating as Estoppel. Most Cited Cases

Affidavit purportedly executed by husband and wife as owners of homestead as part of transaction terminating in execution of deed of trust on homestead, reciting, contrary to the fact, that land was not being used as business or residence homestead, and that they had no intention so to use it did not "estop" wife from claiming homestead right in property, even if the affidavit signed by both owners would constitute an estoppel, in view of form of affidavit, its date, and other circumstances surrounding execution indicating that wife had no knowledge of deed of trust. Vernon's Ann.St.Const.art. 16, § 50.

**[4] Homestead 202 121**

202 Homestead
   202II Transfer or Incumbrance
      202k121 k. Sale on Foreclosure. Most Cited Cases

**Homestead 202 128**

202 Homestead
   202II Transfer or Incumbrance
      202k127 Rights of Purchasers and Mort-

gagees

202k128 k. In General. Most Cited Cases

Where deeds of trust executed by husband on homestead were void because not executed for one of three purposes authorized by constitution, trustee's subsequent sale under deeds of trust and purchaser's later conveyance of portion of land to another were void. Vernon's Ann.St.Const. art. 16, § 50.

**[5] Homestead 202 177(2)**

202 Homestead

202IV Abandonment, Waiver, or Forfeiture

202k177 Estoppel to Claim Homestead

202k177(2) k. Statements and Representations Operating as Estoppel. Most Cited Cases

Where property was actually occupied by husband and wife as homestead, fact that purchaser, before buying property at sale under trust deed, inquired of husband whether property was homestead, and that husband said it was not, did not "estop" wife and, therefore, did not estop husband from subsequently claiming homestead right in property, where purchaser made no inquiry of wife. Vernon's Ann.St.Const. art. 16, § 50.

**[6] Homestead 202 177(1)**

202 Homestead

202IV Abandonment, Waiver, or Forfeiture

202k177 Estoppel to Claim Homestead

202k177(1) k. In General. Most Cited Cases

Where deeds of trust on homestead of husband and wife were void because not executed for one of three purposes authorized by Constitution, fact that wife did not sue to enjoin sale of property under deed of trust and thereby save innocent purchasers from harm, did not "estop" wife from claiming homestead right in property. Vernon's Ann.St.Const. art. 16, § 50.

**[7] Homestead 202 177(2)**

202 Homestead

202IV Abandonment, Waiver, or Forfeiture

202k177 Estoppel to Claim Homestead

202k177(2) k. Statements and Representations Operating as Estoppel. Most Cited Cases

The fact that homestead was claimed on six different contiguous tracts, with owners' residence located on a rented tract a mile or more distant, was immaterial on question whether owners were estopped from claiming homestead as against subsequent purchasers of property at sale under trust deed. Vernon's Ann.St.Const. art. 16, § 50.

**[8] Homestead 202 162(1)**

202 Homestead

202IV Abandonment, Waiver, or Forfeiture

202k160 Removal from Homestead

202k162 Intent to Return

202k162(1) k. In General. Most Cited Cases

It must be clear and beyond almost a shadow, at least, of all reasonable ground of dispute that there has been a total abandonment of homestead with intention not to return and claim the exemption before court will find "abandonment" of homestead. Vernon's Ann.St.Const. art. 16, § 50.

**[9] Homestead 202 163**

202 Homestead

202IV Abandonment, Waiver, or Forfeiture

202k160 Removal from Homestead

202k163 k. Acts Constituting Abandonment. Most Cited Cases

A husband cannot abandon a homestead as part of a "plan of action", deliberate or innocent on his part, that begins with void deed of trust executed by him alone for purpose not authorized by Constitution and ends in sale to which wife is not party, and about which she knows nothing, especially where husband surrenders property to purchasers at trustee's sale reluctantly and in ignorance of his rights. Vernon's Ann.St.Const. art. 16, § 50.

**[10] Vendor and Purchaser 400 89**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 Vendor and Purchaser
  400III Modification or Rescission of Contract
    400III(B) Rescission by Vendor
      400k88 Right to Rescind
        400k89 k. In General. Most Cited Cases

Vendor's remedy of rescission is harsh and is not favored, and relative equities will be weighed and unless they clearly favor vendor, rescission will be denied and vendor, as holder of vendor's lien, will be put to his remedy of foreclosure.

**[11] Vendor and Purchaser 400 👈99**

400 Vendor and Purchaser
  400III Modification or Rescission of Contract
    400III(B) Rescission by Vendor
      400k99 k. Defenses or Objections. Most Cited Cases

Where holder of vendor's lien note on tract involved in trespass to try title action brought by makers of note, alleged that makers had not paid or offered to pay note or part thereof, and that holder, therefore, elected to rescind, makers' reply alleging that they were ready and willing to pay holder the amount he had paid to take up note, that they tendered into court whatever amount court found to be necessary to reimburse holder, and offering to do equity, was sufficient to constitute "tender", entitling makers to reasonable opportunity to perform their tender.

**[12] Taxation 371 👈2768**

371 Taxation
  371III Property Taxes
    371III(J) Payment and Refunding or Recovery of Tax Paid
      371k2767 Rights, as Against Persons or Property Liable, of Other Persons Making Payment
        371k2768 k. In General. Most Cited Cases
    (Formerly 371k531(1))

One who pays taxes due on another's property without any request by debtor or any contractual right so to do or any joint liability therefor is a

"volunteer" and is not entitled to reimbursement.

**[13] Taxation 371 👈2768**

371 Taxation
  371III Property Taxes
    371III(J) Payment and Refunding or Recovery of Tax Paid
      371k2767 Rights, as Against Persons or Property Liable, of Other Persons Making Payment
        371k2768 k. In General. Most Cited Cases
    (Formerly 371k531(1))

One holding a mortgage can recover taxes paid to protect lien if he includes amount of taxes paid in amount for which he forecloses, otherwise, he has no right to reimbursement.

**[14] Taxation 371 👈2768**

371 Taxation
  371III Property Taxes
    371III(J) Payment and Refunding or Recovery of Tax Paid
      371k2767 Rights, as Against Persons or Property Liable, of Other Persons Making Payment
        371k2768 k. In General. Most Cited Cases
    (Formerly 371k531(1))

**Taxation 371 👈2769**

371 Taxation
  371III Property Taxes
    371III(J) Payment and Refunding or Recovery of Tax Paid
      371k2767 Rights, as Against Persons or Property Liable, of Other Persons Making Payment
        371k2769 k. Right to Lien. Most Cited Cases
    (Formerly 371k531(2))

One holding land under a void tax deed is not "subrogated" to the lien, nor is he entitled to a personal judgment for taxes paid by him because he is a mere "trespasser."

**[15] Taxation 371 👈2768**

371 Taxation
    371III Property Taxes
        371III(J) Payment and Refunding or Recovery of Tax Paid
            371k2767 Rights, as Against Persons or Property Liable, of Other Persons Making Payment
                371k2768 k. In General. Most Cited Cases

    (Formerly 371k531(1))

One buying at a tax sale under foreclosure where record owner is not made party is not entitled to reimbursement for taxes paid because, having "constructive notice" that title is in another, he is not considered as acting in "good faith".

**[16] Taxation 371 ⚷2768**

371 Taxation
    371III Property Taxes
        371III(J) Payment and Refunding or Recovery of Tax Paid
            371k2767 Rights, as Against Persons or Property Liable, of Other Persons Making Payment
                371k2768 k. In General. Most Cited Cases

    (Formerly 371k531(1))

The purchaser of homestead property at trustee's sale under trust deed which was void because not executed for purposes authorized by Constitution, and because purchaser was charged with notice, by owners' occupancy, that lands constituted their homestead, was a "volunteer" when he paid taxes on property, and was, therefore, not entitled to recover taxes paid. Vernon's Ann.St.Const. art. 16, § 50.

**[17] Taxation 371 ⚷2768**

371 Taxation
    371III Property Taxes
        371III(J) Payment and Refunding or Recovery of Tax Paid
            371k2767 Rights, as Against Persons or Property Liable, of Other Persons Making Payment
                371k2768 k. In General. Most Cited Cases

    (Formerly 371k531(1))

The purchaser of homestead lands under void sale under trust deed was, as to taxes paid by purchaser on portion of lands as against which he held a vendor's lien note, not a "volunteer", and was entitled to recover the taxes assessed so paid. Vernon's Ann.St.Const. art. 16, § 50.

**[18] Homestead 202 ⚷129(1)**

202 Homestead
    202II Transfer or Incumbrance
        202k127 Rights of Purchasers and Mortgagees
            202k129 Bona Fide Purchasers
                202k129(1) k. In General. Most Cited Cases

A purchaser of homestead property at sale under trust deed which was void because not executed for purposes authorized by Constitution, could not recover from owners in possession for improvements made by him thereon, because owners' possession was "notice" of homestead interest of owners, and, therefore, improvements were not made in "good faith". Vernon's Ann.St.Const. art. 16, § 50.

**[19] Appeal and Error 30 ⚷1001(1)**

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)2 Verdicts
                30k1001 Sufficiency of Evidence in Support
                30k1001(1) k. In General. Most Cited Cases

Where claim of plaintiffs in trespass to try title for damages for reasonable rental value of land during time they were excluded from occupancy in an amount much larger than amount awarded by jury was not supported by any competent evidence in record, trial court's judgment in defendants' favor on that phase of case was affirmed on appeal.

**\*\*849 \*410** H. Fletcher Brown and Walter F.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Brown, both of Houston, for plaintiffs in error.

W. E. Daly and Chas. L. Terry, both of Houston, for defendants in error.

**\*411** BREWSTER, Commissioner.

This is an action in trespass to try title brought by petitioners Otto Burkhardt and wife, Mary Burkhardt, against the respondents, George Lieberman and O. C. Riedel, for title and possession of 71.6 acres of land situated in Harris County, Texas, and a lot in the City of Houston. The 71.6 acres consisted of six tracts, three of 25, 16 and .6 acres, respectively, and three of 10 acres each, all contiguous except that a small tract of 16 acres belonging to a daughter of the Burkhardts lay between the three 10-acre tracts and the other three.

Lieberman pleaded a general denial and "not guilty." He specially pleaded (1) that he was an innocent purchaser for value; (2) estoppel of the Burkhardts to assert that the same was their homestead; (3) **\*\*850** improvements in good faith of the value of $250; (4) and as to 25 acres of the land he sought rescission of sale as holder of a vendor's lien note. By way of cross-action he prayed for judgment for taxes levied against the land and paid by him with foreclosure of the lien to which he claimed he thus became subrogated.

Riedel answered by general denial and plea of "not guilty," disclaimed as to 41.6 acres and specially pleaded as to the other 30 acres that he was an innocent purchaser for value.

Trial was to a jury and upon their answers to special issues judgment was rendered that the Burkhardts take nothing as against Lieberman and Riedel and that Lieberman be quieted in his title to the 25 acres as to which he asserted superior title as holder of a vendor's lien note. Upon appeal by the Burkhardts to the Court of Civil Appeals, at Galveston, the judgment of the trial court was affirmed. 142 S.W.2d 283.

**\*412** The Burkhardts assign numerous errors in the judgment of the Court of Civil Appeals but, as we view the case, only a few of them need be considered. They concede that the judgment of the trial court in favor of Lieberman as to the city lot in Houston was correct.

On January 28, 1932, Burkhardt executed to W. S. Cochran, as trustee for the First National Bank of Houston, a deed of trust covering the lands above described to secure said bank in the payment by Burkhardt of one note in the sum of $1,300 of date October 30, 1931, due January 28, 1932, and another in the principal sum of $1,500 of date December 21, 1931, due March 20, 1932, and to secure all renewals and extensions of said notes and any other debts then or thereafter owing by Burkhardt to said bank. These notes were in renewal of an indebtedness already due by Burkhardt to said bank. On September 24, 1935, Burkhardt executed to W. S. Cochran, as trustee for said bank, another deed of trust on said lands to secure two notes of even date, one for $2,152.49, and the other for $1,055.52, both payable to the order of the bank on January 2, 1936, and any future indebtedness Burkhardt might owe the bank. The second deed of trust was in renewal of the first. Both contained a recitation that the lands covered thereby were no part of Burkhardt's business or residence homestead and were not in any way then occupied, used or enjoyed as such. Mary Burkhardt did not join in the execution of either of these instruments. On April 6, 1937, W. S. Cochran, trustee, reciting default by Burkhardt in payment of said indebtedness, request by the bank, notice, etc., executed to Lieberman a deed conveying said lands to him for a consideration of $3,360 same being the "best and highest" bid. On February 15, 1938, Lieberman by general warranty deed conveyed 30 acres of said lands, in three 10-acre tracts each, to Riedel reciting $10 and other valuable considerations paid. Lieberman testified that Riedel paid him 4,200 "some-odd dollars" for this deed. Riedel said he paid $4,250 cash.

The Burkhardts claimed that the deeds of trust above described and the trustee's deed to Lieberman

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

and Lieberman's deed to Riedel were void on the ground that on January 28, 1932, on September 24, 1935, on April 6, 1937, and thereafter until Burkhardt was ejected by Lieberman, the 71.6 acres of land described was their homestead. Lieberman and Riedel countered with an assertion of estoppel against the Burkhardts to assert any homestead rights, and as a part of their evidence **\*413** on that issue they introduced an affidavit purportedly executed by the Burkhardts on March 25, 1932, stating that 71 acres of the land in controversy was not then being used as a business or residence homestead and that they had no intention so to use it. Other evidence relating to this issue will be recounted by us later.

In response to special issues 1 to 4, inclusive, the jury found that the 71.6 acres of land described in plaintiffs' petition was a part of the homestead of the Burkhardts on January 28, 1932 (the date of the first deed of trust above described), and September 24, 1935 (the date of the second deed of trust above described and the one under which the trustee's sale was made to Lieberman). The testimony conclusively supports these findings. In fact, that the land was so used by the Burkhardts does not seem to have been controverted seriously by either Lieberman or Riedel and seems to have been assumed by the Court of Civil Appeals in its opinion.

[1] Under the language of the Constitution itself the two deeds of trust, being on a homestead and not for one of the three excepted purposes, were utter nullities. Art. 16, Sec. 50, Texas Constitution, Vernon's Ann. St.; Toler et al. v. Fertitta, Tex.Com.App., 67 S.W.2d 229. This much **\*\*851** seems to have been recognized by Lieberman and Riedel since they seek to avoid its effect by the claim that the Burkhardts are estopped to assert their homestead interest, and such appears to have been the view of the trial court in disregarding the jury's findings and it is the basis of the judgment of the Court of Civil Appeals.

[2] Are the Burkhardts estopped? In determining this question we are bound by the well-

established rule that acts or omissions alleged to constitute estoppel must be those of both the husband and the wife. That is, Burkhardt might be held so to have acted or failed to act under circumstances which the law regards as sufficient to estop him to claim the property as homestead, yet unless equivalent conduct or omission is proved as to Mary Burkhardt she cannot be held to be estopped. And if she is not estopped, Burkhardt is not. As recently as November 12, 1941, the Supreme Court approved and applied this principle in Lincoln et ux. v. Bennett, 156 S.W.2d 504, opinion by Justice Sharp. See, also, Miller v. Southland Life Ins. Co., Tex.Civ.App., 68 S.W.2d 558; Kallman v. Ludenecker et al., 9 Civ.App. 182, 28 S.W 579; **\*414** Barclay v. Dismuke et al., Tex.Civ.App., 202 S.W. 364; Andrews v. Security National Bank, 121 Tex. 409, 50 S.W.2d 253, 83 A.L.R. 44.

[3] We have carefully studied the statement of facts in this case and we find not a single fact or circumstance that can fairly be considered as proof of any element of estoppel against Mary Burkhardt except the alleged homestead affidavit claimed to have been executed by her as part of the transaction terminating in the execution of the first deed of trust by Otto Burkhardt on January 28, 1932. That instrument is appended as an exhibit to the Court of Civil Appeals opinion appearing at page 291, of 142 S.W.2d, supra. We think it discloses nothing from which it can reasonably be deduced that Mary Burkhardt had ever heard of any deed of trust that her husband had executed to the First National Bank of Houston. In the first place, the instrument seems one originally to have been prepared for execution by Mary Burkhardt alone. This is demonstrated by continued use of the singular *I, me* and *my* after the plural first person pronouns had been stricken. Again, while the instrument is signed by both Mary and Otto Burkhardt and certified by the notary on *March 25, 1932,* the last notarial certificate is to the effect that same was "subscribed \* \* \* by Otto Burkhardt" on *August 5, 1933.* Again, Mary Burkhardt is made to say that the affidavit is made with full knowledge that "the First National

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Bank of Houston, Houston, Texas, *will advance* certain sums to *me* " (italics ours), whereas the truth was that sums had already been advanced to Otto Burkhardt *prior* to January 28, 1932--nearly two months before she ever saw the "affidavit."

This instrument is not referred to with any intention to suggest that it alone would constitute an estoppel even if signed by both the Burkhardts on January 28, 1932, because all the decisions are to the contrary. See Lincoln et ux. v. Bennett, supra, and the authorities there cited; Nixon v. Hirschi, 134 Tex. 415, 136 S.W.2d 583. We refer to it because, as already stated, it is the only evidence in the record that might be considered as indicating that Mary Burkhardt had any knowledge whatever of the deeds of trust or any of the subsequent transactions had thereunder, and we believe, considering its date, its form and contents, and the other facts surrounding its execution, that it presents as cogent evidence that she had no such knowledge as that she did. This view is further supported by the fact that there is uncontradicted testimony **\*415** in the record that Mary Burkhardt did not understand English very well.

[4][5] Since the deeds of trust were void it follows that the subsequent sale thereunder by the trustee to Lieberman and Lieberman's later conveyance of 30 acres to Riedel were void. If such were not so, the unequivocal provisions of the Constitution could be circumvented by a deed of trust executed by the husband alone (on any consideration whatever) and a sale thereunder to an alleged innocent purchaser for value without the wife ever knowing about the deed of trust, much less that any sale thereunder was ever contemplated. Lieberman's claim that before buying at the trustee's sale he inquired of Burkhardt whether the property was homestead and that the latter said it was not, does not alter the rule, in face of the fact that the same was then actually being used for homestead purposes and Lieberman made no inquiry whatever of Mary Burkhardt. In fact, he testified he did not know her even at the time of the trial. If he made no

inquiry of her, if she did not know that he intended to buy the land or **\*\*852** that it was ever up for sale to anybody, how can Lieberman be heard to urge that he was misled by her silence? If a married woman is not estopped by passive negligence when she has partial notice of the facts (as in McLaren v. Jones, 89 Tex., 131, 33 S.W. 849), how could Mary Burkhardt be estopped by failure to act when she knew nothing of the facts?

[6] For the same reason the argument that she is estopped because she did not enjoin the deed of trust sale and thereby save Lieberman and Riedel from harm is wholly fallacious.

A much stronger case against homestead claimants seeking to cancel a renewal deed of trust in the hands of an innocent purchaser appears in Lincoln v. Bennett, supra, than is presented here against the Burkhardts. In that case the wife joined in the original deed of trust and Bennett, who, without notice of the homestead claim, advanced the money to renew and extend it and took a renewal deed of trust, was held not to have an enforceable lien in the face of actual homestead occupancy by the Lincolns, since it "is not shown that she (Mrs. Lincoln) knew about the statements made by Lincoln to Bennett, or to his attorney, to induce Bennett to acquire the Schoellkoff note, or that she ever ratified such statement. There is nothing in the record, except the homestead designation, executed five years prior to that time, that would in any way affect her rights in **\*416** the homestead." No reason is apparent why the principle thus applied to a subsequent innocent vendee of a void lien would not apply with equal force to a subsequent innocent vendee in a sale of the land under a void lien and to his immediate vendee, the lands being actually occupied by the Burkhardts for homestead purposes.

[7] Nor is this case any different because of the fact that the homestead is claimed on six different contiguous or neighboring tracts with the Burkhardts' residence located on a rented tract a mile or more distant. Rutland Savings Bank v. Isbell et al., Tex.Sup., 154 S.W.2d 442; Higgins v.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Millsap, Tex.Civ.App., 121 S.W.2d 469.

[8][9] But Lieberman contends that Burkhardt, after the lands had been sold to him under the deed of trust, surrendered the property. This contention is without merit because, beginning as early as 1857, in an opinion by Chief Justice Hemphill in Gouhenant v. Cockrell, 20 Tex. 96, our courts have held that "it must be undeniably clear and beyond almost the shadow, at least [of] all reasonable ground of dispute, that there has been a total abandonment with an intention not to return and claim the exemption." Burkhardt testified that after the trustee's sale to Lieberman he surrendered the property because he "had to." While we do not mean to hold that the husband cannot, under proper circumstances, abandon the homestead, we do hold that he cannot do so as part of a plan of action, deliberate or innocent on his part, that begins with a void deed of trust, executed by him alone for a purpose frowned upon by the Constitution, and ends in a sale to which the wife is not a party and about which she knows nothing, especially where the husband surrenders the property reluctantly and in ignorance of his rights. Otherwise, the constitutional provision guaranteeing the family homestead would amount to no more than mere verbiage.

We hold, therefore, that the Burkhardts were not estopped to claim the 71.6 acres of land described in their petition as their homestead and that, therefore, the two deeds of trust and the deed thereunder to Lieberman and Lieberman's deed to Riedel were void.

Lieberman alleged that Burkhardt purchased the 25-acre tract in controversy from one Holm on July 15, 1924; that Burkhardt, as part of the consideration, executed a vendor's *417 lien note in the principal sum of $1,300, due in one year with interest at 8 per cent. per annum, the superior title being retained in the deed from Holm to secure its payment; that said note and lien were last renewed and extended by instrument of date December 31, 1931, executed by Burkhardt in favor of Holm providing for maturity on or before January 1,

1937; that said note was outstanding when he, Lieberman, purchased said 25 acres at the trustee's sale on April 6, 1937, and was secured by the first and superior lien on the 25 acres; that on May 18, 1937, said note and lien and superior title were transferred to him, Lieberman, by Holm for the sum of $1,300; that Burkhardt and wife had not paid or offered to pay said note or any part thereof; wherefore, Lieberman alleged, he had elected to rescind and cancel the executory sale of said 25 acres by Holm to Burkhardt, etc.

In reply to that pleading, the Burkhardts alleged that "they are ready and willing to **853 pay to the defendant, George Lieberman, the amount that he paid to take up the note to E. L. Holm and wife, mentioned in the first amended original answer of the defendant Lieberman, and they tender into court whatever amount the court determines to be necessary to reimburse the said Lieberman for the amount so paid out on said note, *and they offer to do whatever equity the court requires of them in connection with this suit.*" (Italics ours.)

This note, although originally due in one year, had been renewed from time to time so that the indebtedness it evidenced was about 13 years old when Lieberman bought it and was almost 15 years old when he filed his pleading seeking rescission of sale as holder of the superior title to the 25 acres against which the lien securing it existed. Lieberman alleged that he paid $1,300 for the note, so it would appear that Burkhardt had kept the interest paid up thereby winning the indulgences that he had enjoyed at the hands of Holm as to payment of the principal. Although he had theretofore bought the 25 acres, as a tract included in the 71.6 acres conveyed in the trustee's sale on April 6, 1937, when he paid Holm the $1,300 due on said note on May 18, 1937, Lieberman took a transfer of the note and lien rather than a release. According to Riedel, he paid Lieberman $4,250 for 30 acres of this same 71.6 acres on February 15, 1938. Therefore, it would seem that the 25 acres was worth much more than the $1,300 and interest due on the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

note. The record discloses no demand made by Lieberman after he bought the note and lien and before he **\*418** filed his cross-action for rescission that Burkhardt pay either the interest or the principal due on the note. Moreover, Lieberman was asserting title to the land under the trustee's deed so the Burkhardts would naturally be expected to await the determination of the homestead issue, or at least would want to litigate both matters together before liquidating the $1,300 note.

[10][11] With the Burkhardts alleging a tender of whatever amount the court should determine necessary to reimburse Lieberman and offering "to do whatever equity the court requires of them in connection with this suit," we believe they made such an offer to do equity as that their pleading amounted to a tender. Rescission, as sought in this case, is regarded as a harsh remedy and is not favored. Therefore, relative equities will be weighed and unless they clearly favor the party seeking rescission the same will be denied and the holder put to his remedy of foreclosure. We believe the equities here are with the Burkhardts. Consequently, that phase of the case is reversed and remanded to the trial court with instructions to determine the amount of principal and interest due on this note and to give the Burkhardts reasonable opportunity to perform on their tender. If they then fail so to perform that court will enter judgment quieting the title in Lieberman as to the 25 acres as prayed by him. See Young et ux. v. Fitts et al., Tex.Com.App., 157 S.W.2d 873, decided January 7, 1942, and the authorities therein cited.

Lieberman pleaded that after he bought the land at trustee's sale he found that state, county and school district taxes duly levied and assessed against it for the years 1931 to 1936, both inclusive, had been suffered by the Burkhardts to become delinquent; that on April 28, 1937, he paid the same and all penalties and interest that had accrued thereon, to the amount of $862; that, as owner of the land he rendered the same for state, county and school taxes for 1937 and paid such taxes to the

amount of $87.25; that these taxes were not paid by him as a volunteer because he was in possession of the land claiming it under a deed, for a valuable consideration, and therefore he not only had the right but was obligated to pay them; that he is entitled to recover them of the Burkhardts with interest at 6 per cent. per annum from date of payment; that by reason of the premises he is subrogated to the tax liens of the state, county and school district and entitled to a foreclosure thereof.

**\*419** [12][13][14][15] One who pays taxes due on property of another, without any request by the debtor or any contractual right so to do or any joint liability therefor, is a volunteer and is not entitled to reimbursement. So it has been held that one holding a mortgage can recover taxes paid to protect his lien provided he includes the same in the amount for which he forecloses, otherwise he has no right to reimbursement. Stone et al. v. Tilley et al., 100 Tex. 487, 101 S.W. 201, 10 L.R.A.,N.S., 678, 123 Am.St.Rep. 819, 15 Ann.Cas. 524. One who takes a deed to the homestead knowing it is only a mortgage and pays taxes due thereon has no lien. Toler et al. v. Fertitta, supra. Likewise, one holding**\*\*854** the land under a void tax deed is not subrogated to the lien nor is he entitled to a personal judgment for taxes paid by him, because he is a mere trespasser. Mumme v. McCloskey, 28 Tex.Civ.App. 83, 66 S.W. 853, error refused. One buying at a tax sale under foreclosure where the record owner is not made a party is not entitled to reimbursement because, having constructive notice that the title is in another, he is not considered as acting in good faith. American Realty Corporation v. Tinkler, Tex.Civ.App., 107 S.W.2d 627, error refused. See, also, Young v. Harbin Citrus Growers, Tex.Civ.App., 130 S.W.2d 896, error refused. These principles apply to taxes accruing and paid subsequent to the void deed as well as to those recovered by means of the sale. McCormick v. Edwards, 69 Tex. 106, 6 S.W. 32.

[16][17] On authority of these cases, we hold that Lieberman, claiming title under a void deed

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

and charged with notice by their occupancy of the lands that the same was the homestead of the Burkhardts, was a volunteer when he paid the taxes and is, therefore, not entitled to recover them. However, as to the taxes paid for 1937 on the 25 acres against which he then held a vendor's lien note, as above discussed, we think Lieberman was not a volunteer. Under authority of Stone et al. v. Tilley et al., supra, we hold that he is entitled to recover such part of $87.25 as was assessed against said 25 acres for the year 1937 along with his recovery of principal and interest on the vendor's lien note he bought from Holm. To that extent the judgment is reversed and remanded with instructions to the trial court to determine what part of the $87.25 taxes paid by Lieberman for 1937 was assessed against the 25 acres and to allow him recovery thereof along with the principal and interest due on the Holm vendor's lien note as above directed.

[18] For the reasons given in discussing the taxes paid by him, Lieberman cannot recover on his claim for improvements in **\*420** good faith. Since possession by the Burkhardts of the land was notice to him of their homestead interest, one essential element in his cause of action for improvements made-- that of good faith--is wanting. Mumme v. McCloskey and other authorities cited, supra.

[19] On the Burkhardts' claim for damages the jury found that the reasonable rental value of the 71 acres of land in suit from May 5, 1937, to the date of trial was $70. The Burkhardts prayed for $1,000. Without attempting to set out the testimony relating thereto, we simply say that we find no competent evidence in the record that would support a judgment on that issue. Therefore, the judgment of the trial court in favor of Lieberman and Riedel on that phase of the case is affirmed.

It follows from what we have said that the judgments of the trial court and of the Court of Civil Appeals are affirmed in so far as they deny the Burkhardts any recovery of rents against Lieberman and Riedel and in so far as they award Lieberman recovery of the city lot in Houston. Said judgments are reversed and remanded in so far as they quiet the title of Lieberman to the 25 acres, and for a determination of what part of the $87.25 taxes for 1937 paid by him was assessed against said 25 acres, with instructions to the trial court as above stated; otherwise, said judgments are in all things reversed and rendered for the Burkhardts, as against both Lieberman and Riedel.

Affirmed in part; reversed and remanded in part, with instructions; reversed and rendered in part.

Opinion adopted by the Supreme Court February 4, 1942.

Tex.Com.App. 1942
Burkhardt v. Lieberman
138 Tex. 409, 159 S.W.2d 847

END OF DOCUMENT



▷

Supreme Court of Texas.
HERITAGE RESOURCES, INC., Petitioner,
v.
NATIONSBANK, Co–Trustee under the Will of
David B. Trammell, Deceased et al., Respondents.

No. 95–0515.
Argued Nov. 29, 1995.
Decided April 25, 1996.
Rehearing Overruled March 21, 1997.

Trustee for gas interest royalty owners brought action against gas lessee to recover amounts of transportation costs which lessee had deducted in calculating royalty payments under leases. The 109th District Court, Winkler County, James L. Rex, J., entered partial summary judgment for trustee, holding that lease language prohibited deduction of transportation costs from royalties, and, after bench trial, entered judgment for trustee. On review, the El Paso Court of Appeals, Eighth Judicial District, Susan Larsen, J., 895 S.W.2d 833, affirmed. On application for writ of error, the Supreme Court, Baker, J., held that: (1) in calculating royalties to be paid to owners under leases, lessee properly deducted costs of transporting gas to point of sale, despite clauses in leases limiting deduction from royalty for postproduction costs, and (2) lessee could not be held liable to trustee for amounts lessee paid to pipeline carrier to transport gas to point of sale, which amounts lessee deducted in calculating owners' royalties, under division order that allegedly allocated payments among interest owners in manner that differed from lease provisions.

Reversed and rendered.

Owen, J., concurred and filed opinion in which Hecht, J., joined. Gonzalez, J., dissented and filed opinion in which Abbott, J., joined.

West Headnotes

**[1] Contracts 95 ⚷176(2)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k176 Questions for Jury
            95k176(2) k. Ambiguity in general.
Most Cited Cases
   Question of whether contract is ambiguous is one of law for court.

**[2] Contracts 95 ⚷143(2)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k143 Application to Contracts in General
            95k143(2) k. Existence of ambiguity.
Most Cited Cases
   Contract is "ambiguous" when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation.

**[3] Mines and Minerals 260 ⚷73**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts
         260II(C)3 Construction and Operation of Oil and Gas Leases
            260k73 k. In general; general rules of construction. Most Cited Cases
   In construing unambiguous oil and gas lease, Supreme Court's task is to ascertain parties' intentions as expressed in lease.

**[4] Mines and Minerals 260 ⚷73**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts
         260II(C)3 Construction and Operation of Oil and Gas Leases
            260k73 k. In general; general rules of

939 S.W.2d 118, 39 Tex. Sup. Ct. J. 537
**(Cite as: 939 S.W.2d 118)**

construction. Most Cited Cases

In construing unambiguous oil and gas lease, to achieve goal of ascertaining parties' intentions as expressed in lease, Supreme Court examines entire document and considers each part with every other part so that effect and meaning of one part on any other part may be determined.

**[5] Contracts 95 ⚷143.5**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143.5 k. Construction as a whole.
Most Cited Cases

Supreme Court presumes that parties to contract intend every clause to have some effect.

**[6] Contracts 95 ⚷152**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k151 Language of Instrument
                95k152 k. In general. Most Cited Cases

In construing contract, Supreme Court gives terms their plain, ordinary, and generally accepted meaning unless instrument shows that parties used them in technical or different sense.

**[7] Contracts 95 ⚷143(1)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143 Application to Contracts in General
                95k143(1) k. In general. Most Cited Cases

In construing contract, Supreme Court will enforce unambiguous document as written.

**[8] Mines and Minerals 260 ⚷79.1(1)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts

        260II(C) Leases, Licenses, and Contracts
            260II(C)3 Construction and Operation of Oil and Gas Leases
                260k79 Rent or Royalties
                260k79.1 In General
                  260k79.1(1) k. Rights and liabilities. Most Cited Cases

For oil and gas purposes, "royalty" is commonly defined as landowner's share of production, free of expenses of production.

**[9] Mines and Minerals 260 ⚷79.1(1)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)3 Construction and Operation of Oil and Gas Leases
                260k79 Rent or Royalties
                260k79.1 In General
                  260k79.1(1) k. Rights and liabilities. Most Cited Cases

For oil and gas purposes, although it is not subject to costs of production, royalty is usually subject to postproduction costs, including taxes, treatment costs to render it marketable, and transportation costs.

**[10] Mines and Minerals 260 ⚷79.1(1)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)3 Construction and Operation of Oil and Gas Leases
                260k79 Rent or Royalties
                260k79.1 In General
                  260k79.1(1) k. Rights and liabilities. Most Cited Cases

For oil and gas purposes, parties may by agreement modify general rule that royalty is subject to postproduction costs.

**[11] Mines and Minerals 260 ⚷79.3**

260 Mines and Minerals

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

939 S.W.2d 118, 39 Tex. Sup. Ct. J. 537
**(Cite as: 939 S.W.2d 118)**

260II Title, Conveyances, and Contracts
260II(C) Leases, Licenses, and Contracts
260II(C)3 Construction and Operation of Oil and Gas Leases
260k79 Rent or Royalties
260k79.3 k. Amount and time of payment. Most Cited Cases

In determining market value at the well for oil and gas royalty purposes, "market value" is price willing seller obtains from willing buyer.

**[12] Mines and Minerals 260 ☞79.3**

260 Mines and Minerals
260II Title, Conveyances, and Contracts
260II(C) Leases, Licenses, and Contracts
260II(C)3 Construction and Operation of Oil and Gas Leases
260k79 Rent or Royalties
260k79.3 k. Amount and time of payment. Most Cited Cases

For oil and gas royalty purposes, the most desirable method of determining market value at the well is to use comparable sales.

**[13] Mines and Minerals 260 ☞79.3**

260 Mines and Minerals
260II Title, Conveyances, and Contracts
260II(C) Leases, Licenses, and Contracts
260II(C)3 Construction and Operation of Oil and Gas Leases
260k79 Rent or Royalties
260k79.3 k. Amount and time of payment. Most Cited Cases

For oil and gas royalty purposes, in determining market value at the well by use of comparable sales, "comparable sale" is one that is comparable in time, quality, quantity, and availability of marketing outlets.

**[14] Mines and Minerals 260 ☞79.3**

260 Mines and Minerals
260II Title, Conveyances, and Contracts
260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases
260k79 Rent or Royalties
260k79.3 k. Amount and time of payment. Most Cited Cases

In determining market value at the well for oil and gas royalty purposes, when information about comparable sales is not readily available, courts use method involving subtracting reasonable postproduction marketing costs from market value at point of sale.

**[15] Mines and Minerals 260 ☞79.3**

260 Mines and Minerals
260II Title, Conveyances, and Contracts
260II(C) Leases, Licenses, and Contracts
260II(C)3 Construction and Operation of Oil and Gas Leases
260k79 Rent or Royalties
260k79.3 k. Amount and time of payment. Most Cited Cases

For purposes of determining market value at the well for oil and gas royalty purposes when information about comparable sales is not readily available, "postproduction marketing costs" include transporting gas to market and processing gas to make it marketable.

**[16] Mines and Minerals 260 ☞79.7**

260 Mines and Minerals
260II Title, Conveyances, and Contracts
260II(C) Leases, Licenses, and Contracts
260II(C)3 Construction and Operation of Oil and Gas Leases
260k79 Rent or Royalties
260k79.7 k. Actions. Most Cited Cases

For oil and gas royalty purposes, plaintiff has burden to prove market value at the well, under either comparable sales method or method of subtracting reasonable postproduction marketing costs from market value at point of sale.

**[17] Mines and Minerals 260 ☞79.3**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

939 S.W.2d 118, 39 Tex. Sup. Ct. J. 537
**(Cite as: 939 S.W.2d 118)**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
     260II(C) Leases, Licenses, and Contracts
      260II(C)3 Construction and Operation of Oil and Gas Leases
       260k79 Rent or Royalties
        260k79.3 k. Amount and time of payment. Most Cited Cases

In calculating royalties to be paid to gas interest royalty owners under oil and gas leases, lessee properly deducted costs of transporting gas to point of sale, despite clauses in leases limiting deduction from royalty for postproduction costs; postproduction clauses stated that there shall be no deduction from value of royalty, leases clearly set royalty as fraction of market value at the well, lessee determined market value at the well by subtracting postproduction transportation costs from amount received at point of sale, and commonly-accepted meaning of "royalty" and "market value at the well" terms rendered postproduction clauses surplusage.

**[18] Mines and Minerals 260 ⟳79.1(3)**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
     260II(C) Leases, Licenses, and Contracts
      260II(C)3 Construction and Operation of Oil and Gas Leases
       260k79 Rent or Royalties
        260k79.1 In General
         260k79.1(3) k. Persons entitled in general; apportionment and division orders. Most Cited Cases

For oil and gas purposes, general rule is that division orders are binding until revoked.

**[19] Mines and Minerals 260 ⟳79.1(3)**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
     260II(C) Leases, Licenses, and Contracts
      260II(C)3 Construction and Operation of Oil and Gas Leases
       260k79 Rent or Royalties

260k79.1 In General
    260k79.1(3) k. Persons entitled in general; apportionment and division orders. Most Cited Cases

When oil and gas operator prepares division order that allocates payments among interest owners in manner that differs from oil and gas lease provisions and operator retains benefits, division order is not binding, and operator then becomes liable for part of interest owner's payments the operator retained; basis of rule is unjust enrichment.

**[20] Mines and Minerals 260 ⟳79.1(3)**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
     260II(C) Leases, Licenses, and Contracts
      260II(C)3 Construction and Operation of Oil and Gas Leases
       260k79 Rent or Royalties
        260k79.1 In General
         260k79.1(3) k. Persons entitled in general; apportionment and division orders. Most Cited Cases

When oil and gas operator prepares division order that allocates payments among interest owners in manner that differs from oil and gas lease provisions, operator is not liable to interest owner for amounts it paid out to other interest owners.

**[21] Mines and Minerals 260 ⟳79.1(3)**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
     260II(C) Leases, Licenses, and Contracts
      260II(C)3 Construction and Operation of Oil and Gas Leases
       260k79 Rent or Royalties
        260k79.1 In General
         260k79.1(3) k. Persons entitled in general; apportionment and division orders. Most Cited Cases

Gas lessee could not be held liable to trustee for gas interest royalty owners for amounts lessee paid to pipeline carrier to transport gas to point of sale, which amounts lessee deducted in calculating

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

939 S.W.2d 118, 39 Tex. Sup. Ct. J. 537
**(Cite as: 939 S.W.2d 118)**

owners' royalties, under division order that allegedly allocated payments among interest owners in manner that differed from lease provisions; lessee would be liable, if at all, only for amount of unpaid royalties it retained.

**\*120** Appealed from El Paso Court of Appeals, Eighth Judicial District; Susan Larsen, Justice.John R. Woodward, Dallas, for Petitioner.

Robert Scogin, Kermit, Rick K. Disney, Fort Worth, Cary L. Jennings, Fort Worth, Ben A. Douglas, Fort Worth, for Respondents.

Justice BAKER delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice CORNYN, Justice ENOCH, and Justice SPECTOR join.

This case involves construction of royalty clauses in several oil and gas leases. NationsBank sued Heritage contending that Heritage deducted transportation costs from the value of NationsBank's royalty in violation of the leases.

The trial court rendered a partial summary judgment against Heritage deciding liability and damages through 1991. NationsBank amended its pleading to include Heritage's deductions through 1993. After a bench trial, the trial court awarded NationsBank and other royalty owners the transportation costs Heritage deducted plus interest and attorney's fees.

The court of appeals affirmed the trial court's judgment. 895 S.W.2d 833. It held that the royalty clauses showed the parties' intent not to deduct the post-production transportation costs when determining market value at the well. 895 S.W.2d at 836–37. The court of appeals also held that the division orders Heritage and the royalty owners executed did not bind the royalty owners and that Heritage was liable for the full amount deducted. 895 S.W.2d at 839.

We conclude the trial court and the court of ap-

peals incorrectly interpreted the royalty clauses. We reverse the court of appeals' judgment. We render judgment that NationsBank take nothing. Further, we disapprove of the court of appeals' language about the liability of an operator who underpays royalty interest owners.

### Facts

NationsBank is the trustee for owners of interests in gas, oil, and other minerals inherited under David B. Trammel's will. Heritage is the lessee and operator under a number of leases. Heritage also owns an undivided working interest in some of the leases. Heritage sold gas off the leased premises. Heritage deducted the cost to transport the gas from the wellhead to the point of sale as a post-production cost from the sales price before calculating royalties.

In January 1989, NationsBank noticed that Heritage was deducting severance taxes and transportation charges from the purchase price. NationsBank objected to the transportation charge deduction. NationsBank contended that the leases specifically prohibited the deduction. Three different leases are in issue. The relevant parts are:

3. The royalties to be paid Lessor are ...

(b) on gas, including casinghead gas or other gaseous substances produced from the land, or land consolidated therewith, and sold or used off the premises or in the manufacture of gasoline or other products therefrom, the market value at the well of 1/5 of the gas so sold or used, provided that on gas sold at the well the royalty shall be 1/5 of the amount realized from such sale provided, however, that there shall be no deductions from the value of the Lessor's royalty by reason of any required processing, cost of dehydration, compression, transportation or other matter to market such gas.

or:

3. In consideration of the premises, Lessee covenants and agrees ...

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(b) To pay the Lessor 1/4 of the market value at the well for all gas (including substances contained in such gas) produced from the leased premises; provided, however, that there shall be no deductions from the value of Lessor's royalty by reason of any required processing, cost of dehydration, compression,**\*121** transportation, or other matter to market such gas.

or

3. Lessee shall pay the following royalties subject to the following provisions: ...

(b) Lessee shall pay the Lessor 1/4 of the market value at the well for all gas (including all substances contained in such gas) produced from the leased premises and sold by Lessee or used off the leased premises, including sulphur produced in conjunction therewith; provided, however, that there shall be no deductions from the value of Lessor's royalty by reason of any required processing, cost of dehydration, compression, transportation, or other matter to market such gas.

Although the court of appeals states that the leases are virtually identical, the first lease is distinctly different from the others. In the first lease, for gas sold on the lease, royalty is on proceeds, with no deduction for marketing costs, but if sold at a point off the lease, the royalty is the market value at the well. However, this difference is irrelevant for purposes of this opinion. All three leases require us to determine if Heritage improperly deducted transportation costs from the royalty payments. The critical clause in all three leases is the requirement that Heritage pay the royalty interest owners their fractional interest of "the market value at the well" of the gas produced.

**Royalty Clause Construction**

Heritage contends that the royalty clauses define the lessor's royalty as a fraction of the market value at the well. Therefore, the clauses limiting deduction from the value of the lessor's royalty simply means that Heritage cannot deduct an amount from the sales price that would make the royalty paid less than the required fraction of market value at the well. Because NationsBank concedes Heritage only deducted reasonable transportation costs from the market value at the point of sale, Heritage did not make a deduction from the "value of the Lessor's royalty."

The court of appeals rejected Heritage's interpretation of the royalty clause. 895 S.W.2d at 836. The court of appeals reasoned that because royalty interests are normally subject to post-production costs, Heritage's interpretation renders the post-production clause meaningless. 895 S.W.2d at 837. Although we do not disagree with the court of appeals' reasoning in this respect, we find that applying the trade meaning of royalty and market value at the well renders the post-production clauses surplusage as a matter of law.

*(a) Applicable Law*
Oil and Gas Lease Construction

[1][2][3][4][5][6][7] The question of whether a contract is ambiguous is one of law for the court. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex.1980). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). In construing an unambiguous oil and gas lease our task is to ascertain the parties' intentions as expressed in the lease. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 727–28 (Tex.1981); *McMahon v. Christmann,* 157 Tex. 403, 303 S.W.2d 341, 344 (1957). To achieve this goal, we examine the entire document and consider each part with every other part so that the effect and meaning of one part on any other part may be determined. *Steeger v. Beard Drilling,* 371 S.W.2d 684, 688 (Tex.1963). We presume that the parties to a contract intend every clause to have some effect. *Ogden v. Dickinson State Bank,* 662 S.W.2d 330, 331 (Tex.1983). We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense. *Western Reserve Life Ins. Co. v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

939 S.W.2d 118, 39 Tex. Sup. Ct. J. 537
**(Cite as: 939 S.W.2d 118)**

*Meadows,* 152 Tex. 559, 261 S.W.2d 554, 557 (1953), *cert. denied,* 347 U.S. 928, 74 S.Ct. 531, 98 L.Ed. 1081 (1954). This Court will enforce the unambiguous document as written. *Sun Oil Co.,* 626 S.W.2d at 728. Both the trial court and the court of appeals determined that the leases in question were unambiguous. We agree.

Royalty

[8][9][10] Royalty is commonly defined as the landowner's share of production, free of **\*122** expenses of production. *See Delta Drilling Co. v. Simmons,* 161 Tex. 122, 338 S.W.2d 143, 147 (1960); *Alamo Nat'l Bank v. Hurd,* 485 S.W.2d 335, 338 (Tex.Civ.App.—San Antonio 1972, writ ref'd n.r.e.); 8 WILLIAMS & MEYERS, OIL & GAS LAW, 856–57 (1987); 3 KUNTZ, OIL & GAS LAW, § 42.2 (1989). Although it is not subject to the costs of production, royalty is usually subject to post-production costs, including taxes, treatment costs to render it marketable, and transportation costs. *Martin v. Glass,* 571 F.Supp. 1406, 1410 (N.D.Tex.1983), *aff'd,* 736 F.2d 1524 (5th Cir.1984); WILLIAMS & MEYERS, *supra,* p. 857. However, the parties may modify this general rule by agreement. *Martin,* 571 F.Supp. at 1410.

Market Value at the Well

[11] Market value at the well has a commonly accepted meaning in the oil and gas industry. *See generally* Wakefield, Annotation, *Meaning of, and Proper Method for Determining, Market Value or Market Price in Oil and Gas Lease Requiring Royalty to be Paid on Standard Measured by Such Terms,* 10 ALR 4TH 732 (1981). Market value is the price a willing seller obtains from a willing buyer. *See Exxon Corp. v. Middleton,* 613 S.W.2d 240, 246 (Tex.1981). There are two methods to determine market value at the well.

[12][13] The most desirable method is to use comparable sales. *Middleton,* 613 S.W.2d at 246; *Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 872 (Tex.1968). A comparable sale is one that is comparable in time, quality, quantity, and availability of marketing outlets. *Middleton,* 613 S.W.2d at

246; *Vela,* 429 S.W.2d at 872.

[14][15][16] Courts use the second method when information about comparable sales is not readily available. *See, e.g., Le Cuno Oil Co. v. Smith,* 306 S.W.2d 190, 193 (Tex.Civ.App.—Texarkana 1957, writ ref'd n.r.e.), *cert. denied,* 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed.2d 1147 (1958); *Clear Creek Oil & Gas Co. v. Bushmiaer,* 165 Ark. 303, 264 S.W. 830, 832 (1924); *see also* Pierce, *Royalty Valuation Principles in a Changing Gas Market, in* STATE BAR OF TEXAS PROF. DEV. PROGRAM, 11TH ANNUAL ADVANCED OIL, GAS AND MINERAL LAW COURSE E, E–9 (1993). This method involves subtracting reasonable post-production marketing costs from the market value at the point of sale. *Texas Oil & Gas Corp. v. Hagen,* 683 S.W.2d 24, 28 (Tex.App.—Texarkana 1984), *dism'd as moot,* 760 S.W.2d 960 (Tex.1988). Post-production marketing costs include transporting the gas to the market and processing the gas to make it marketable. *Hagen,* 683 S.W.2d at 29. With either method, the plaintiff has the burden to prove market value at the well. *Hagen,* 683 S.W.2d at 29.

*(b) Application of Law to the Facts*

The court of appeals disregarded the generally accepted meanings of "market value at the well" and "royalty" to determine that Heritage wrongfully deducted post-production costs. The court of appeals' construction results in a royalty clause that specifies royalty payable as a fraction of the market value at the well, to mean the royalty is payable as a fraction of the market value at the point of sale with no deductions for post-production costs.

[17] The terms "royalty" and "market value at the well" have well accepted meanings in the oil and gas industry. The post-production clauses in issue here plainly state that there "shall be no deduction from the *value of the Lessor's Royalty.*" The leases clearly set the lessor's royalty as a fraction ( 1/4 or 1/5 ) "of the market value at the well." Under the leases, the lessee must determine the value of the lessor's royalty. The lessee accomplishes this by

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

939 S.W.2d 118, 39 Tex. Sup. Ct. J. 537
**(Cite as: 939 S.W.2d 118)**

determining market value at the well and multiplying it by the fraction specified in the royalty clause ( 1/4 or 1/5 ). This result is the value of the lessor's royalty. The post-production clauses then specify that there can be no deduction from this value (the value of the lessor's royalty) by reason of any post-production costs.

Here, the only conclusion we can draw is that the post-production clauses merely restate existing law. The post-production clauses illustrate that the lessee cannot pay the lessor less than his fractional value of the comparable sales price (market value). This could occur if the amount realized from the **\*123** sale of the gas less the post production costs was less than the comparable sales price and the lessee calculated the lessor's royalty by subtracting post production costs from amount realized. At times the amount realized from the sale of gas has varied greatly from the market value of the gas. *See Vela,* 429 S.W.2d at 875–76 (evidence sustained trial court's finding that market value was 13.047 cents per mcf even though amount realized by lessee under long term gas sales contract was 2.3 cents per mcf). Even though the *Vela* scenario may be unlikely to reoccur in the future due to changes in the market place, *see, e.g.* Pierce, *supra,* E–1—E–3, the market value may differ from the amount realized.

We recognize that our construction of the royalty clauses in two of the three leases arguably renders the post-productions clause unnecessary where gas sales occur off the lease. However, the commonly accepted meaning of the "royalty" and "market value at the well" terms renders the post-production clause in each lease surplusage as a matter of law.

To determine if Heritage correctly paid royalties under the leases, we must first determine the market value of the gas at the well. NationsBank offered no evidence of comparable sales. However, Heritage conceded in its response to NationsBank's motion for partial summary judgment that the price Heritage received for the gas was the market price at the point of sale. NationsBank conceded at oral argument that the transportation costs Heritage deducted were reasonable.

Because there is no evidence to support the comparable sales method of computing market value at the well, we use the alternate method. Under that method, Heritage must pay a royalty based on the market value at the point of sale less the reasonable post-production marketing costs. *Hagen,* 683 S.W.2d at 28. Based on the parties' concessions, the amount Heritage paid is the correct amount in royalties to NationsBank under the leases.

### Division Orders

Heritage entered into division orders with the royalty owners. The division orders contained the following language:

All proceeds from the sale of gas shall be paid to the undersigned or their assigns in the proportions as herein set out less taxes and any costs incurred in the handling and transportation to the point of sale, treating, compressing boosting, dehydrating or any other conditioning necessary, subject to the terms of any contract of purchase and sale which affects the above described property ...

The court of appeals held that the division orders were of no effect and that Heritage was liable for reimbursement to the royalty owners for transportation costs improperly withheld in payment to Urantia. The court of appeals' discussion about the effect of a division order that contradicts the lease terms conflicts with our earlier opinion in *Gavenda v. Strata Energy, Inc.,* 705 S.W.2d 690 (Tex.1986).

[18][19][20] The general rule is that division orders are binding until revoked. *Gavenda,* 705 S.W.2d at 691; *Middleton,* 613 S.W.2d at 250. When an operator prepares a division order that allocates payments among the interest owners in a manner that differs from the lease provisions and the operator retains the benefits, the division order is not binding. *Gavenda,* 705 S.W.2d at 692. The

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

939 S.W.2d 118, 39 Tex. Sup. Ct. J. 537
**(Cite as: 939 S.W.2d 118)**

basis of this rule is unjust enrichment. *Gavenda,* 705 S.W.2d at 692. The operator then becomes liable for the part of the interest owner's payments the operator retained. *See Gavenda,* 705 S.W.2d at 693. The operator is not liable for the amounts it paid out to other interest owners. *Gavenda,* 705 S.W.2d at 693.

[21] The court of appeals decision incorrectly states that "Heritage was liable for reimbursement to the royalty owners for transportation costs improperly withheld in payment to Urantia." 895 S.W.2d at 839. Under *Gavenda,* Heritage would be liable, if at all, only for the amount of the unpaid royalty it retained. In this case, there were other working interest owners who were not parties to the suit. Absent an agreement **\*124** otherwise, all the working interest owners would benefit from an improper deduction of transportation charges from the royalties paid to NationsBank. Therefore the trial court could only hold Heritage liable for an amount of unpaid royalties that Heritage retained.

### Summary

In conclusion, we hold that the court of appeals erred in holding that the lease required Heritage to pay royalties based on the market value at the point of sale. Further, we specifically disapprove of the court of appeals discussion about an erroneous division order's effects. We reverse the court of appeals' judgment and render judgment that NationsBank take nothing from Heritage.

Justice OWEN, joined by Justice HECHT, concurring.

I concur in the judgment of the Court. The meaning of "market value at the well," upon which the resolution of this case ultimately turns, is not as clear-cut as the Court's opinion indicates when determining whether post-production costs are to be shared by a royalty owner. I write separately to consider the meaning of "market value at the well" more fully and to recognize that the construction we are compelled to give to the leases at issue may not comport with the subjective intent of at least some of the parties to those agreements.

### I

NationsBank, as trustee, is an owner of royalty interests under six leases that are the subject of this suit. Heritage is a working interest owner under each of the leases and is the operator of the wells located on those leases. The specific lease provisions that have given rise to this dispute are set forth in the Court's opinion.

The royalty clauses in contention specifically address marketing costs that may be incurred after the gas leaves the wellhead, including processing, dehydration, compression, and transportation costs. These are sometimes called post-production costs. The only costs at issue in this suit, however, are transportation charges. Simply put, the issue is how the cost of transporting the gas to market is to be allocated under the terms of these leases. This is a question of law. There are no factual disputes. NationsBank has conceded that the transportation charges were reasonable and in line with market rates. Heritage and NationsBank agree that the prices at which the gas was sold reflected its market value at the point of sale. It is undisputed that the sales of gas at issue have taken place off of the leased premises. The trial court, the court of appeals, and this Court correctly concluded that none of the leases are ambiguous.

### II

At the outset, it is important to note that we are construing specific language in specific oil and gas leases. Parties to a lease may allocate costs, including post-production or marketing costs, as they choose. *See generally* 3 WILLIAMS, OIL & GAS LAW § 645 (1990). Our task is to determine how those costs were allocated under *these* particular leases.

Each of the royalty provisions begins with the statement that royalties are to be paid on gas sold off the lease based on the market value of the gas at the well. The proviso that follows, prohibiting the deduction of marketing costs from the value of the royalty, is virtually identical in all of the leases. Accordingly, any differences among the leases are

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

939 S.W.2d 118, 39 Tex. Sup. Ct. J. 537
**(Cite as: 939 S.W.2d 118)**

immaterial for purposes of determining the royalty obligation.[FN1]

> FN1. One of the leases differs somewhat from the others. Because of the way in which the royalty clause of that lease is structured, an argument could be made that the proviso prohibiting the deduction of marketing costs from the value of the royalty applies only when the sale of gas occurs at the well and that the proviso does not apply when determining the market value of gas sold off the lease. It is unnecessary to decide that issue, however, because the parties agree that the proviso does apply under this lease as well as under the other leases in determining the market value of gas at the well when it is sold off the premises.

The starting point in construing the leases is the language chosen by the parties. We first must ascertain the meaning of "market value at the well," which the agreements set **\*125** out as the initial benchmark for valuing the royalty. "Market value at the well" tells us how and where the value of the royalty is measured, subject to any other provisions that bear on valuation.

A number of courts in producing states across the country have considered the meaning of various royalty clauses, including "market value at the well" clauses, in deciding which marketing costs, if any, are to be borne by the royalty owner. The decisions, including those under Texas law, are not uniform. There are two diverse viewpoints, with some decisions picking and choosing between the two, depending on the specific marketing cost under consideration.[FN2] At one end of the spectrum is the view that because the operator has an implied duty or an implied covenant to market the gas, all costs of marketing must be borne by the operator. Generally speaking, this is the minority view. On the other end of the spectrum, many decisions recognize that while there is an implied duty or covenant to market the gas, this duty does not extend to

expenses incurred in sales off the lease; marketing costs are to be shared proportionately by the working interest and royalty owners.

> FN2. For a general discussion of these competing principles and some of the divergent decisions, see *Wood v. TXO Production Corp.,* 854 P.2d 880 (Okl.1992). *See also* 3 WILLIAMS, OIL & GAS LAW § 645 (1990).

In examining decisions in this area, it must be borne in mind that not all royalty clauses were created equal. Some are based on "proceeds," some on "amount realized," while others are based on "market value." Some specify the point at which the value of the royalty is determined, such as "at the well." Some do not. Some leases have more than one method for valuing royalty depending on whether the gas is sold or used off the leased premises or is sold at the well. Different courts have accorded differing meanings to the same language.

With these distinctions in mind, I consider Texas decisions first.

A

The concept of "market value" is well-established in our jurisprudence. It is what a willing buyer under no compulsion to buy will pay to a willing seller under no compulsion to sell. *See, e.g., Exxon Corp. v. Middleton,* 613 S.W.2d 240, 246 (Tex.1981). This would seem to be a straight-forward measure, but *how* market value is determined in the context of an oil and gas lease is a question that has been before this Court on more than one occasion. We held in *Texas Oil & Gas Corp. v. Vela* that the price paid under a gas purchase contract between the lessee and the purchaser is not necessarily the market price within the meaning of the lease. 429 S.W.2d 866, 871 (Tex.1968). The parties in that case agreed that the market price of gas is to be determined by sales comparable in time, quality, and availability of marketing outlets. *Id.* at 872. *See also First Nat'l Bank in Weatherford, Texas v. Ex-*

*xon Corp.,* 622 S.W.2d 80, 82 (Tex.1981) (intrastate sales of gas not comparable to interstate sales regulated by the Federal Power Commission).

In *Middleton,* we considered *when* gas is sold within the meaning of a royalty clause based on "market value at the well." Exxon contended that the gas was sold at the time Exxon entered into a long term contract with the purchaser, and that market value should be determined as of then. We disagreed, holding that market value is determined at the point in time when the gas is actually produced and delivered. 613 S.W.2d at 245. We also concluded that "sold at the wells" means sold at the wells within the lease, not sold at wells within the field. *Id.* at 243.

We had occasion to consider whether an operator owes a duty to a non-participating interest owner to process gas in *Danciger Oil & Refineries, Inc. v. Hamill Drilling Co.,* 141 Tex. 153, 171 S.W.2d 321 (1943). We determined that the operator was not obligated to process the gas where the agreement provided that an overriding royalty interest would be computed on 1/24 th of the gas "produced, saved and marketed at the prevailing market price paid by major companies ... free and clear of operating expenses." *Id.,* 171 S.W.2d at 322–23. The only market in the vicinity was for processed **\*126** gas. There was no market for gas produced in its raw state at the wellhead. We reasoned that the overriding royalty payments were to be made out of gas "if, as and when produced," not out of its value after it had been processed into a more valuable product, even though the clause also referred to gas "marketed." *Id.* at 322. We further held that "operating costs" meant the expenses necessary to market the gas, not processing the gas into some other product. *Id.* at 323.

We have recognized that for occupation tax purposes, the market value of processed gas is measured as to all ownership interests, including royalty interests, by the total proceeds of the sale of the component parts of the gas after processing, less transportation and processing costs. *Mobil Oil Corp. v. Calvert,* 451 S.W.2d 889, 892 (Tex.1970). In *Mobil,* market value was defined in the tax statute as value "at the mouth of the well." *Id.* at 891.

But these decisions do not directly answer the question of who bears marketing costs under a "market value at the well" royalty clause in a lease. Our Court has spoken to this issue only obliquely. In *Upham v. Ladd,* 128 Tex. 14, 95 S.W.2d 365, 366 (1936), we concluded that a lessor suing for underpayment of royalties based on a clause calling for payment of "proceeds" had stated a cause of action, but noted that the question of construction of the lease was not yet before the Court.

Decisions of the courts of appeals and other courts applying Texas law have confronted the question of whether post-production costs may be allocated to the royalty interest owners, but the holdings are not entirely consistent and construe differing provisions.

One of the earliest decisions dealing with Texas law on the subject of marketing costs and payment of royalties was *Phillips Petroleum Co. v. Bynum,* 155 F.2d 196 (5th Cir.1946). In discussing how to arrive upon the market value of gas, the Fifth Circuit observed that in the absence of available evidence of market price at the well, it "would seem appropriate" to look at the market price paid by the purchasers in the area at the point of sale, and to then deduct transportation costs. *Id.* at 198. The Fifth Circuit assumed without discussion that transportation charges should be deducted in arriving upon market value. *See also Phillips Petroleum Co. v. Johnson,* 155 F.2d 185, 189 (5th Cir.), *cert. denied,* 329 U.S. 730, 67 S.Ct. 87, 91 L.Ed. 632 (1946) (decided the same day, holding that royalty on processed gas is 1/8 th of the sale proceeds less a credit for transportation, separation, and sales costs under a royalty clause that called for " 1/8 th of net proceeds derived from the sale of the gas at the mouth of the well"); *Holbein v. Austral Oil Co., Inc.,* 609 F.2d 206, 209 (5th Cir.1980) (dehydration costs deductible from royalty under clause basing royalty on amount realized from the sale of gas).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

At least two decisions from Texas courts of appeals are at odds with the approach taken by the Fifth Circuit. The royalty in *Miller v. Speed,* 248 S.W.2d 250, 256 (Tex.Civ.App.—Eastland 1952, no writ), was held to be free of any marketing costs. The provision under consideration was not expressly a market value clause. It simply provided for a royalty of 1/24 th of all gas produced, saved and made available for market. The case of *Pan American Petroleum Corp. v. Southland Royalty Co.,* 396 S.W.2d 519, 524–25 (Tex.Civ.App.—El Paso 1965, writ dism'd w.o.j.), relied on *Miller* and reasoned that a royalty interest is free of the cost of production *and marketing* costs. The poorly worded royalty clause in *Pan American* was based on proceeds and also provided for delivery of the lessor's share of the minerals "free of cost." *See also Skaggs v. Heard,* 172 F.Supp. 813 (S.D.Tex.1959) (compression costs could not be charged to the lessor where the sale occurred on the lease and the royalty clause provided for royalties based on proceeds).

In contrast, other Texas courts of appeals have allowed certain marketing costs to be allocated to the royalty owner. Only one of those cases dealt with a market value royalty clause, *Texas Oil & Gas Corp. v. Hagen,* 683 S.W.2d 24 (Tex.App.—Texarkana 1984), *writ dism'd as moot,* 760 S.W.2d 960 (Tex.1988). *Hagen* held that market value at the well is the market value of the gas where sold, less reasonable and necessary transportation and processing costs. *Id.* at 28. Similarly, in **\*127** *Parker v. TXO Prod. Corp.,* 716 S.W.2d 644 (Tex.App.—Corpus Christi 1986, no writ), the royalty owner was required to share in post-production compression costs. In *dicta,* the *Parker* court indicated that all post-production costs could be charged to the royalty owners. *Id.* at 648. The specific terms of the royalty clause cannot be discerned from the opinion in *Parker.*

Marketing costs were also charged to the royalty owners in *Le Cuno Oil Co. v. Smith,* 306 S.W.2d 190 (Tex.Civ.App.—Texarkana 1957, writ ref'd n.r.e.), *cert. denied,* 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed.2d 1147 (1958). The parties agreed that a division order calling for 1/8 th of the price received at the wells governed the royalty, and the court held costs of dehydration, gathering, transporting, and processing could be deducted from the gross sales price received by the operator. *Id.* at 193. *See also Martin v. Glass,* 571 F.Supp. 1406, 1411–15 (N.D.Tex.1983), *aff'd,* 736 F.2d 1524 (5th Cir.1984) (post-production compression charges held deductible under a royalty clause based on net proceeds at the well). The court found that "net proceeds" contemplated deductions. 571 F.Supp. at 1411. *See also Maddox v. Texas Co.,* 150 F.Supp. 175, 180 (E.D.Tex.1957) ("fair value" was the measure where there was no market and marketing costs must be considered where the lease required the lessor to bear its proportionate cost of rendering gas merchantable).

To add another point of view on this subject, a Texas court of appeals recently held that a royalty clause based on "market value at the well" was ambiguous. That court upheld a jury finding that the parties did not intend to allow the deduction of compression charges from royalties. *Judice v. Mewbourne Oil Co.,* 890 S.W.2d 180 (Tex.App.—Amarillo 1994), reversed today by this Court in a companion decision, 939 S.W.2d 133.

While it is fair to say that the greater number of courts considering Texas law have permitted allocation of post-production costs to royalty owners, there are decisions reaching the opposite conclusion. It remains for this Court to determine whether "market value at the well" includes or excludes post-production costs. Decisions from other jurisdictions illuminate the arguments on both sides of the issue and offer a variety of potential resolutions.

B

One of the most comprehensive discussions of "market value at the well" royalty clauses is Judge Wisdom's decision in *Piney Woods Country Life Sch. v. Shell Oil Co.,* 726 F.2d 225 (5th Cir.1984), *cert. denied,* 471 U.S. 1005, 105 S.Ct. 1868, 85

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

939 S.W.2d 118, 39 Tex. Sup. Ct. J. 537
**(Cite as: 939 S.W.2d 118)**

L.Ed.2d 161 (1985). Although that decision applies Mississippi law, the court's review of the law is not restricted to Mississippi jurisprudence. Among other authorities, the opinion considers at some length the meaning attributed to "market value at the well" by numerous commentators, concluding that the purpose in specifying "at the well" is to distinguish between gas sold in the form in which it emerges from the wellhead and gas which thereafter has had value added by transportation or processing. *Id.* at 231, 240. The Fifth Circuit held that royalties under a "market value at the well" clause should compensate only for the value of the gas at the well, before the operator adds value. *Id.* Accordingly, that court concluded that royalty owners may be charged with all expenses subsequent to production including processing, transportation, removal of sulfur, and other marketing costs where the royalty provision measures value "at the well." *Id.* This reasoning is persuasive.

It has not been followed, however, by the highest courts of some of our sister states. The implied obligation to market gas was held to be paramount in *Garman v. Conoco, Inc.,* 886 P.2d 652 (Colo.1994). After surveying the law in other jurisdictions and examining the rationale underpinning the various decisions, the Supreme Court of Colorado concluded that the implied covenant to market gas obligates the lessee to incur post-production costs necessary to place the gas in a condition acceptable for market. *Id.* at 659. Examples of costs borne solely by the lessee included gathering and compression costs to move the gas from the wellhead to a processing plant, and dehydration costs. *Id.* at 655–56 n. 8. The court did draw a distinction, though, between costs necessary to **\*128** market the gas and those that increased value after the gas had been rendered marketable. *Id.* at 661. The court imposed the burden on the lessee to demonstrate that costs enhancing an already marketable product are reasonable and that they increase royalty revenues in proportion with those costs. *Id.* at 661. It should be noted that this case was decided essentially in a vacuum, without reference to any specific lease clause. A general question had been certified to the court.

The Oklahoma supreme court, after similarly surveying other states' decisions, concluded that the implied duty to market gas is a duty to "get the product to the place of sale in marketable form." *Wood v. TXO Prod. Corp.,* 854 P.2d 880, 882 (Okla.1992). A "market value at the well" clause was at issue. The court held that compression charges necessary for the gas to enter the purchaser's pipeline could not be deducted from the royalty where the sale occurred *on the lease premises. Id.* In the dissenting opinion, four members of the court found this result "harsh and untenable" and would have adopted the "better-reasoned" approach of allowing the deduction of compression costs. *Id.* at 883.

The majority in *Wood v. TXO* distinguished that court's prior decision in *Johnson v. Jernigan,* 475 P.2d 396 (Okla.1970), which held that the obligation to market did not require the operator to absorb the cost of transporting gas ten miles by pipeline to the point of sale *off the lease. Johnson* extended the duty to market only to the lease boundaries. *Id.* at 399. The *Johnson* court reached this conclusion even though the lease called for royalties based on the "gross proceeds at the prevailing market rate for all gas sold off the premises." *Id.* at 397. The court reasoned that "gross proceeds" had reference to the value of the gas on the lease property "without deducting any of the expenses involved in developing and marketing the dry gas to this point of delivery." *Id.* at 399.

Kansas courts have also seemed to draw a distinction between sales on the lease premises and those off the premises in deciding whether marketing costs may be passed on to the royalty owner. Language in the lease specifying that royalty is to be determined "at the well" has not appeared to be a factor in the courts' decisions. *Compare Schupbach v. Continental Oil Co.,* 193 Kan. 401, 394 P.2d 1 (1964) (lessee cannot deduct post-production compression costs where sale occurred on the lease

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

and royalty clause was based on proceeds at the mouth of the well; court noted that compression was installed without consulting royalty owners as to size, location and number of compressors); *and Gilmore v. Superior Oil Co.,* 192 Kan. 388, 388 P.2d 602 (1964) (could not recover compression costs under lease based on "proceeds from the sale of gas at the mouth of the well"; court emphasized that compression was installed *on the lease* and recognized duty to market, distinguishing situations where market is distant from the lease) *with Matzen v. Hugoton Prod. Co.,* 182 Kan. 456, 321 P.2d 576, 581–82 (1958) (where gas gathered, processed and sold off premises, lessee may deduct these costs from gross proceeds under clause based on proceeds from the sale of gas, even though lease silent as to where market must be found); *and Molter v. Lewis,* 156 Kan. 544, 134 P.2d 404, 406 (1943) (implied covenant to market does not require lessee to bear cost of transporting oil by truck to a distant place even though lease provided for delivery by lessee to lessor into pipeline "free of cost"). *See also Ashland Oil & Refining Co. v. Staats, Inc.,* 271 F.Supp. 571, 575 (D.Kan.1967) (refusing to enlarge lessee's duty to market to require it to bear full cost of 153–mile pipeline system).

Arkansas seems to recognize a distinction between royalty based on "proceeds" versus "market value at the well," even if the proceeds are to be determined "at the well." *Compare Hanna Oil & Gas Co. v. Taylor,* 297 Ark. 80, 759 S.W.2d 563, 564–65 (1988) (compression costs necessary to market gas not deductible under lease providing for royalty on proceeds received at the well), *with Clear Creek Oil & Gas Co. v. Bushmiaer,* 165 Ark. 303, 264 S.W. 830, 832 (1924) (under lease calling for royalty based on market price at the wells, royalty was net price after deducting transportation costs).

**\*129** Kentucky and Wyoming decisions appear to permit the deduction of at least transportation charges where the sale occurs off the lease. *Reed v. Hackworth,* 287 S.W.2d 912, 913–14 (Ky.Ct.App.1956) (where lease silent as to place of market, royalty is based on market at the well); *Kretni Dev. Co. v. Consolidated Oil Corp.,* 74 F.2d 497, 500 (10th Cir.1934), *cert. denied,* 295 U.S. 750, 55 S.Ct. 829, 79 L.Ed. 1694 (1935), (obligation to market did not extend to providing ninety-mile pipeline for distant market at sole cost of lessee).

California law appears to allow the deduction of marketing costs under a "market price at the well" clause, absent language to the contrary. *Atlantic Richfield Co. v. State,* 214 Cal.App.3d 533, 262 Cal.Rptr. 683, 688 (1989, review denied) (unless there is clear language to the contrary, lessor bears proportionate share of processing and transportation costs when term "market price at the well" is used).

The North Dakota supreme court took a route similar to that of our court of appeals in *Judice. West v. Alpar Resources, Inc.,* 298 N.W.2d 484, 490–91 (N.D.1980). The North Dakota court found a royalty clause ambiguous where it specified only that the royalty was "one-eighth of the proceeds from the sale of the gas," and did not specify whether proceeds were to be determined at the well or at the point of sale. The North Dakota court proceeded to construe the lease against the lessor as a matter of law, requiring the lessor to bear all costs. *Id.* at 491.

Finally, courts applying Louisiana law have uniformly held that post-production costs are deductible under a "market value at the well" clause, commencing with the Louisiana supreme court's decision in *Wall v. United Gas Pub. Serv. Co.,* 178 La. 908, 152 So. 561, 564 (1934) (market price means market value in the field and the lessee is not required to bear all the expense of carrying gas to a market beyond the field). Louisiana has applied a "reconstruction" approach to determine market value. Value is "reconstructed" by beginning with the gross proceeds from the sale of the gas and deducting any costs of taking the gas from the wellhead to the market. *See Merritt v. Southwestern*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Elec. Power Co.,* 499 So.2d 210, 213 (La.Ct.App.1986) (compression charges to market gas, as opposed to produce it, could be deducted). For a good discussion of the rationale underpinning Louisiana law in this area, see *Freeland v. Sun Oil Co.,* 277 F.2d 154 (5th Cir.1960), *cert. denied,* 364 U.S. 826, 81 S.Ct. 64, 5 L.Ed.2d 55 (processing costs can be deducted). *See also Sartor v. United Gas Pub. Serv. Co.,* 84 F.2d 436, 440 (5th Cir.1936) (transportation charges deductible under "market value at the well" leases).

Having canvassed the law of other states, it can fairly be said that there is no consensus among other jurisdictions as to when post-production costs are to be shared by the royalty owner, although the majority view appears to be that royalty owners do share in costs, at least where the sale occurs off the lease.

C

In the case before us, the court of appeals concluded that "market value at the well" meant that the royalty interests were subject to costs incurred after production, including taxes, costs of treating the gas, and costs of transportation to market, unless other language in the lease modified this provision. 895 S.W.2d at 836. This is the better-reasoned view.

While Texas recognizes that the lessee has an implied duty to market gas, *Cabot Corp. v. Brown,* 754 S.W.2d 104, 106 (Tex.1987), we have never determined who bears the cost of marketing gas beyond the wellhead in the absence of an express agreement. There is an express agreement in this case as to how and where royalty will be determined. The implied duty to market gas cannot override that agreement. The words "at the well" should be given their straightforward meaning. Market value "at the well" means the value of gas at the well, before it is transported, treated, compressed or otherwise prepared for market.

In construing language commonly used in oil and gas leases, we must keep in mind that there is a

need for predictability and uniformity as to what the language used means. Parties entering into agreements expect that **\*130** the words they have used will be given the meaning generally accorded to them. As we have seen, the decisions under Texas law are not entirely consistent, but the weight of the precedent is that post-production costs are to be shared by the royalty owner under a lease that values the gas based on "market value at the well." *See Phillips Petroleum Co.,* 155 F.2d at 198; *Martin,* 571 F.Supp. at 1411–15; *Hagen,* 683 S.W.2d at 28; *and Le Cuno Oil Co.,* 306 S.W.2d at 193. *See also Parker,* 716 S.W.2d at 648. These decisions are not binding, but are persuasive.

Having concluded that marketing costs are to be shared by the royalty interest owners under a "market value at the well" clause, absent language to the contrary, it must be determined whether there is language in the leases in this case that re-allocates these costs.

III

The language of the pertinent clause states:

Lessee shall pay the Lessor ... market value at the well for all gas ... sold ... off the leased premises ... provided, however, that there shall be no deductions from the value of Lessor's royalty by reason of any required processing, cost of dehydration, compression, transportation, or other matter to market such gas.

It is clear certain "deductions" are prohibited. The question that must be answered is from *what* are deductions prohibited. The clause says "from the value of Lessor's royalty." The value of Lessor's royalty is "market value at the well" for gas sold off the leased premises.

The court of appeals correctly observed that the intent of the parties is determined from what they actually expressed in the lease as written, not what they may have intended but failed to express. 895 S.W.2d at 836. However, the court of appeals did not apply this principle. It reasoned that the parties

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

"must have intended *something* by this language," and in order to give the language some meaning, the court construed the proviso to mean that royalty owners do not share in post-production costs. *Id.*

There is little doubt that at least some of the parties to these agreements subjectively intended the phrase at issue to have meaning. However, the use of the words "deductions from the value of Lessor's royalty" is circular in light of this and other courts' interpretation of "market value at the well." The concept of "deductions" of marketing costs from the value of the gas is meaningless when gas is valued at the well. Value at the well is already net of reasonable marketing costs. The value of gas "at the well" represents its value in the marketplace at any given point of sale, less the reasonable cost to get the gas to that point of sale, including compression, transportation, and processing costs. Evidence of market value is often comparable sales, as the Court indicates, or value can be proven by the so-called net-back approach, which determines the prevailing market price at a given point and backs out the necessary, reasonable costs between that point and the wellhead. But, regardless of how value is proven in a court of law, logic and economics tell us that there are no marketing costs to "deduct" from value at the wellhead. *See Piney Woods Country Life Sch.,* 726 F.2d at 231.

Further, prohibiting deductions "from the value of Lessor's royalty" is not the equivalent of directing that value be based on anything other than "market value at the well." The Court is not presented with a clause similar to one at issue in *Judice v. Mewbourne Oil Co.,* 939 S.W.2d 133, 136 (Tex.1996), where a division order directed royalties to be based on "gross proceeds realized at the well." There is an inherent, irreconcilable conflict between "gross proceeds" and "at the well" in arriving at the value of the gas. That conflict renders the phrase ambiguous. The proviso in the Heritage leases does not create an ambiguity. It is simply ineffective.

As long as "market value at the well" is the benchmark for valuing the gas, a phrase prohibiting the deduction of post-production costs from that value does not change the meaning of the royalty clause. Thus, even if the Court were to hold that a lessee's duty to market gas includes the obligation to absorb all of the marketing costs, the proviso at **\*131** issue would add nothing to the royalty clause. All costs would already be borne by the lessee. It could not be said under that circumstance that the clause is ambiguous. It could only be said that the proviso is surplusage.

However, the proviso prohibiting the deduction of marketing costs would not be surplusage if we interpreted "market value at the well" to obligate the lessee to pay some, but not all, marketing costs. For example, it has been argued that at least some post-production costs, such as compression, should be borne solely by the lessee as part of its duty to market the gas, but that other costs, such as processing, should be shared by the lessor. *See, e.g., Garman v. Conoco, Inc.,* 886 P.2d at 654. Such an interpretation of a royalty clause would mean that value is determined on a basis other than value "at the well." If "value" were not referable to "market value at the well," but encompassed other considerations, then the proviso could be construed to prohibit the deduction of any costs "required ... to market such gas." But such an approach injects uncertainty into the meaning of "market value at the well" leases, and could lead to a fact-finding inquiry in virtually every case as to what was and was not a cost "required to market the gas." This weighs heavily against adopting the approach apparently taken in Colorado where the lessee has a duty to "create a marketable product," and a fact question exists as to what costs are required to make the gas marketable. *Id.* at n. 3. Our Court has correctly concluded that "market value at the well" means just that, what a willing buyer would pay at the well, recognizing there would be costs to get the gas from the wellhead to a market.

There are any number of ways the parties could

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

939 S.W.2d 118, 39 Tex. Sup. Ct. J. 537
**(Cite as: 939 S.W.2d 118)**

have provided that the lessee was to bear all costs of marketing the gas. If they had intended that the royalty owners would receive royalty based on the market value at the point of *delivery or sale,* they could have said so. If they had intended that *in addition to* the payment of market value at the well, the lessee would pay all post-production costs, they could have said so. They did not. There is no direct statement in the leases that the royalty owners are to receive anything *in addition* to the value of their royalty, which is based on value at the well. To the contrary, the leases only prohibit any *deduction* from value at the well. This distinction may be a fine one, but the language used is not ambiguous and must be given its ordinary meaning.

We cannot re-write the agreement for the parties. *See, e.g., Exxon v. Middleton,* 613 S.W.2d at 245 (quoting *Vela,* 429 S.W.2d at 871) (explaining that if Exxon had intended its royalty obligation to be based on the prices it actually received under long term sales contracts, it could have agreed in the lease that royalty would be based on the "amount realized" from the sale, rather than "market value at the well").

\* \* \* \* \* \*

For the foregoing reasons, I concur in the judgment of the Court.

Justice GONZALEZ, joined by Justice ABBOTT, dissenting.

The simple question presented in this case is whether Heritage can deduct transportation costs from the value of NationsBank's royalties under these leases. The language at issue, which is common to each contract, reads as follows:

[T]here shall be no deductions from the value of Lessor's royalty by reason of any required processing, cost of dehydration, compression, transportation, or other matter to market such gas.[FN1]

> FN1. The royalty clause in one lease differs slightly from the others. However, any

differences are immaterial to resolving the issue presented.

What could be more clear? This provision expresses the parties' intent in plain English, and I am puzzled by the Court's decision to ignore the unequivocal intent of sophisticated parties who negotiated contractual terms at arm's length. *See M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 12, 92 S.Ct. 1907, 1914, 32 L.Ed.2d 513 (1972) (noting that, absent compelling reason, contracts "made in an arm's-length negotiation by experienced **\*132** and sophisticated businessmen ... should be honored by the parties and enforced by the courts"); *accord Prudential Ins. Co. v. Jefferson Assoc.,* 896 S.W.2d 156, 161 (Tex.1995). In my opinion, both the trial court and the court of appeals correctly held that this language clearly forbids Heritage from deducting transportation costs to arrive at the market value of the gas on which the royalty payment is based.

Fundamental principles of Texas law hold that competent parties enjoy the utmost freedom of contract and that courts will enforce a contract freely and voluntarily made for a lawful purpose. *Crutchfield v. Associates Inv. Co.,* 376 S.W.2d 957, 959 (Tex.Civ.App.—Dallas 1964, writ ref'd). Under basic rules of contract interpretation, this Court must give effect to the written expression of the parties' intent. *See Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994). To do so involves reading all parts of the contract together, giving effect to each individual part. *Id.* In this case, however, the Court unnecessarily looks to the trade meaning of the words used to conclude that the post-production clause is surplusage as a matter of law. 939 S.W.2d 118. Similarly, the concurrence needlessly considers other judicial constructions of "market value at the well," including several non-Texas cases, without analyzing whether those contracts bear any similarity to the ones at issue here. *Id.* at 124 (Owen, J., concurring). Neither the majority nor the concurrence give proper legal effect to specific language in these contracts which

clearly denotes the parties' intent that "there shall be no deductions from the value of Lessor's royalty by reason of any ... cost of ... transportation." *See Forbau,* 876 S.W.2d at 133–34.

Heritage was free to bargain over whether NationsBank would have the right to participate in post-production business activities and receive royalties derived from those activities. The lease provision incorporates all four of the distinct business activities into which most gas production operations can be divided: production, gathering, marketing, and processing. It clearly excludes deductions for "any required processing, cost of dehydration, compression, transportation, or other matter to market such gas." The drafters of this clause could have allowed for deductions of the cost of any of the distinct business activities that occur after the production of gas, but chose not to include language to that effect. The language in the lease provision is clear, and in the absence of fraud or misrepresentation, a party is charged with knowing the legal effect of a contract voluntarily made. *Barfield v. Howard M. Smith Co.,* 426 S.W.2d 834, 838 (Tex.1968). Because the provision at issue is unambiguous, the Court errs by ignoring the clear intent of the parties.

The majority and the concurrence both state that they agree with the trial court and the court of appeals that the leases in question are unambiguous. 939 S.W.2d 118; *id.* at 124 (Owen, J., concurring). I find their agreement odd and amusing given that, interpreting the same contracts, both opinions reach a completely opposite result than the lower courts. By definition, if a contract is reasonably susceptible to more than one meaning, it is ambiguous. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *Skelly Oil Co. v. Archer,* 163 Tex. 336, 356 S.W.2d 774, 778 (1961). By supplying a meaning not found in the leases for "market value at the well," both the majority and the concurrence create an ambiguity where none exists.

When a contract contains an ambiguity, we consider the words used in the instrument, in light of the surrounding circumstances, and apply the appropriate rules of construction to settle their meaning. *Harris v. Rowe,* 593 S.W.2d 303, 306 (Tex.1979). Assuming for the sake of argument that these contracts are ambiguous, we must apply two of the most basic rules governing interpretation of oil and gas leases: (1) contracts are to be construed against the scrivener; and (2) leases are to be construed against the lessee. The "construe against the scrivener" canon flows from basic contract law. *See* Kramer, *The Sisyphean Task of Interpreting Mineral Deeds and Leases: An Encyclopedia of Canons of Construction,* 24 TEX.TECH L.REV. 1, 103 (1993). This canon allocates the burden of uncertainty caused by the use of inappropriate or vague language in a written instrument. To the extent the court can identify the party who either drafted the instrument **\*133** or provided the form used, the canon requires that the uncertainty be resolved against that party. The "construe against the lessee" canon functions similarly. When an oil and gas lease is subject to two or more equally reasonable constructions, "the one more favorable to the lessor will be allowed to prevail." *Zeppa v. Houston Oil Co.,* 113 S.W.2d 612, 615 (Tex.Civ.App.—Texarkana 1938, writ ref'd); *see also Stanolind Oil & Gas Co. v. Newman Bros. Drilling Co.,* 157 Tex. 489, 305 S.W.2d 169, 176 (1957). In the present case, Heritage indisputably wrote the lease contracts and occupied the position of lessee. Thus, even if the provision is ambiguous, application of the basic rules of interpreting oil and gas leases would result in a construction against Heritage and in favor of NationsBank.

I have one final concern about today's decision. By attributing an unequivocal, precise meaning to "market value at the well" in oil and gas leases, the Court announces a new rule that should be applied only prospectively. *See generally Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 515–521 (Tex.1992) (discussing factors for deciding between retroactive and prospective operation). We have limited the effect of our decisions in this man-

939 S.W.2d 118, 39 Tex. Sup. Ct. J. 537
**(Cite as: 939 S.W.2d 118)**

ner when considerations of fairness and policy preclude full retroactivity. *See, e.g., Moser v. United States Steel Corp.,* 676 S.W.2d 99, 103 (Tex.1984) (limiting new rule concerning phrase "other minerals" in deeds to prospective application). This result is appropriate in the present case because, before now, the meaning of "market value at the well" was subject to specific negotiation by the parties. Indeed, as the concurring opinion notes, this Court has never decided previously whether " 'market value at the well' includes or excludes post-production costs," 939 S.W.2d at 127 (Owen, J., concurring), and lower courts have not reached agreement on the issue. *See id.* at 126. *Compare Texas Oil & Gas Corp. v. Hagen,* 683 S.W.2d 24, 28 (Tex.App.—Texarkana 1984) (concluding that "market value at the well" includes deduction for "the reasonable cost of transporting the gas to the market"), *writ dism'd as moot,* 760 S.W.2d 960 (Tex.1988) *with Heritage Resources, Inc. v. Nationsbank,* 895 S.W.2d 833, 836–37 (Tex.App.—El Paso 1995) (determining that market-value royalty clause did not allow deduction for transportation costs), *rev'd,* 939 S.W.2d 118 (Tex.1996). Today, the Court decides that question, but substitutes its own interpretation of the phrase for the meaning the parties intended. The Court blindsides NationsBank and other lessors by mandating that this decision apply retroactively.

This decision wrongfully denies parties such as NationsBank the right to collect royalty payments for which they clearly bargained. For the foregoing reasons, I dissent.

Tex.,1996.
Heritage Resources, Inc. v. NationsBank
939 S.W.2d 118, 39 Tex. Sup. Ct. J. 537

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


▷

Supreme Court of Texas.
LINCOLN et ux.
v.
BENNETT.

No. 7704.
Nov. 12, 1941.
Motion for Rehearing Overruled Dec. 10, 1941.

Error to Court of Civil Appeals of Fifth Supreme Judicial District.

Suit by James A. Lincoln and wife against Dale E. Bennett of cancel a trust deed. From an adverse judgment, the plaintiffs appealed to the Court of Civil Appeals. To review a judgment of the Court of Civil Appeals, 135 S.W.2d 632, affirming the judgment, the plaintiffs bring error.

Judgments of trial court and Court of Civil Appeals reversed in part, and affirmed in part, and judgment rendered.

West Headnotes

**[1] Homestead 202 ⚷122**

202 Homestead
   202II Transfer or Incumbrance
      202k122 k. Estoppel to Assert Invalidity.
Most Cited Cases

Where owners not actually occupying realty, or so using it that its status is dubious at time mortgage is executed, represent that it is not their homestead, or they create a lien by entering into a simulated transaction which has all the outward appearance of a valid, unconditional sale, but which is in fact a mortgage, or they represent that existing notes are valid mechanic's lien notes for improvements, secured by a mechanic's lien contract properly executed, liens are enforced against the homestead, though created neither for purchase money nor improvements contracted for as

provided in constitutional provision that no mortgage, trust deed, or other lien on homestead shall ever be valid, except for purchase money therefor or improvements made thereon. Vernon's Ann.St.Const. art. 16, § 50.

**[2] Homestead 202 ⚷122**

202 Homestead
   202II Transfer or Incumbrance
      202k122 k. Estoppel to Assert Invalidity.
Most Cited Cases

"Estoppel" cannot arise in favor of a lender who has attempted to secure a lien on a homestead in actual use and possession of a family, based on declarations of the husband and wife, made orally or in writing contrary to the facts, and the husband and wife will not be precluded from relying on constitutional provision that no mortgage, trust deed or other lien on homestead shall ever be valid, except for purchase money therefor or improvements made thereon, since to hold otherwise would practically abrogate the Constitution. Vernon's Ann.St.Const. art. 16, § 50.

**[3] Homestead 202 ⚷122**

202 Homestead
   202II Transfer or Incumbrance
      202k122 k. Estoppel to Assert Invalidity.
Most Cited Cases

Where husband and wife occupied realty encumbered by trust deed as their homestead at time of purchase and extension of note, wife was not "estopped" to rely on constitutional provision declaring that no mortgage, trust deed or other lien on homestead shall ever be valid, except for purchase money therefor, or improvements made thereon, because of the fact that husband and wife at time of making of original note and deed of trust represented in designation of homestead that other realty was their homestead. Vernon's Ann.St.Const. art. 16, § 50.

**\*57 \*\*504** Goggans & Ritchie, Nathaniel Jacks, and John B. Stigall, Jr., all of Dallas, for plaintiffs in error.

Liveley, Dougherty & Alexander, of Dallas, for defendant in error.

SHARP, Justice.

This suit was filed by plaintiffs in error, James A. Lincoln and wife, to cancel a deed of trust, dated May 31, 1927, given to secure a loan of $7,000, advanced by defendant in error, Dale E. Bennett, for the purpose of renewing and extending a deed of trust dated May 25, 1922, executed by plaintiffs in error to secure one G. H. Schoellkopf in the payment of a note for $7,000. Plaintiffs in error sought cancellation of the lien and deed of trust on the ground that the property encumbered, a lot situated on Harwood Street in the City of **\*58** Dallas, is their homestead, and has been openly and uninterruptedly used and occupied by them as their homestead since 1907, down to and inclusive of the date of trial, and that the lien is invalid and unenforcible under the provisions of Section 50 of Article XVI of the State Constitution, Vernon's Ann.St.

Defendant in error alleged that the Schoellkopf note was taken up and renewed and extended at the special instance and request of James A. Lincoln, who represented to Hiram F. Lively, the acting representative and attorney of defendant in error, that the Schoellkopf note was secured by a valid **\*\*505** lien on the Harwood Street property, and that the lot was not his homestead when executed; that at the time of the Schoellkopf executed; that at the time of the Shoellkopf transaction, and as a part thereof, plaintiffs in error executed and acknowledged, and caused to be filed for record in the deed records of Dallas County, a designation of homestead, in which they designated property on Lindsley Avenue, in Dallas, then owned by them, as their homestead. It was further alleged that at the time of the purchase and extension of the Schoellkopf note and deed of trust, neither Bennett nor his attorney knew or had any notice that the Harwood Street property was the homestead of plaintiffs in error in 1922, and did not know that the statement contained in the designation of homestead was untrue; that James A. Lincoln concealed the true facts respecting the homestead status in May, 1922, with the intention of inducing him to purchase the Schoellkopf note and deed of trust; and, therefore, that plaintiffs in error are estopped to assert that the original deed of trust made to Schoellkopf is invalid.

The case was submitted to the jury on special issues, and the trial court entered judgment in favor of Dale E. Bennett, foreclosing the deed of trust held by him. The Court of Civil Appeals, by a majority opinion, Chief Justice Bond dissenting, affirmed the judgment of the trial court. 135 S.W.2d 632, 634. This court granted the application for writ of error on the importance of the homestead question involved and because of the dissenting opinion.

Defendant in error contends that Lincoln and wife are estopped from asserting that the deed of trust lien held by him is invalid, because the property upon which such deed of trust was given constitutes their homestead, on two grounds: (a) Because of the representations made by Lincoln and wife in the designation of homestead that such property was not their homestead; and (b) because Lincoln represented to the attorney**\*59** for Bennett that the lien held by Schoellkopf was a valid one.

It is undisputed that the note held by Schoellkopf and Bennett was not made for purchase money or any part thereof, or for taxes due on such property, or for work and material used in constructing improvements thereon. It is also undisputed that Lincoln and wife never occupied the property on Lindsley Avenue, which they designated as their homestead, nor did they make any pretense to occupy same. We quote from the opinion of the Court of Civil Appeals the following statement: 'It is not disputed that, at the time the Schoellkopf loan was consummated in May, 1922, the Harwood Street property was the homestead of appellants, and that, the statements contained in

their homestead designation to the contrary were untrue, and that all other statements or implications contradictory of the idea of its being their homestead at the time were untrue.'

Article XVI, Section 50, of the Constitution declares that 'No mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor, or improvements made thereon, as hereinbefore provided, whether such mortgage, or trust deed, or other lien, shall have been created by the husband alone, or together with his wife; * * *.'

[1] Our courts have in certain cases enforced against the homestead certain liens which were created neither for purchase money nor for improvements contracted for as provided for in the provision of the Constitution just quoted. Those cases are generally classified as follows: '(1) When the owners, not actually occupying the property, or so using it that its status is dubious at the time the mortgage is executed, represent that it is not their homestead; (2) when the owners create a lien by entering into a simulated transaction which has all the outward appearance of a valid, unconditional sale, but which is in fact a mortgage; (3) when the owners represent that existing notes are valid mechanic's lien notes for improvements, secured by a mechanic's lien contract properly executed.'

This case does not fall within any of the three classes above mentioned. Consequently, a discussion of the decisions falling within those three classes would be immaterial to a decision of this case. Also, to do so would unnecessarily prolong this opinion. We shall merely cite some of the leading cases falling within**\*60** those classes: First Texas Joint Stock Land Bank v. Chapman, Tex.Civ.App., 48 S.W.2d 651; McMullan v. San Antonio Joint Stock Land Bank of San Antonio, Tex.Civ.App., 78 S.W.2d 669; Carstens v. Landrum, Tex.Com.App., 17 S.W.2d 803; Parrish v. Hawes, 95 Tex. 185, 66 S.W. 209; Garrett v. Katz, Tex.Civ.App., 23 S.W.2d 436, judgment corrected 27 S.W.2d 373; Nixon v. Hirschi, 134 Tex.

415, 136 S.W.2d 583; **\*\*506**Nat'l Bond & Mortgage Corp. v. Davis et al., Tex.Com.App., 60 S.W.2d 429, 434.

It is undisputed that the debt in controversy does not fall within the provisions of the Constitution above quoted. Here we have the owners of the homestead executing a deed of trust on the property occupied and used by them as a homestead, in violation of the provisions of the Constitution. The possession and occupancy of the property on Harwood Street by Lincoln and his wife was open, certain, and unambiguous, and unbroken for a period of time beginning long before the execution of the deed of trust and the designation of homestead; and such use and occupancy continued down to the trial of this case. The homestead designation executed by Lincoln and wife was made five years prior to the time Bennett acquired said note from Schoellkopf, and during all that time they occupied said property openly and exclusively as their homestead; and such occupancy continued for a period of twenty years.

The jury found: (1) That Lincoln and wife occupied and used the property situated on Harwood Street as their homestead, and that they never did occupy the premises on Lindsley Avenue as a homestead; (2) that Lincoln requested Hiram F. Lively, as attorney for Bennett, to take up and extend the Schoellkopf note and deed of trust; (3) that Lively did not know that the property situated on Harwood Street was used and occupied by Lincoln and wife as a homestead; (4) that Lincoln did not represent to Lively that the property on Harwood Street was not used and occupied by himself and wife as a homestead at the time of the execution of said Schoellkopf note and the deed of trust securing same; (5) that at the time Hiram F. Lively purchased the Schoellkopf note secured by deed of trust for Bennett, he did not rely upon the representations made by Lincoln that the Schoellkopf note was secured by a valid lien on the Harwood Street property. No issue of estoppel on the part of Mrs. Lincoln was submitted to the jury, nor is any com-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaint made regarding that matter.

*61 [2] The case of Texas Land & Loan Co. v. Blalock, 76 Tex. 85, 13 S.W. 12, 13, is one of the outstanding cases bearing upon this question. That case involved the validity of a lien described in a deed of trust containing strong statements that the property upon which a lien was undertaken to be given did not constitute the homestead; and it was sought there, as here, to show that the maker of the note and deed of trust was estopped from asserting that the lien was invalid on account of such property constituting a homestead. In that case Blalock and wife alleged that the land was their homestead before and at the time the deed of trust was executed, and that, therefore, same was void. In that case it appeared indisputably that Blalock and his family occupied the land as their homestead continuously, before and at the time said deed of trust and note were executed, and that it was the homestead of the family. After reciting the facts in that case, this court announced the following rule:

'The constitution forbidding the fixing on the homestead of liens other than such as are thereby expressly permitted, no estoppel can arise in favor of a lender, who has attempted to secure a lien on homestead in actual use and possession of the family, based on declarations of the husband and wife made orally or in writing, contrary to the fact. To hold otherwise would practically abrogate the constitution.

'If property be homestead in fact and law, lenders must understand that liens can not be fixed upon it, and that declarations of husband and wife to the contrary, however made, must not be relied upon. They must further understand that no designation of homestead, contrary to the fact, will enable parties to evade the law, and incumber homesteads with liens forbidden by the constitution. ( Equitable) Mortgage Co. v. Norton, 71 Tex. 683, 10 S.W. 301; Pellat v. Decker, 72 Tex. (578), 581, 10 S.W. 696; Kempner v. Comer, 73 Tex. (196), 203, 11 S.W. 194.'

See, also, Schulz v. L. E. Whitham & Co., 119 Tex. 211, 27 S.W.2d 1093; Rutland Savings Bank v. Isbell, Tex.Civ.App., State Bank, Tex.Civ.App., 75 S.W.2d 167, writ refused; Nixon v. Hirschi, 2d 167, writ refused; Nixon v. Hirschi, 134 Tex. 415, 136 S.W.2d 583.

[3] In 22 Tex.Jur., p. 184, s 128, the rule is stated in the following language: 'The homestead claimant being shown to have been using and occupying the premises, the lien or encumbrance is not sustainable as against the claim of homestead by reason of the *62 fact that the claimant accompanied his disclaimer by a designation of another parcel as being the property**507 in which his homestead right existed.' Also see cases cited in footnotes.

No contention is made that Mrs. Lincoln made any representations to Bennett, or his attorney, to induce Bennett to take up the note held by Schoellkopf, Reliance for estoppel is based upon the representations contained in the designation of homestead executed by Lincoln and wife at the time of the making of the Schoellkopf note and deed of trust, and upon the statements made by Lincoln that the lien held by Schoellkopf was valid. If it should be assumed, without deciding, that Lincoln is estopped to question the lien held by Bennett, that would not prevent his wife, under the facts of this case, from contesting the validity of the lien. She was occupying the homestead on Harwood Street, as the wife of Lincoln, during the years above mentioned, and was using and enjoying such property as her homestead during all that time. She, as well as Lincoln, had homestead rights in such property. It is not shown that she knew about the statements made by Lincoln to Bennett, or to his attorney, to induce Bennett to acquire the Schoellkopf note, or that she ever ratified such statements. There is nothing in this record, except the homestead designation, executed five years prior to that time, that would in any way affect her rights in the homestead. The testimony contained in this record, as we view it, is not sufficient to raise the is-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

sue of estoppel on the part of Mrs. Lincoln, and prevent her from asserting her homestead rights in this property and questioning the validity of the lien held by Bennett. Martin v. Astin, Tex.Com.App., 295 S.W. 584, 585; Miller v. Southland Life Ins. Co., Tex.Civ.App., 68 S.W.2d 558; Bell v. Schwarz, 56 Tex. 353; McLaren v. Jones, 89 Tex. 131, 33 S.W. 849; Parker et al. v. Schrimsher, Tex.Civ.App., 172 S.W. 165; Speer's Law of Marital Rights, 3d Ed., p. 351, s 280.

The judgments of the trial court and Court of Civil Appeals, foreclosing the deed of trust lien held by Bennett on part of Block No. 132, situated on Harwood Street, according to the official map of the City of Dallas, which property is fully described in the deed of trust dated May 31, 1927, executed by Lincoln and wife to Hiram F. Lively, trustee, and which is recorded in Volume 739, page 213, of the Deed of Trust Records of Dallas County, Texas, to which reference is hereby made for a description of the property therein described, are hereby reversed, and judgment is rendered herein denying defendant in error a lien on said property; but said judgments of the trial **\*63** court and Court of Civil Appeals in all other respects are affirmed.

TEX. 1941.
Lincoln v. Bennett
138 Tex. 56, 156 S.W.2d 504

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.





Supreme Court of Texas.
Mary E. McGEORGE, Petitioner,
v.
Ruth VAN METER et al., Respondents.

No. A-8797.
June 20, 1962
Rehearing Denied July 18, 1962.

Action in trespass to try title to recover title and possession of undivided one-half of all oil, gas and other minerals in or under a 95-acre tract of land. The District Court, Wise County, W. A. Hughes, Jr., J., rendered a judgment for the plaintiffs and the defendant appealed. The Fort Worth Court of Civil Appeals of the Second Supreme Judicial Court, 351 S.W.2d 623, affirmed and the defendant brought error. The Supreme Court, Norvell, J., held that where grantee as part of consideration for grantor's conveyance of land, by which grantor reserved one-half royalty in mineral lease rights, assumed payment of grantor's notes secured by deed of trust, and grantee gave second deed of trust to secure extension of grantor's note and an additional loan, and second deed of trust provided that holder of note was subrogated to all rights, powers and equities of original owners of note, exercise of power of sale under second deed of trust foreclosed original grantor's mineral interest.

Judgment of lower courts reversed and judgment rendered.

West Headnotes

**Mortgages 266 ⚷378**

266 Mortgages
    266IX Foreclosure by Exercise of Power of Sale
        266k378 k. Operation and Effect. Most Cited Cases

Where grantee as part of consideration for grantor's conveyance of land by which grantor reserved one-half royalty in mineral lease rights assumed payment of grantor's notes secured by deed of trust, and grantee gave second deed of trust to secure extension of grantor's note and an additional loan, and second deed of trust provided that holder of note was subrogated to all rights, powers and equities of original owners of note, exercise of power of sale under second deed of trust foreclosed original grantor's mineral interest. Vernon's Ann.Civ.St. art. 5522.

**\*552 \*\*580** Hardwicke, Haddaway & Pope, Fort Worth (Claude D. Brown, Fort Worth, with above firm), for petitioner.

Sewell & Forbis, Decatur, for respondents.

**\*553** NORVELL, Justice.

This is an action in trespass to try title brought by Ruth Van Meter and others against Mary E. McGeorge for the recovery of title and possession of an undivided one-half of all the oil, gas and other minerals in, on and under a 95.34 acre tract of land situated in Wise County, Texas. Judgment for the plaintiffs was rendered by the District Court and affirmed by the Court of Civil Appeals.

The case turns upon the question of whether or not a deed of trust foreclosure sale held on January 5, 1937 effectively passed the Stokes (Van Meter et al.) interest to Arthur McGeorge, the purchaser at said sale. The petitoner, Mary E. McGeorge, claims under Arthur McGeorge.

It was agreed that the common source of title was M. A. Small and wife, Laura C. Small.

On June 3, 1916, M. A. Small and Laura A. Small conveyed the 95.34 acre tract to Walter Stokes for a cash consideration.

On June 10, 1916, Walter Stokes and wife, Corine Stokes, executed a deed of trust to W. A.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Bonner, Trustee, conveying among other lands, the 95.34 acre tract here involved. This deed of trust was given to secure four promissory notes including one for $1450.00 due December 1, 1922 and payable to The Bonner Loan & Investment Company. In the briefs this **\*\*581** instrument is generally referred to as the first deed of trust.

On November 10, 1919 at a time when all of the notes above mentioned, except the $1450.00 note, had been paid, Walter Stokes and wife conveyed the 95.34 acre tract to G. W. Griffith for a cash consideration of $6500.00 and the assumption of the $1450.00 note above mentioned. In this deed the grantor reserved the mineral interest which is the subject matter of this action. The wording of the reservation was that, 'Grantor reserves one-half of the royalty and one-half of the mineral lease rights on the hereinafter described tract.'

On March 1, 1923 G. W. Griffith and the heirs of his deceased wife executed a deed of trust to secure a promissory note for $3,000.00 due February 1, 1933 and payable to Percy McGeorge. This deed of trust contained the following provision:

**\*554** 'The holder of the indebtedness secured hereby is expressly subrogated to any and all liens paid by the proceeds of this mortgage.

'The note secured hereby is given in renewal and in extension of a note for $1,450.00 dated October 10, 1916, and due December 1, 1922, executed by Walter Stokes and wife to the Bonner Loan and Investment Company, and secured by a deed of trust recorded in Book 32, Page 133, of the trust deed records of Wise County, Texas, and the holder hereof is subrogated to all the rights, powers, and equities of the original owners and holders of said note.

'The money loaned by the said third party is borrowed for the purpose of providing funds necessary for the payment of debts owing by the estate of Addie E. Griffith, deceased, and constituting valid claims against said estate.'   (Italics supplied.)

In the briefs this 1923 deed of trust is generally referred to as the second deed of trust.

On March 14, 1923, Percy McGeorge received a written assignment of the Stokes $1450.00 note from J. A. Simmons who held the same under mesne assignments from Bonner Loan & Investment Company.

Griffith defaulted in the payment of the $3,000.00 note secured by the second deed of trust and on January 5, 1937 the 95.34 acre tract was sold at trustee's sale to Arthur McGeorge for $500.00.

Deed of trust sales are largely controlled by statute in this state, Article 3810, Vernon's Ann.Tex.Stats., and the provisions of the deed of trust given by Stokes to W. A. Bonner, trustee, on June 10, 1916, were substantially the same as those contained in the later deed of trust of March 1, 1923, insofar as the procedures relating to an extra-judicial foreclosure in case of default in the payment of indebtedness were concerned. The Court of Civil Appeals held in effect that Griffith could have agreed with McGeorge that the power of sale contained in the second deed of trust would be effective to foreclose the Stokes reserved mineral interest insofar as the indebtedness originally represented by the $1450.00 note was concerned, but that the **\*555** language selected by them in their wording of the second deed of trust did not disclose such intention.[FN1]

> FN1.   Tex.Civ.App., 351 S.W.2d 623, 1. c. 626.

We are unable to agree with this latter conclusion.

The Stokes $1450.00 indebtedness was originally secured by a deed of trust lien covering the entire 95.34 acre tract. Griffith had assumed payment of this indebtedness and was authorized to extend the payment thereof without the joinder of Stokes. He could not however subject the Stokes retained

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

mineral interest to any additional indebtedness. The second deed of trust was, however, effective to extend **\*\*582** the $1450.00 note and preserve the lien securing the payment thereof. Article 5522, Vernon's Ann.Tex.Stats. As pointed out by the Court of Civil Appeals, the controlling question presented is whether the exercise of the power of sale under the second deed of trust effectively foreclosed the Stokes mineral interest.

We think that it did. While the second deed of trust does not contain the words 'merged' and 'incorporated', it did expressly provide that the note secured by the second deed of trust was given in renewal and extension of the Stokes $1450.00 note and that the holder thereof was 'subrogated to all the rights, powers, and equities of the original owners and holders of said $1450.00 note.' This is the usual and customary language employed in instruments which have for their object the carrying forward of an indebtedness and its securing lien for the purpose of incorporating the same into a new form of security.

The facts disclosed by the opinion in Countiss v. Baldwin, Tex.Civ.App., 151 S.W.2d 235, dism., judg. cor., are similar to those shown by the record before us. In Countiss, it appears that in 1919 one Kirk executed a deed of trust to secure an indebtedness due the Federal Land Bank. In 1920 he conveyed a mineral interest to Baldwin. In 1925 the Federal Land Bank advanced further monies to Kirk, extended the time of payment of the 1919 loan, and took a new deed of trust from Kirk. In commenting upon the effect that a foreclosure under this deed of trust had on the Baldwin interest, the Court of Civil Appeals said:

'Appellees (the holders of the Baldwin mineral interest) contend that their royalty interest was not foreclosed by the trustee's sale made under the 1925 deed of trust, because they did not join in the execution of this deed of trust. Appellees **\*556** took their mineral deed burdened by the deed of trust lien of 1919, and Kirk could renew and extend this lien without the necessity of a joinder of the repres-entatives of the Baldwin estate. Allison-Richey Gulf Coast Home Co. v. Welder, Tex.Civ.App., 220 S.W. 392; Templeman & Son v. Kempner, Tex.Civ.App., 223 S.W. 293; Richmond v. Nowlin, Tex.Civ.App., 135 S.W.2d 521.

'Appellees could have protected their royalty interest by paying off the indebtedness secured by the 1919 deed of trust prior to either one of the trustee sales. Hampshire v. Greeves, 104 Tex. 620, 143 S.W. 147; Texas Company v. Tucker, supra (Tex.Civ.App., 129 S.W.2d 762).

'After the trustee's sale of February 5, 1935, appellees were possessed, at most, with a mere equity of redemption, as distinguished from title, legal or equitable, and such equity if any, was barred by the four-year statute of limitation, Art. 5529, Vernon's Ann.Civ.St., and lost to appellees under the doctrine of laches and stale demand. Parks v. Worthington, 39 Tex.Civ.App. 421, 87 S.W. 720; Pierce v. Moreman, 84 Tex. 596, 20 S.W. 821; Groesbeeck v. Crow, 85 Tex. 200, 20 S.W. 49; Jasper State Bank v. Braswell, 130 Tex. 549, 111 S.W.2d 1079, 115 A.L.R. 329; Richmond v. Nowlin, supra (Tex.Civ.App., 135 S.W.2d 521); Texas Company v. Tucker, supra.'

The Court of Civil Appeals in this case points out that the opinion in Countiss v. Baldwin does not set out the language contained in the 1925 deed of trust relating to the prior deed of trust executed by Kirk in 1919. It is inferred that the language of the second deed of trust may have been entirely sufficient to have vested the trustee in the second deed of trust with full power to sell the property covered by the 1919 deed of trust in order to discharge the indebtedness secured by said mortgage which had been extended by the execution of the second deed of trust. This seems to be the only possible legal distinction between**\*\*583** Countiss and this case. We believe the propositions of law discussed in the excerpt from the Countiss opinion above set out were correctly decided, and consequently we are again met by the recurring question: Was the subrogation language contained in the Griffith-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

McGeorge deed of trust of 1923 sufficient in law to vest in the trustee in said deed of trust the power to sell the property and thus foreclose the lien as it existed in 1916 at the time the Stokes-Bonner deed of trust was executed. We hold the language used in the 1923 deed of trust was sufficient and this holding settles the case as it appears that the indebtedness evidenced**\*557** by the original note for $1450.00 had not been discharged at the time of the 1937 deed of trust foreclosure sale.

This does not mean that any second deed of trust given upon property automatically carries forward the power to sell such property under the second deed of trust in order to pay an indebtedness secured by a first deed of trust even though the time for the payment of such indebtedness be extended by a valid agreement. One of the cases cited by the Court of Civil Appeals is illustrative of this situation. In Winters v. Slover, 151 Tex. 485, 251 S.W.2d 726, this Court considered an unusual deed of trust provision reading as follows:

'It is especially understood and agreed by all parties hereto that this (second) deed of Trust may be declared void * * * in case the interest which matures on the 1st of November, 1925, secured by a (prior) Deed of trust, * * * and in case the interest which matures on the 1st of October, 1925, secured by (another prior) deed of trust * * * shall not have been paid at maturity and any action taken by the beneficiary under said former deeds of trust and extension agreement shall be evidence of the fact that such payment and interest has not been made.'

In view of this provision a subsequent clause relating to an extension of time for the payment of notes and the liens securing the same could not operate to vest a power of sale in the trustee under the subsequent deed of trust which would foreclose all the liens mentioned in the prior deeds of trust. Obviously, if a failure to pay interest under the prior deeds of trust could result in a valid sale under the prior deeds of trust and could render the subsequent deed of trust void, it could not be said that the parties intended an 'incorporation' or a 'merger' of deed of trust liens.

It was also pointed out in Winters that the portion of the second deed of trust relating to an extension of notes and liens referred only to vendor's liens. This Court held that such provision showed 'no intention to incorporate the prior deeds of trust, but shows only an intention to extend the express vendor's liens, and perpetuate the superior legal title in the mortgagee to all surface and all mineral rights. This Chilton had a right to do, both under an authorization by statute, Articles 5520, 5522 and their predecessors, Tex.Civ.Stats., 1925, Vernon's Ann.Civ.St. arts. 5520, 5522; Texas Land & Mortgage Co., Ltd. v. Cohen, Tex.Com.App., 138 Tex. 464, 159 S.W.2d 859. Under the authority of that case, Chilton and Hancock Mutual also would **\*558** have had the right to renew and extend the former deed of trust covering the entire surface and minerals without T. J. Slover's consent. The absence of a provision to such effect shows that this was not done. The renewal of the express vendor's liens was merely to negative any intention on the part of the mortgagee to waive his rights to judicial foreclosure or trespass to try title under the same.' (Italics added.)

In the second deed of trust involved in this case, the first deed of trust lien is mentioned specifically, the indebtedness secured thereby is carried forward and incorporated in the note secured by the second deed of trust and the holder of such note acquired all the rights, powers and equities of the original owner of the note secured **\*\*584** by the first deed of trust. The point of difference between the Court of Civil Appeals and this Court is comparatively narrow and turns upon the wording of the second deed of trust. The language of this instrument, in our opinion, places the case within the rule of Countiss v. Baldwin as above stated.

The judgments of the lower courts are reversed and judgment here rendered that petitioner do have and recover of and from the respondents the title and possession of the real property which is the subject matter of this action, namely, an undivided

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

one-half of all the oil, gas and other minerals in, on and under the 95.34 acre tract here involved.

TEX. 1962.
McGeorge v. Van Meter
163 Tex. 552, 358 S.W.2d 580

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Supreme Court of Texas.
Frankie SIMS, on Behalf of Himself and all Others Similarly Situated; and Patsy Sims, on Behalf of Herself and all Others Similarly Situated, Appellants,
v.
CARRINGTON MORTGAGE SERVICES, L.L.C., Appellee.

No. 13–0638.
Argued Dec. 4, 2013.
Decided May 16, 2014.
Rehearing Denied Oct. 3, 2014.

**Background:** Borrowers brought putative class action against loan servicer for their home equity loans, alleging that parties' post-loan transactions violated Texas Constitution. The United States District Court for the Northern District of Texas, John McBryde, J., 889 F.Supp.2d 883, granted servicer's motion to dismiss. Borrowers appealed. The United States Court of Appeals for the Fifth Circuit, 538 Fed.Appx. 537, affirmed in part and certified questions to the Texas Supreme Court.

**Holding:** The Supreme Court, Hecht, C.J., held that restructuring of home equity loan was not extension of new credit required to comply with constitutional requirements for new loan.

Questions answered.

West Headnotes

**Homestead 202 �kößß99**

202 Homestead
　202I Nature, Acquisition, and Extent
　　　　202I(E) Liabilities Enforceable Against Homestead
　　　　202k99 k. Loans and advances. Most Cited Cases

**Mortgages 266 ⊱ß306**

266 Mortgages
　266VII Payment or Performance of Condition, Release, and Satisfaction
　　　266k306 k. Change in time or mode of payment. Most Cited Cases

The restructuring of a home equity loan that involved capitalization of past-due amounts owed under the terms of the initial loan and a lowering of the interest rate and the amount of installment payments, but did not involve the satisfaction or replacement of the original note, an advancement of new funds, or an increase in the obligations created by the original note, was not a new extension of credit that was required to meet the constitutional requirements for a new loan; capitalization of past-due amounts was simply a mechanism for deferring payments of obligations already owed in a way that allowed borrowers to retain their homes. Vernon's Ann.Texas Const. Art. 16, § 50.

**\*11** David M. Gottfried, Law Office of David Gottfried, P.C., Austin, Earl Berry Jr., Hurt & Berry, LLP, Edom, James Patrick Sutton, The Law Office of J. Patrick Sutton, Austin, Jeffrey W. Hurt, Hurt & Berry LLP, Dallas, TX, for Appellant.

Amanda Schaeffer, Benjamin David Lee Foster, Daron L. Janis, Robert T. Mowrey, Thomas G. Yoxall, William Scott Hastings, Locke Lord LLP, Austin, TX, for Appellee.

Ken Carroll, Carrington Coleman Sloman & Blumenthal, Dallas, TX, for Amicus Curiae Federal National Mortgage Association.

Karen M. Neeley, Cox Smith Matthews, Inc., Austin, TX, for Amicus Curiae Independent Bankers Association of Texas.

B. Scott Daugherty, for Amicus Curiae, Texas Bankers Association.

John C. Fleming, Law Office of John C. Fleming, Austin, TX, for Amicus Curiae Texas Bankers Association.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Chief Justice HECHT delivered the opinion of the Court.

To avoid foreclosure, homeowners and lenders often try to restructure underwater home mortgage loans that are in default by capitalizing past-due amounts as principal, lowering the interest rate, and reducing monthly payments, thereby easing the burden on the homeowners. But home equity loans are subject to the requirements of Article XVI, Section 50 of the Texas Constitution. The United States Court of Appeals for the Fifth Circuit has asked whether those requirements apply to such loan restructuring.[FN1] We answer that as long as the original note is not satisfied and replaced, and there is no additional extension of credit, as we define it, the restructuring is valid and need not **\*12** meet the constitutional requirements for a new loan.

> FN1. 538 Fed.Appx. 537 (5th Cir.2013) (per curiam); *see* TEX. CONST. art. V, § 3–c(a) ("The supreme court [has] jurisdiction to answer questions of state law certified from a federal appellate court.").

## I

Frankie and Patsy Sims obtained a 30–year home equity loan in 2003. In 2009, the Simses, behind on their payments, reached what was entitled a "Loan Modification Agreement" with Carrington Mortgage Services, L.L.C. The agreements involved capitalizing past-due interest and other charges, including fees and unpaid taxes and insurance premiums, and reducing the interest rate and monthly payments. Two years later, the Simses were again behind, and this time CMS sought foreclosure. The Simses resisted, asserting that the 2009 restructuring violated constitutional requirements for home equity loans. The parties then reached a second "Loan Modification Agreement", further reducing the interest rate and payments. The following chart summarizes the loan data at the outset and after the two restructurings:

|  | Principal | Amt. Cap'd | New Prin. | Rate | Payment | Appraisal |
|---|---|---|---|---|---|---|
| 2003 Loan | $76,000.00 | — | — | 9% | $611.51 | $96,000 |
| 2009 Mod. | $72,145.50 | $2,200.00 | $74,345.50 | 6.5% | $511.16 | $72,300 |
| 2011 Mod. | $72,655.61 | $7,368.44 | $80,023.95 | 4.75% | $492.34 | $73,000 |

The original note required the Simses to pay principal, interest, and late charges.[FN2] The security agreement echoed that requirement and added an obligation for the Simses to make payments for "Escrow Items", such as taxes, assessments, and insurance premiums.[FN3] The security agreement also authorized the lender to "do and pay for whatever is reasonable or appropriate" to protect its interest in the property and its rights under the agreement and provided that any amount the lender disbursed to that end "shall become additional debt of Borrower secured by this Security Instrument." The 2009 and 2011 "Loan Modification Agreements" provided that all the Simses' obligations and all the loan documents remained unchanged.[FN4]

> FN2. The note signed by the Simses stated: "In return for a loan that I have received, I promise to pay U.S. $76,000.00 (this amount is called 'principal'), plus interest, to the order of the Lender." The note also provided for a 5% late charge on overdue principal and interest.

> FN3. The security instrument stated: "Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the 'Funds') to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; ... and (c) premiums for any and all insurance required by Lender under Section 5. These items are called 'Escrow Items.' "

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN4. The 2009 agreement stated: "All covenants, agreements, stipulations, and conditions in your Note and Mortgage will remain in full force and effect, except as modified herein, and none of your obligations or liabilities under your Note and Mortgage will be diminished or released by any provisions hereof, nor will this Agreement in any way impair, diminish, or affect [the] rights under or remedies on your Note and Mortgage."

Similarly, the 2011 Agreement stated: "[A]ll terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and [ ] except as otherwise specifically provided in, and expressly modified by, this Agreement, the Lender and you will be bound by, and will comply with, all of the terms and conditions of the Loan Documents."

Two months after the 2011 agreement, the Simses brought this class action **\*13** against CMS in the United States District Court, alleging that CMS's loan modifications for them and other similarly situated borrowers violated Article XVI, Section 50 of the Texas Constitution. Before considering certification, the court dismissed the case under Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action,[FN5] and the Simses appealed. After oral argument, the Fifth Circuit certified the following four questions to us:

FN5. 889 F.Supp.2d 883, 884 (N.D.Tex.2012).

1. After an initial extension of credit, if a home equity lender enters into a new agreement with the borrower that capitalizes past-due interest, fees, property taxes, or insurance premiums into the principal of the loan but neither satisfies nor replaces the original note, is the transaction a modification or a refinance for purposes of Section 50 of Article XVI of the Texas Constitution?

If the transaction is a modification rather than a refinance, the following questions also arise:

2. Does the capitalization of past-due interest, fees, property taxes, or insurance premiums constitute an impermissible "advance of additional funds" under Section 153.14(2)(B) of the Texas Administrative Code?

3. Must such a modification comply with the requirements of Section 50(a)(6), including subsection (B), which mandates that a home equity loan have a maximum loan-to-value ratio of 80%?

4. Do repeated modifications like those in this case convert a home equity loan into an open-end account that must comply with Section 50(t)?

## II

As we have more fully explained in prior decisions, because of Texas' strong, historic protection of the homestead, home equity loans are regulated, not by statute as one might suppose, but by the "elaborate, detailed provisions" of Article XVI, Section 50 of the Texas Constitution.[FN6] To provide guidance to lenders, the Finance Commission and the Credit Union Commission have been authorized by the Constitution and by statute to interpret these provisions, subject to judicial review,[FN7] and the Commissions have done so in Chapter 153 of the Texas Administrative Code.[FN8] "A lender's compliance with an agency interpretation of Section 50, even a wrong interpretation, is compliance with Section 50 itself."[FN9] Thus, in answering the certified questions, we look to the constitutional text and the Commissions' interpretations. However, those interpretations "can do no more than interpret the constitutional text, just as a court would."[FN10] The issue is not whether a lending practice or policy is advisable, something the Commissions would decide in exercising their regulatory functions; the issue is what the Constitution requires.[FN11]

FN6. *Fin. Comm'n of Tex. v. Norwood,* 418 S.W.3d 566, 571 (Tex.2013); *see also LaSalle Bank Nat'l Ass'n v. White,* 246 S.W.3d 616, 618 (Tex.2007) (per curiam) ("Texas became the

last state in the nation to permit home-equity loans when constitutional amendments voted on by referendum took effect in 1997.").

FN7. *Norwood,* 418 S.W.3d at 573; TEX. CONST. art. XVI, § 50(u).

FN8. 7 TEX. ADMIN. CODE §§ 153.1–.96

FN9. *Norwood,* 418 S.W.3d at 573.

FN10. *Id.* at 585.

FN11. *Id.*

**A**

The certified questions assume a distinction between a loan modification and a refinancing that, if understood in financial **\*14** circles,[FN12] is not clear in the text of Section 50. Neither concept is defined in Section 50. The word "refinance" is used eleven times in Section 50, and "refinancing" once.[FN13] In each instance, the reference seems to be to a redone transaction. A form of the word "modify" is used in three places in Section 50. In one, lenders are authorized to "modify" previously provided documentation at closing in exigent circumstances.[FN14] In the other two, lenders can correct noncompliance with Section 50 by sending a borrower "notice modifying any ... amount, percentage, term, or other provision prohibited by this section",[FN15] or, if noncompliance cannot be cured under the other provisions, by offering the borrower a $1,000 credit and "the right to refinance the extension of credit" for the remaining term at no cost "with any modifications necessary to comply" or that the parties agree will comply.[FN16] In these two instances, if not also in the first, a modification could substantially alter the loan; indeed, in the last situation, modifications can shape the refinancing.[FN17]

FN12. CMS points to the Federal Reserve Board's definition of a "refinancing" requiring new Truth In Lending Act disclosures under Regulation Z when refinancing is undertaken by the original creditor, or a holder or servicer of the original obligation. Under this definition, a refinancing is "a new transaction requiring

new disclosures" that "occurs when an existing obligation that was subject to [federal 'closed end credit' disclosure requirements] is satisfied and replaced by a new obligation". 12 C.F.R. § 226.20(a); 12 C.F.R. pt. 226, supp. 1, cmt. 20(a) (Official Staff Interpretations). Some transactions, however, will not be treated as a refinancing under this section, including "[a] change in the payment schedule or a change in collateral requirements as a result of the consumer's default or delinquency, unless the rate is increased, or the new amount financed exceeds the unpaid balance plus earned finance charge and premiums for continuation insurance...." *Id.* § 226.20(a)(4). The Federal National Mortgage Association, in an amicus brief, references the same regulation but does not otherwise attempt to define a distinction between refinancings and modifications. An amicus brief by the Independent Bankers Association of Texas, the Texas Bankers Association, and the Texas Mortgage Bankers Association refers to the distinction but does not attempt to define it. Other federal entities, like HUD and FDIC, have their own glossaries referring to and defining general terms like "modification," "mortgage modification," "refinancing," and "debt restructuring," but these agencies, to fulfill their specific missions, also define and apply more specific classifications or limitations.

FN13. TEX. CONST. art. XVI, § 50(a)(4), (a)(6)(M)(iii), (a)(6)(Q)(vii), (a)(6)(Q)(x)(f), (a)(8); § 50(e) and (f).

FN14. *Id.* § 50(a)(6)(M)(ii).

FN15. *Id.* § 50(a)(6)(Q)(x)(c).

FN16. *Id.* § 50(a)(6)(Q)(x)(f).

FN17. Section 153.96(b) of the Commissions' interpretations contemplates that in order to comply with constitutional requirements, "the lender ... and borrower may ... modify the

equity loan without completing the requirements of a refinance". 7 TEX. ADMIN. CODEE § 153.96(b)(2)(A).

The modification-refinancing distinction is one drawn by the Commissions in interpreting Section 50(a)(6)(M)(iii). The effect of that provision is to prohibit a second home equity loan within a year of the first, with certain exceptions. As interpreted by the Commissions, the provision prohibits a "refinancing" like a "new equity loan" but not a "modification".[FN18] According to the **\*15** Commissions, a modification does not involve satisfaction or replacement of the original note, an "advance of additional funds", or new terms that would not have been permitted for the original "extension of credit".[FN19] Further, the original loan and a subsequent modification are treated as a single transaction, including for purposes of the 3% fee cap.[FN20]

> FN18. " § 153.14. One Year Prohibition: Section 50(a)(6)(M)(iii)
>
> "An equity loan may not be closed before the first anniversary of the closing date of any other equity loan secured by the same homestead property.
>
> "(1) Section 50(a)(6)(M)(iii) prohibits an owner who has obtained an equity loan from:
>
> "(A) **refinancing** the equity loan before one year has elapsed since the loan's closing date; or
>
> "(B) obtaining a new equity loan on the same homestead property before one year has elapsed since the previous equity loan's closing date, regardless of whether the previous equity loan has been paid in full.
>
> "(2) Section 50(a)(6)(M)(iii) does not prohibit **modification** of an equity loan before one year has elapsed since the loan's closing date. A modification of a home equity loan occurs when one or more terms of an existing equity loan is modified, but the note is not satisfied

and replaced. A home equity loan and a subsequent modification will be considered a single transaction. The home equity requirements of Section 50(a)(6) will be applied to the original loan and the subsequent modification as a single transaction.

> "(A) A modification of an equity loan must be agreed to in writing by the borrower and lender, unless otherwise required by law. An example of a modification that is not required to be in writing is the modification required under the Soldiers' and Sailors' Civil Relief Act.
>
> "(B) The advance of additional funds to a borrower is not permitted by modification of an equity loan.
>
> "(C) A modification of an equity loan may not provide for new terms that would not have been permitted by applicable law at the date of closing of the extension of credit.
>
> "(D) The 3% fee cap required by Section 50(a)(6)(E) applies to the original home equity loan and any subsequent modification as a single transaction."
>
> 7. TEX. ADMIN. CODE § 153.14 (emphasis added).
>
> FN19. *Id.* § 153.14(2).
>
> FN20. *Id.* § 153.14(2)(D).

But Section 50(a)(6)(M)(iii) of the Constitution does not mention refinancing or modification. It states:

(a) The homestead ... is ... protected from forced sale[ ] for the payment of all debts except for: ...

(6) *an extension of credit* that: ...

(M) is closed not before: ...

(iii) the first anniversary of the closing date of any other extension of credit described by Subsec-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion (a)(6) of this section secured by the same homestead property [with certain exceptions]....FN21

> FN21. TEX. CONST. art. XVI, § 50 (a)(6)(M)(iii) (emphasis added).

The applicability of this particular provision, as well as all of Section 50(a)(6), which governs home equity loans, depends not on whether the transaction is a modification or a refinance but on whether it is an "extension of credit". If the restructuring of a home equity loan does not involve a new extension of credit, the requirements of Section 50(a)(6) do not apply. Thus, we restate the first certified question as follows:

1. After an initial extension of credit, if a home equity lender enters into a new agreement with the borrower that capitalizes past-due interest, fees, property taxes, or insurance premiums into the principal of the loan but neither satisfies nor replaces the original note, is the transaction *a new extension of credit* for purposes of section 50 of Article XVI of the Texas Constitution?

**B**

Neither the Constitution nor the Commissions' interpretations define an "extension of credit", but its meaning is clear. Credit is simply the ability to assume a debt repayable over time, and an extension of credit affords the right to do so in a **\*16** particular situation.FN22

> FN22. *See, e.g.,* TEX. FIN.CODE § 31.002(a)(34) (" 'Loans and extensions of credit' means direct or indirect advances of money ... to a person that are conditioned on the obligation of the person to repay...."); *id.* § 181.002(a)(28) (same); *id.* § 350.001(a) ("credit means the right granted to a debtor to defer payment of debt or to incur debt and defer its payment"); *id.* § 393.001(4) (" 'extension of consumer credit' means the right to defer payment"); *see also* 7 TEX. ADMIN. CODE § 12.3(a)(2) (defining "[l]oans or exten-

sions of credit" for purposes of TEX. FIN.CODE § 34.201 as including various transactions involving an advance of funds to be repaid over time).

The Simses argue that any increase in the principal amount of a loan is a new extension of credit within the meaning of Section 50(a)(6), in effect equating the loan principal with an extension of credit. The Constitution contradicts the Simses' argument. Section 50(a)(6)(E) refers to principal as a component of an extension of credit, capping fees at "three percent of the original principal amount *of* the extension of credit".FN23 The extension of credit for purposes of Section 50(a)(6) consists not merely of the creation of a principal debt but includes all the terms of the loan transaction. Terms requiring the borrower to pay taxes, insurance premiums, and other such expenses when due protect the lender's security and are as much a part of the extension of credit as terms requiring timely payments of principal and interest. The Simses argue that in restructuring a loan to capitalize past-due amounts, the lender is actually advancing additional funds to itself (past-due interest) or others (past-due taxes and insurance) to pay those amounts for the borrower, and that this constitutes a new extension of credit. But the borrower's obligation for such amounts, and the lender's right to pay them to protect its security, were all terms of the original extension of credit. The Simses argue that requiring interest on capitalized, past-due amounts is really a new loan, but it is simply a mechanism for deferring payment of obligations already owed in a way that allows the borrower to retain his home.

> FN23. TEX. CONST. art. XVI, § 50(a)(6)(E) (emphasis added).

The Simses argue that a loan that can be restructured to change the amount of the periodic payments does not meet the requirement of Section 50(a)(6)(L)(i) that loans be "scheduled to be repaid ... in substantially equal successive period installments".FN24 But the required schedule is not one that, when initially set, can never be altered. After all, whenever a payment is missed, the schedule is altered. Further, Section 50(g) gives the borrower the right to prepay the loan,FN25

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

which would alter the initial schedule. Section 50(a)(6) does not forbid a revision of the initial repayment schedule that merely adjusts the regular installment amount.

> FN24. *Id.* § 50(a)(6)(L)(i).

> FN25. TEX. CONST. art. XVI, § 50(g).

CMS argues that restructuring a loan does not involve a new extension of credit so long as the borrower's note is not satisfied or replaced and no new money is extended. We agree that these two conditions are necessary, but we cannot say with assurance that they are sufficient. For example, a restructuring to make the homestead lien security for another indebtedness, such as the borrower's consumer or credit card debt, would certainly be a new extension of credit. The test should be whether the secured obligations are those incurred under the terms of the original loan.

**\*17** The Simses object that this test provides no effective limit on the size or frequency of additions to principal. But the terms of the original loan supply the limit. The Simses' argument is that any change in principal is a new extension of credit, but as we have shown, their position is inconsistent with Section 50.

The Simses argue that it matters not that, as in their own situation, restructuring lowers the interest rate and the amount of installment payments, and makes it possible for borrowers to keep their homes and meet their obligations. Lenders have two options other than foreclosing on loans in default: further forbearance and forgiveness. Nevertheless, the Simses' argument encourages lenders to foreclose, which is certainly at odds with the fundamental purpose of Section 50: to protect the homestead.

To the first certified question, we answer: the restructuring of a home equity loan that, as in the context from which the question arises, involves capitalization of past-due amounts owed under the terms of the initial loan and a lowering of the interest rate and the amount of installment payments, but does not involve the satisfaction or replacement of the original note, an advance-

ment of new funds, or an increase in the obligations created by the original note, is not a new extension of credit that must meet the requirements of Section 50.

### C

Our reasons for answering the first question as we have largely dictate our answers to the other three certified questions.

Is the capitalization of past-due interest, taxes, insurance premiums, and fees an "advance of additional funds" under the Commissions' interpretations of Section 50?[FN26] No, if those amounts were among the obligations assumed by the borrower under the terms of the original loan. And more importantly, such capitalization is not a new extension of credit under Section 50(a)(6).

> FN26. 7 TEX. ADMIN. CODE § 153.14.

Must a restructuring like the Simses' comply with Section 50(a)(6)? No, because it does not involve a new extension of credit, for the reasons we have explained. The Simses argue that any restructuring must satisfy Section 50(a)(6)(B), which requires a home equity loan to be

> of a principal amount that when added to the aggregate total of the outstanding principal balances of all other indebtedness secured by valid encumbrances of record against the homestead does not exceed 80 percent of the fair market value of the homestead *on the date the extension of credit is made....*[FN27]

> FN27. TEX. CONST. art. XVI, § 50(a)(6)(B) (emphasis added).

The Simses' argument incorrectly assumes that the restructuring is a new extension of credit.[FN28]

> FN28. The Circuit noted that if the highlighted phrase modified the word "value" and not the word "exceed", the provision would never allow the loan principal, during the life of the loan, to exceed the amount that was the value of the property when the loan was closed. 538

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Fed.Appx. 537, 545–546 (5th Cir.2013) (per curiam). This could happen if the loan-to-value ratio was very close to the limit at the time the loan closed, and when the loan was restructured, the amount capitalized caused the total principal indebtedness to exceed the limit. But nothing in Section 50 suggests that a loan's compliance is to be determined at any time other than when it is made.

Finally, would repeated restructuring convert a home equity loan into an open-**\*18** end account subject to Section 50(t)? Section 50(t) applies to a home equity line of credit—"a form of an open-end account that may be debited from time to time, under which credit may be extended from time to time and under which ... the owner requests advances, repays money, and reborrows money". The repeat transactions are clearly contemplated from the outset. FN29 This description does not remotely resemble a loan with a stated principal that is to be repaid as scheduled from the outset but must be restructured to avoid foreclosure.

> FN29. *See also* TEX. FIN.CODE § 301.002(a)(14)(A) ("In this subtitle ... 'Open-end account' ... means an account under a written contract between a creditor and an obligor in connection with which: (i) the creditor reasonably contemplates repeated transactions and the obligor is authorized to make purchases or borrow money; (ii) an interest or time price differential may be charged from time to time on an outstanding unpaid balance; and (iii) the amount of credit that may be extended during the term of the account is generally made available to the extent that any outstanding balance is repaid....").

\* \* \* \* \* \*

Fundamentally, the requirements of Article XIV, Section 50 of the Texas Constitution for extensions of credit secured by the homestead are designed to protect the homestead, not endanger it. The Constitution does not prohibit the restructuring of a home equity loan that already meets its requirements in order to avoid fore-closure while maintaining the terms of the original extension of credit. We answer the certified questions accordingly.

Tex.,2014.
Sims v. Carrington Mortg. Services, L.L.C.
440 S.W.3d 10, 57 Tex. Sup. Ct. J. 588

END OF DOCUMENT



907 S.W.2d 430, 38 Tex. Sup. Ct. J. 947
**(Cite as: 907 S.W.2d 430)**

▷

Supreme Court of Texas.
STATE FARM LIFE INSURANCE COMPANY
and Ted H. Heaton, III, Petitioners,
v.
Terri BEASTON, Respondent.

No. D–4454.
Argued May 5, 1994.
Delivered June 29, 1995.
Rehearing Overruled Oct. 27, 1995.

Beneficiary of life insurance policy brought action against insurer and its agent, seeking benefits under policy and damages under unfair insurance practices statute. After jury trial, the 201st District Court, Travis County, Joseph H. Hart, J., rendered judgment for beneficiary on coverage, but did not award damages for mental anguish, and both parties brought limited appeals. The Austin Court of Appeals, Third District, 861 S.W.2d 268,Mack Kidd, J., affirmed as modified, and insurer applied for writ of error. The Supreme Court, Owen, J., held that: (1) as matter of first impression, express finding of knowing conduct is prerequisite to recovery of mental anguish damages as "actual damages" available under unfair insurance practices statute; (2) to obtain award of attorney's fees under fee-shifting provisions of same statute, party must prevail on cause of action for which such fees are recoverable and recover damages; and (3) policy lapsed three days prior to insured's death, and was not revived by policy's dividend-at-death provision.

Judgment of Court of Appeals reversed; judgment rendered.

Phillips, C.J., filed opinion concurring in part and dissenting in part, in which Spector, J., joined.

Gammage, J., dissented and filed opinion, in which Hightower, J., joined.

West Headnotes

**[1] Insurance 217 ⚷2028**

217 Insurance
  217XIV Premiums
    217XIV(E) Payment
      217k2025 Method of Payment; Tender
        217k2028 k. Application of dividends or credits. Most Cited Cases
  (Formerly 217k360.2)

Dividend-at-death provision of lapsed life insurance policy, stating that dividend for period from start of policy year to insured's death would be "part of the proceeds," did not entitle beneficiary to receive dividend upon insured's death, and thus did not constitute accumulated dividend which would provide basis for revival of policy under accumulations-to-avoid-lapse provision, where policy had lapsed for nonpayment of premium three days before insured's death, and thus no proceeds were payable at all under policy.

**[2] Insurance 217 ⚷1806**

217 Insurance
  217XIII Contracts and Policies
    217XIII(G) Rules of Construction
      217k1806 k. Application of rules of contract construction. Most Cited Cases
  (Formerly 217k146)

Interpretation of insurance contracts is governed by same rules of construction applicable to other contracts.

**[3] Contracts 95 ⚷147(3)**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k147 Intention of Parties
        95k147(3) k. Construing whole contract together. Most Cited Cases

When construing contract, courts must strive to give effect to written expression of parties' intent, by reading all parts of contract together, and while

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

being particularly wary of isolating single phrase, sentence or section of contract from its surroundings or considering it apart from other provisions.

**[4] Insurance 217 ⟜1832(2)**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
           217k1830 Favoring Insureds or Beneficiaries; Disfavoring Insurers
             217k1832 Ambiguity, Uncertainty or Conflict
               217k1832(2) k. Necessity of ambiguity. Most Cited Cases
    (Formerly 217k146.7(8))

    Courts should construe language of insurance policy against insurer in manner that favors coverage only if policy remains ambiguous despite application of canons of construction.

**[5] Damages 115 ⟜57.45**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
           115III(A)2 Mental Suffering and Emotional Distress
             115k57.44 Insurance Practices
               115k57.45 k. In general. Most Cited Cases
    (Formerly 115k56.10)

    Express finding of knowing conduct is prerequisite to recovery of mental anguish damages as "actual damages" available under unfair insurance practices statute. V.A.T.S. Insurance Code, art. 21.21, § 16(b)(1).

**[6] Damages 115 ⟜57.45**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
           115III(A)2 Mental Suffering and Emotional Distress
             115k57.44 Insurance Practices
               115k57.45 k. In general. Most Cited Cases
    (Formerly 115k56.10)

    Prerequisites for recovery of mental anguish damages under common law are also prerequisites for recovery of such damages as "actual damages" under unfair insurance practices statute. V.A.T.S. Insurance Code, art. 21.21, § 16(b)(1).

**[7] Appeal and Error 30 ⟜215(1)**

30 Appeal and Error
    30V Presentation and Reservation in Lower Court of Grounds of Review
        30V(B) Objections and Motions, and Rulings Thereon
           30k214 Instructions
             30k215 Objections in General
               30k215(1) k. Necessity of objection in general. Most Cited Cases

    Life insurer did not waive error as to jury question that erroneously failed to condition availability of mental anguish damages upon express finding of knowing conduct, in action under unfair insurance practices statute, even though insurer failed to object on that ground at trial, where judgment entered by trial court expressly excluded mental anguish damages, and thus trial court could not be deemed to have found the omitted element of knowing conduct. Vernon's Ann.Texas Rules Civ.Proc., Rule 279.

**[8] Insurance 217 ⟜3342**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(C) Settlement Duties; Bad Faith
           217k3341 Prerequisites for Claim of Breach or Bad Faith
             217k3342 k. In general. Most Cited Cases
    (Formerly 217k3345, 217k602.7)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

To obtain award of attorney's fees under fee-shifting provisions of unfair insurance practices statute, party must (1) prevail on cause of action for which such fees are recoverable, and (2) recover damages. V.A.T.S. Insurance Code, art. 21.21, § 16(b)(1).

**\*431** Larry G. Black and Ranelle M. Meroney, Austin, for petitioners.

Mark L. Kincaid, Joe K. Longley and Philip K. Maxwell, Austin, for respondent.

OWEN, Justice, delivered the opinion of the Court in which GONZALEZ, HECHT, CORNYN, and ENOCH, Justices, join.

PHILLIPS, Chief Justice, and SPECTOR, Justice, join in Parts III, IV, and V.

We are called upon to interpret the terms of a life insurance policy and to decide whether a plaintiff can recover mental anguish damages from an insurance company for a violation of Article 21.21 of the Texas Insurance Code absent a finding that the defendant acted knowingly. Because we hold that the plaintiff is not entitled to benefits under her husband's policy and that a finding of knowing conduct is required to recover mental anguish damages under Article 21.21, we reverse the judgment of the court of appeals, 861 S.W.2d 268, and render judgment that the plaintiff take nothing.

## I

In 1982, Terri and David Beaston bought life insurance policies from Ted Heaton, a State Farm Life Insurance Company agent. The Beastons failed to pay the premium on David's policy due on December 28, 1983. His policy lapsed as of December 28, 1983, and the thirty-one day grace period expired on January 28, 1984. Three days after the expiration of the grace period, David died in an automobile accident. State Farm refused to pay the benefits under his life insurance policy, claiming that coverage had expired before his death.

As the sole beneficiary of her husband's graded premium whole life policy, Terri brought suit against both State Farm and Heaton, asserting, among other claims, that they had violated Article 21.21. She also contended that the terms of the policy guaranteed payment of a dividend at death which should have been used to pay a part of the premium that was in arrears and thereby "cure" the policy's lapse.

The case was tried to a jury. At the close of the evidence, the trial court granted an instructed verdict in Terri's favor on the issue of coverage, finding that the policy was ambiguous and construing it to provide for dividends that "would have been sufficient to avoid the asserted lapse." (The basis of the trial court's ruling is set forth in its judgment.)

Issues were submitted to the jury on Terri Beaston's other claims. The jury found that the defendants had engaged in unfair or deceptive acts and that such conduct was a producing cause of damages to Terri Beaston. The jury failed to find, however, that State Farm or Heaton (1) had engaged in any false, misleading, or deceptive act or practice, (2) had engaged in any unconscionable action or course of action, (3) was negligent, or (4) was grossly negligent. There was a finding that State Farm had not waived any lapse under the policy. An issue as to whether State Farm or Heaton had knowingly engaged in any unconscionable **\*432** conduct was conditioned on an affirmative response to the question that asked whether either defendant had engaged "in any unconscionable action or course of action that was a producing cause of damages to Terri Beaston." Because the jury responded negatively, it did not reach the question asking whether the defendants had engaged in knowing conduct. No objection was made to the conditional submission.

In response to the damage issue, the jury awarded no policy benefits, but awarded $200,000 for mental anguish in the past. The jury was asked to and did award attorney's fees as a percentage of Terri Beaston's recovery, finding that forty percent

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

was a reasonable fee, with increased percentages if the case were appealed to the court of appeals and to this Court.

The trial court rendered judgment in Terri Beaston's favor, awarding the face amount of the policy benefits ($250,000), and prejudgment interest ($147,171). A statutory delay penalty in the amount of twelve percent ($30,000) was added pursuant to Article 3.62 of the Texas Insurance Code, for a total of $427,171, and forty percent of that total ($170,868.40) was included in the judgment as attorney's fees. The trial court stated in its judgment that it "finds no cases that would allow the award of mental anguish damages absent a finding that the conduct of the Defendants was committed knowingly, and therefore ... mental anguish damages will not be awarded, and the jury's answer to Question 8(b) [concerning mental anguish damages] will be disregarded." The trial court additionally refused to treble the actual damages and refused to award attorney's fees based on a calculation that Terri Beaston contended was equal to forty percent of the "recovery" (which would result in attorney's fees of $284,780.87 as calculated by Beaston) as opposed to only forty percent of the damages, including penalty and interest.

The court of appeals reversed the judgment of the trial court, holding that Terri Beaston was not required to obtain a jury finding that State Farm or its agent had knowingly violated Article 21.21 as a prerequisite for the recovery of mental anguish damages. 861 S.W.2d at 275. The court of appeals reinstated the jury's award of $200,000 in mental anguish damages and concluded that the trebling of those damages was mandatory under former Article 21.21, which governed this case.[FN1] The court affirmed the award of policy benefits, prejudgment interest, and a twelve-percent delay penalty,[FN2] but increased the amount of the judgment to include prejudgment interest and attorney's fees based on Terri Beaston's increased recovery. The court of appeals also modified the manner in which attorney's fees were calculated, rejecting the trial court's

method in favor of the method proffered by Beaston. The court of appeals held that "the contingency fee percentage should be calculated on the total *recovery* and *not* on the total *damages.*" 861 S.W.2d at 279 (emphasis in original).

> FN1. Section 16 of the former Article 21.21 provided that "any plaintiff who prevails may obtain ... three times the amount of actual damages...." Act of May 21, 1973, 63rd Leg., R.S., ch. 143, § 2(c), 1973 Tex.Gen.Laws 322, 338, *amended by* Act of April 4, 1985, 69th Leg., R.S., ch. 22, § 3, 1985 Tex.Gen.Laws 395, 395. Article 21.21 presently provides, however, that a prevailing plaintiff can recover treble damages only if the "trier of fact finds that the defendant knowingly committed the acts" of which the plaintiff complains. TEX.INS.CODE art. 21.21, § 16(b)(1).

> FN2. Prior to September 1, 1991, Article 3.62 of the Texas Insurance Code provided in relevant part:

> > In all cases where a loss occurs and the life insurance company ... liable therefor shall fail to pay the same within thirty days after demand therefor, such company shall be liable to pay the holder of such policy, in addition to the amount of the loss, twelve percent damages on the amount of such loss....

> > Act of April 27, 1931, 42nd Leg., R.S., ch. 91, § 1, 1931 Tex.Gen.Laws 135, 135, *repealed by* Act of June 6, 1991, 72nd Leg., R.S., ch. 242, § 12.01(2), 1991 Tex.Gen.Laws 939, 1133.

State Farm brings forth several points of error, including challenges to the finding of coverage under the policy, the award of mental anguish damages, and the calculation of attorney's fees.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

907 S.W.2d 430, 38 Tex. Sup. Ct. J. 947
**(Cite as: 907 S.W.2d 430)**

## II

[1] Although it is undisputed that her husband's policy would have otherwise lapsed on December 28, 1983, Terri claims that the **\*433** policy remained in force because of its dividend-at-death provision. The policy provides, in relevant part:

**Nonpayment of Premium.** If a premium has not been paid by the end of its grace period, the Accumulations to Avoid Lapse and, if chosen, the Automatic Premium Loan provisions will apply. If neither of these provisions apply, this policy will lapse as of the due date of any amount of unpaid premium. With such lapse, all coverage ceases....

**Accumulations to Avoid Lapse.** If a premium has not been paid by the end of its grace period, any available dividend accumulations will be used to pay all or part of that premium....

**Premium Adjustment When Insured Dies.** If the Insured dies during a grace period, any part of a premium due will be paid from the proceeds....

**Annual Dividends.** State Farm Life may apportion and pay dividends each year. Any such dividends will be paid at the end of the policy year if all premiums due have been paid....

**Dividend Options.** The Owner may choose one of the options listed below....

3. Dividend Accumulation. Left to accumulate.... Accumulations plus interest to the Insured's death will be part of the proceeds.

**Dividend at Death.** A dividend for the period from the start of the policy year to the Insured's death will be part of the proceeds.

It is undisputed that David had not accumulated any dividend following the first year of the policy or that he died before its second anniversary. State Farm argues that the terms of David's policy make clear that the payment of any dividend is contingent on the insured's payment of all premiums due.

Since David had not paid the last premium on his policy prior to the expiration of its grace period, he was entitled to no dividend that could be used to cure his unpaid premium. The trial court held, however, that the terms of the policy were ambiguous because they could reasonably be taken to mean that State Farm would pay David a dividend at his death, regardless of his arrearages. The court of appeals affirmed. 861 S.W.2d at 276–77.

[2][3][4] We disagree. As we explained in *Forbau v. Aetna Life Insurance Co.,* 876 S.W.2d 132 (Tex.1994), the interpretation of insurance contracts is governed by the same rules of construction applicable to other contracts. *Id.* at 133 (citations omitted). When construing a contract, courts must strive to give effect to the written expression of the parties' intent. *Id.* (citations omitted). To do so, they must read all parts of a contract together. *Id.* (citations omitted). Indeed, courts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract. *See id.* at 133–34 (citations omitted). Only if an insurance policy remains ambiguous despite these canons of interpretation should courts construe its language against the insurer in a manner that favors coverage. *See, e.g., National Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991); *Blaylock v. American Guar. Bank Liab. Ins. Co.,* 632 S.W.2d 719, 721 (Tex.1982); *Ramsay v. Maryland Am. Gen. Ins. Co.,* 533 S.W.2d 344, 349 (Tex.1976).

Terri Beaston interprets David's policy to mean that State Farm would pay a pro-rated dividend at his death, regardless of how many premium payments had been missed or whether the policy was inside or outside its grace period following the nonpayment of a premium. However, as we recognized in *Forbau:*

[N]ot every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity. Both the insured and the insurer are likely to take conflicting views of coverage, but

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

neither conflicting expectations nor disputation is sufficient to *create* an ambiguity.

*Forbau,* 876 S.W.2d at 134 (citations omitted) (emphasis in original).

Despite Terri's contrary interpretation, the policy, viewed in its entirety, unambiguously provides that David would not receive any dividend that could be used to cure his policy's lapse under the circumstances presented here. The policy states that if, as in this **\*434** case, a premium has not been paid by the end of its grace period, the accumulations-to-avoid-lapse provision will apply. Under that provision, State Farm agrees to use "any available dividend accumulations" to pay all or part of the unpaid premium. Dividend accumulations are those dividends, if any, paid to the insured on the anniversary of the policy and "left to accumulate," as allowed by one of the policy's "dividend options." [FN3] The annual-dividends provision confirms this. Terri acknowledges that her husband's policy had not accumulated any dividends on its first anniversary [FN4] and that the policy lapsed before its second anniversary. Because the policy lapsed before its second anniversary, any dividends that might have been paid on that date had not yet "accumulated." As a result, there simply were no dividend accumulations available to cure the lapse.

> FN3. When State Farm pays a dividend at the end of a policy year, the policy provides the insured with four options. He or she can (1) use the dividend toward the payment of a premium; (2) use the dividend to purchase a paid-up life insurance addition; (3) leave the dividend to accumulate (in which case, the dividend accumulations earn interest at the minimum rate of 4 1/2 % each year); or (4) be paid the dividend in cash.

> FN4. The terms of the policy do not guarantee payment of dividends, as evidenced by the annual-dividends provision which provided that State Farm "*may* apportion

and pay dividends each year." (Emphasis added.) Because no dividend was paid during the first year of David's policy, there was no dividend left to accumulate.

The policy's dividend-at-death provision is irrelevant under these circumstances. Contrary to Terri Beaston's assertion that the policy's dividend-at-death clause states unconditionally that State Farm *will* pay a pro-rated dividend to David upon his demise, the provision states only that "[a] dividend for the period from the start of the policy year to the Insured's death will be *part of the proceeds.*" (Emphasis added). But the payment of proceeds under the policy is contingent upon the insured's timely payment of premiums. Under the policy's nonpayment-of-premium provision, if a premium has not been paid by the end of the grace period, the "policy will lapse *as of the due date* of any amount of unpaid premium," unless the accumulations-to-avoid-lapse provision or the automatic premium loan provision applies. (Emphasis added). Neither of those provisions applies here. [FN5] When the policy lapses due to nonpayment, "all coverage ceases," and consequently there are no proceeds with which the dividend could be included. Construed together, the dividend-at-death and nonpayment-of-premium provisions leave no doubt that the insured is not entitled to a dividend at death unless the policy is in force when the insured dies. Under this policy, therefore, a dividend at death is not available to cure an unpaid premium. [FN6] The grace period for the payment of David's December 28, 1983 premium expired on January 28, 1984, three days before David's death. Since coverage ceased before David's death, he was not entitled to a pro-rated dividend upon his death that could revive his coverage under the lapsed policy. Thus, we reverse the judgment of the court of appeals in awarding Terri Beaston the benefits of her husband's life insurance policy.

> FN5. As discussed above, the accumulations-to-avoid-lapse provision does not apply because there were no dividend accu-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

mulations. The automatic premium loan provision does not apply because David's policy had not yet built up any cash value, and thus the policy did not have adequate "loan value," as required by that provision.

FN6. If the insured dies while the policy is *within* the thirty-one day grace period following the nonpayment of a premium, any premium due is paid from the proceeds.

### III

[5] State Farm also complains that the court of appeals erred in awarding Terri Beaston damages for mental anguish under Article 21.21. State Farm argues in the alternative that (1) there is no evidence to support the jury's finding that it violated Article 21.21; (2) there is no evidence to support the jury's finding regarding mental anguish damages; or (3) damages for emotional distress are not recoverable because Terri failed to secure a jury finding that State Farm acted knowingly.

Article 21.21 provides a remedy for those injured by (1) any "unfair methods of competition **\*435** and unfair and deceptive acts or practices in the business of insurance" specifically defined in Section 4 of Article 21.21, (2) practices declared in the rules or regulations of the Board of Insurance to be unfair methods of competition and unfair and deceptive acts or practices in the business of insurance, or (3) violations of Section 17.46 of the Texas Business and Commerce Code, otherwise known as the Deceptive Trade Practices—Consumer Protection Act ("DTPA").FN7 *See* TEX.INS.CODE art. 21.21, § 16(a). The jury found that one or both of the defendants engaged in an unfair or deceptive act or practice.

FN7. TEX.BUS. & COM.CODE §§ 17.41–17.63.

State Farm contends that there is no evidence to support this finding. Because the only damages found by the jury were for mental anguish, we turn first to State Farm's argument that Terri cannot re-

cover mental anguish damages in the absence of a finding that it acted knowingly. Whether such a finding is a prerequisite for recovering mental anguish damages under Article 21.21 is a question of first impression for this Court.

Like the DTPA, Article 21.21 provides that parties may recover their actual damages against a defendant who has violated the statute's provisions. TEX.INS.CODE art. 21.21, § 16(b)(1). Neither the DTPA nor Article 21.21 defines "actual damages." In construing this term, our courts have concluded that the "actual damages" available under Article 21.21 or the DTPA are those damages recoverable at common law. *Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931, 939 (Tex.), *cert. denied,* 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980); *see also Frank B. Hall & Co. v. Beach, Inc.,* 733 S.W.2d 251, 265 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.); *St. Paul Ins. Co. v. McPeak,* 641 S.W.2d 284, 287 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.).

Courts traditionally have been reluctant to allow recovery of damages for emotional distress without some additional threshold showing, for example, that the mental anguish was accompanied by a physical injury "resulting from a physical impact or was produced by a particularly upsetting or disturbing event." *The Parkway Co. v. Woodruff,* 901 S.W.2d 434, 442 (Tex.1995). *See generally,* LAYCOCK, MODERN AMERICAN REMEDIES 189–90 (2d ed. 1994) (discussing restrictions on recovery for emotional distress).

We have held in a DTPA case that mental anguish damages are not recoverable where there was no willful conduct and no resulting physical injury. *Brown,* 601 S.W.2d at 939. We similarly held in *Duncan v. Luke Johnson Ford, Inc.,* 603 S.W.2d 777, 779 (Tex.1980), that damages cannot be recovered for mental anguish alone and that there must be proof of a willful tort, gross negligence, or willful disregard. See also *Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115, 117–18

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Tex.1984), where we held that a finding that the unconscionable actions were committed "knowingly" would support mental anguish damages, but we remanded for a determination of the factual sufficiency of the evidence to support the mental anguish award, and *Boyles v. Kerr,* 855 S.W.2d 593, 598 (Tex.1993), where we observed in dicta that mental anguish damages may not be recovered under the DTPA absent proof of a willful or grossly negligent violation.

We see no reason that a culpable mental state should not also be required to recover mental anguish damages under Article 21.21. As the court of appeals recognized, the DTPA and Article 21.21 are interrelated. 861 S.W.2d at 274. The Legislature enacted both remedies in 1973 as "part of a reform package of consumer legislation." *State Farm Fire & Cas. Co. v. Gros,* 818 S.W.2d 908, 916 (Tex.App.—Austin 1991, no writ); *see also Frank B. Hall,* 733 S.W.2d at 265 (noting that the purposes of the statutes are similar). The DTPA was designed to protect consumers against "false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty...." TEX.BUS. & COM.CODE § 17.44. Similarly, Article 21.21 was enacted to regulate practices in the insurance industry by prohibiting "unfair methods of competition or unfair or deceptive acts or practices." TEX.INS.CODE art. 21.21, § 1(a). Section 17.50(a)(4) of the DTPA incorporates Section 16 of Article 21.21, and Section 16 of Article 21.21 prohibits an insurer**436** from engaging in any practice proscribed by Section 17.46 of the DTPA. TEX.BUS. & COM.CODE § 17.50(a)(4); TEX.INS.CODE art. 21.21, § 16(a); *see also Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 273 (Tex.1995).

In DTPA cases that do not involve personal injury, we have required a threshold finding of a culpable mental state as one of the prerequisites for mental anguish damages. *See, e.g., Luna,* 667 S.W.2d at 117–18; *Duncan,* 603 S.W.2d at 779; *Brown,* 601 S.W.2d at 939. It is logical to require a similar culpable mental state under Article 21.21.

[6] Having decided that some culpability is required, we must determine the appropriate standard. We conclude that a finding of knowing conduct is a prerequisite to the recovery of mental anguish damages under Article 21.21. "Knowingly" is the only culpable mental state to which the statute currently refers. *See* TEX.INS.CODE art. 21.21, § 16(b)(1).FN8 We therefore hold that mental anguish damages are not recoverable under Article 21.21 as an element of actual damages without an express finding of knowing conduct. The other prerequisites for recovery of mental anguish damages under the common law must also be present. As there was no finding here of knowing conduct, the judgment of the court of appeals is reversed to the extent that it awards any damages for mental anguish. Accordingly, we do not address State Farm's further argument that the record contains no evidence that State Farm or Heaton committed a violation of Article 21.21 of the Insurance Code or the argument that the record contains no evidence of Terri's mental anguish. Nor are we called upon to consider whether Terri has satisfied any other requirements for a recovery of mental anguish damages in this case.

> FN8. The Insurance Code defines "knowingly" as "actual awareness of the falsity, unfairness, or deception of the act or practice made the basis for a claim for damages under Section 16 of this Article. 'Actual awareness' may be inferred where objective manifestations indicate that a person acted with actual awareness." TEX.INS.CODE § 21.21(2)(c).

## IV

[7] Terri Beaston counters that even if a finding of knowing conduct is required to recover mental anguish damages under Article 21.21 in this case, she nevertheless is entitled to prevail because State Farm failed to preserve its complaint regarding this issue. We hold that State Farm did not waive error on this point.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

907 S.W.2d 430, 38 Tex. Sup. Ct. J. 947
**(Cite as: 907 S.W.2d 430)**

Tracking the language of Article 21.21, question one to the jury asked whether "State Farm or Ted Heaton engage[d] in any unfair or deceptive act or practice that was a producing cause of damages to Terri Beaston." The jury responded affirmatively. The jury further found in response to question eight that $200,000 would fairly and reasonably compensate Terri for her mental anguish. The jury charge did not condition question eight on an affirmative response to any issue concerning knowing conduct. State Farm objected to question eight on the grounds that there was no evidence to support a finding of mental anguish damages, but it never objected that the charge failed to condition question eight on a finding that State Farm had acted knowingly.

Terri contends that because State Farm did not point out to the trial court that question eight regarding mental anguish damages should have been conditioned on a finding of knowing conduct, State Farm cannot now complain that the court of appeals erred in awarding mental anguish damages without such a finding. She argues that if a party makes no objection to a defective submission of a controlling issue constituting an element of a ground of recovery and a judgment is rendered thereon, the party's failure to object waives the defective submission of that issue. *See, e.g., Allen v. American Nat'l Ins. Co.,* 380 S.W.2d 604, 609 (Tex.1964).[FN9]

> FN9. In *Allen,* we wrote:
>
> > It seems well settled in this State that where no objection is made to a defective submission of a controlling issue constituting a component element of a ground of recovery or a defense and a judgment is rendered thereon, such judgment will not be reversed because the failure to object is considered a waiver of the defective submission of such issue.
>
> *Allen,* 380 S.W.2d at 609 (citations omitted).

**\*437** Had the trial court rendered judgment in favor of Terri for mental anguish damages, her argument would be correct. Where, as here, a jury awards damages based on a charge that omits an element necessary to sustain a ground of recovery, the trial court can either file a written finding regarding the missing element or render judgment without one. *See* TEX.R.CIV.P. 279.[FN10] If the trial court does not file a written finding, the omitted element is deemed found in support of the judgment as long as no objection was made and the evidence supports such a finding. *See id.; Ramos v. Frito–Lay, Inc.,* 784 S.W.2d 667, 668 (Tex.1990).

> FN10. Rule 279 governs omissions from the jury charge and provides in relevant part:
>
> > When a ground of recovery or defense consists of more than one element, if one or more of such elements necessary to sustain such ground of recovery or defense, and necessarily referable thereto, are submitted to and found by the jury, and one or more of such elements are omitted from the charge, without request or objection.... the trial court ... may ... make and file written findings on such omitted element or elements in support of the judgment. If *no* such written findings are made, such omitted element or elements shall be deemed found by the court in such manner as to *support* the judgment.
>
> TEX.R.CIV.P. 279 (emphasis added).

But in this case, the trial court did not file a written finding as to whether State Farm or Heaton acted knowingly. To the contrary, the judgment that the trial court rendered expressly excluded mental anguish damages. By denying Terri any damages for emotional distress, the trial court cannot be deemed to have found that either defendant acted knowingly. *See* TEX.R.CIV.P. 279. Accordingly, State Farm's failure to object to the form of ques-

tion eight did not waive error regarding this issue. FN11

> FN11. We do not necessarily disagree with the principles of law articulated by the dissent, but they are inapplicable under these circumstances since the trial court did not render judgment for Terri with respect to damages for emotional distress.

## V

[8] Having rendered judgment that Terri Beaston take nothing with respect to her claim under Article 21.21, we also reverse her award of attorney's fees. Section 16 of the applicable version of Article 21.21 provides that "any plaintiff who prevails may obtain ... actual damages plus ... attorneys' fees reasonable in relation to the amount of work expended...." FN12 Act of May 21, 1973, 63rd Leg., R.S., ch. 143, § 2(c), 1973 Tex.Gen.Laws 322, 338, *amended by* Act of April 4, 1985, 69th Leg., R.S., ch. 22, § 3, 1985 Tex.Gen.Laws 395, 395.

> FN12. The fee-shifting language of the current version of Article 21.21 is essentially the same. It provides that "any plaintiff who prevails may obtain ... the amount of actual damages plus court costs and reasonable and necessary attorneys' fees." TEX.INS.CODE art. 21.21, § 16(b)(1).

To obtain an award of attorney's fees under the DTPA or Section 38.001 of the Civil Practice and Remedies Code, FN13 a party must (1) prevail on a cause of a cause of action for which attorney's fees are recoverable, and (2) recover damages. *See McKinley v. Drozd,* 685 S.W.2d 7, 9 (Tex.1985) (construing the DTPA); *Rodgers v. RAB Investments, Ltd.,* 816 S.W.2d 543, 551 (Tex.App.—Dallas 1991, no writ) (construing the Civil Practice and Remedies Code). Since the fee-shifting provision of Article 21.21 echoes the words of the DTPA and Section 38.001 which provide for awarding attorney's fees, we hold that a party must

satisfy the same two requirements to recover attorney's fees under Article 21.21. While we assume without deciding that Terri prevailed under Article 21.21, she cannot recover attorney's fees because she has recovered no damages. We therefore reverse the judgment of the court of appeals concerning the award of attorney's fees under Article 21.21.

> FN13. Section 38.001 provides:
>
> > A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: (1) rendered services; (2) performed labor; (3) furnished material; (4) freight or express overcharges; (5) lost or damaged freight or express; (6) killed or injured stock; (7) a sworn account; or (8) an oral or written contract.
>
> TEX.CIV.PRAC. & REM.CODE § 38.001.
> * * *

For the foregoing reasons, we reverse the judgment of the court of appeals and render **\*438** judgment that Terri Beaston take nothing. FN14

> FN14. Consequently, we do not reach the question of whether the attorney's fees were properly calculated, but note that in *Great American Insurance Company v. North Austin Municipal Utility District No. 1,* —— S.W.2d —— (Tex.1995), we expressly disapproved of the method of calculation used by the court of appeals in this case. Nor do we reach Terri's point of error regarding the court of appeals' refusal to treble the award of policy benefits or State Farm's point of error regarding the court of appeals' trebling of prejudgment interest.

PHILLIPS, Chief Justice, delivered a concurring and dissenting opinion, joined by SPECTOR,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

907 S.W.2d 430, 38 Tex. Sup. Ct. J. 947
**(Cite as: 907 S.W.2d 430)**

Justice.

I agree with the Court in most respects. But for many of the same reasons as the dissent, I believe that the insurance policy was ambiguous and, consequently, that the court of appeals was correct in affirming the trial court's judgment that State Farm owed Terri the proceeds of the policy as a matter of law.

Therefore, I note my dissent to Part II of the Court's opinion concerning the policy, while joining in Parts III, IV, and V of the Court's opinion concerning mental anguish damages, preservation of error, and attorney's fees. I would render judgment that Terri recover only the policy benefits, statutory attorney's fees, and costs.

GAMMAGE, Justice, joined by HIGHTOWER, Justice, dissenting.

The majority overlooks procedural waiver by defendants in order to reach statutory construction issues, rewrites DTPA and Insurance Code article 21.21 law in ways never conceived before, then misapplies its own new rule. The jury found she had suffered damages from unfair insurance practices. The trial court and court of appeals struggled with the question of how much she should recover. The policy at issue is ambiguous, as we have historically used the term "ambiguity" for insurance policies. The trial court correctly rendered judgment on an instructed verdict for Beaston for the policy amount based on the undisputed facts. And, as to unfair insurance practice recovery, defendants failed to object to the jury charge, which neither segregated nor conditioned the mental anguish damages issue on an additional finding of "knowing" conduct. Defendants were required to object to an improperly conditioned damages issue to preserve error, and their failure waived their complaints about mental anguish as an element of damages absent "knowing" conduct. Even if one reaches the "knowing" issue, however, the version of article 21.21 applicable when the incident occurred did not require "knowing" conduct for mental anguish damages. Even under the majority's test, however,

mental anguish damages are recoverable if they would be part of common law actual damages, and Beaston's injury of delay and anguish over policy coverage for the death of her husband is most analogous to common law actions allowing mental anguish recovery. The majority misapplies its own test. Because I believe the majority is wrong on each issue, I dissent.

**I.**

First consider whether Mrs. Beaston is entitled to recover any proceeds from her husband's life insurance policy. Although it is undisputed, based upon the issue date shown on its face, that her husband's policy had expired for nonpayment of premium when he died, Mrs. Beaston argues a construction of the policy that keeps it in force because of its dividend-at-death provision. The policy provides, in relevant part:

**Accumulations to Avoid Lapse.** If a premium has not been paid by the end of its grace period, *any* available dividend will be used to pay all or part of that premium....

**Annual Dividends.** State Farm Life may apportion and pay dividends each year. Any such dividends will be paid at the end of the policy year if all premiums due have been paid....

**Dividend at Death.** A dividend for the period *from the start of the policy year* to the insured's death will be part of the proceeds.

(Emphasis added.)

The parties do not dispute that Mr. Beaston had not accumulated any dividend following the first year of the policy or that he died **\*439** before its second anniversary. The court accepts State Farm's argument that the terms of Mr. Beaston's policy make clear that the payment of any dividend is contingent on the insured's payment of all premiums due. Since Mr. Beaston had not paid the last premium on his policy prior to the expiration of its grace period, State Farm contends, the terms of the policy

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

are unambiguous that he would not receive any dividend that could be used to cure his unpaid premium. The court thus accepts a reading of the contract favorable to the insurance company, *which drafted it.* This is **not** proper.

The trial court held that these policy provisions could reasonably be taken to mean that State Farm would pay Mr. Beaston a dividend at his death, regardless of his arrearages, and the court of appeals agreed with that analysis. 861 S.W.2d at 277. The dividend-at-death clause states unconditionally that State Farm *will* pay a pro-rated dividend to Mr. Beaston upon his demise. The accumulations-to-avoid-lapse provision states with equal certainty that State Farm *will* use any such dividend to pay all or part of the insured's unpaid premiums. State Farm was aware of the difference between discretionary or contingent clauses and mandatory provisions. The annual-dividend clause, for example, says State Farm "may" pay dividends each year. State Farm's choice to *not* make the payment of a dividend at death expressly contingent on the insured's timely payment of premiums created an ambiguity that leaves the policy susceptible to two reasonable interpretations. That makes the language "ambiguous" and the court should construe it against the insurer in a manner that favors coverage. *See Balderama v. Western Casualty Life Ins. Co.,* 825 S.W.2d 432, 434 (Tex.1991); *National Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991); *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 666 (Tex.1987); *Blaylock v. American Guarantee Bank Liab. Ins. Co.,* 632 S.W.2d 719, 722 (Tex.1982); *Ramsay v. Maryland Am. Gen. Ins. Co.,* 533 S.W.2d 344, 349 (Tex.1976). Construed against State Farm, Mr. Beaston's policy provides that State Farm would pay him a pro-rata dividend at death and would apply that dividend pro-rata to his unpaid premium. Under this construction, as State Farm concedes, the amount of such a pro-rated dividend would have been sufficient to prevent the policy from lapsing.

The majority reaches its contrary conclusion through its new-found device to avoid ambiguity, applying "rules of construction" as in *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132 (Tex.1994). Unlike the insurance policy in *Forbau,* however, the policy at issue here does not contain any provision that, with reference to an external event, resolves its ambiguity. It appears that the majority now interprets *Forbau* as overruling all our insurance ambiguity precedents, although in *Forbau* the majority claimed otherwise. The gymnastics utilized to conclude ambiguity is not ambiguous, at bottom amount to reading a provision into the contract that *is not there* to provide that all dividends and accumulations are *not payable* after a lapse, even upon death, at which occurrence the policy states expressly they are payable. Therefore, no ambiguity!

**II.**

Assuming our traditional rules dealing with ambiguities in insurance contracts were applied and the policy were construed in Beaston's favor, State Farm and Heaton waived their complaint that "mental anguish" damages required a "knowingly" finding. The jury's affirmative finding to question one, a general article 21.21 violation, was one of five conditions which if the jury answered "Yes" to any one, required the jury to answer the damages question. State Farm made no objection that the damages issue was improperly conditioned because the general article 21.21 liability question, and possibly some of the other four questions requiring the jury to answer on damages, would also require a "knowing" finding. Neither did State Farm object that the damages question used the wrong measure of damages because the mental anguish element was improper absent an express "knowing" finding. And State Farm did not object to the damages question because it contained an element of damages—mental anguish—not supported by some of the liability theories presented**\*440** (no "knowing" violation). *No objection* appears in the record which would give the trial court or opposing counsel notice of the complaint about mental anguish as an element of damages.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Rule 272 expressly provides that all parties must have adequate opportunity to review and object to any defects in the charge, and "[a]ll objections not so presented shall be considered as waived." TEX.R.CIV.P. 272. Rule 274 contains additional waiver provisions. This court has long held that Rule 272, with or independent of Rule 274, is a broad waiver provision defeating complaints about what the jury found or the form or substance of the jury questions. *Cogburn v. Harbour,* 657 S.W.2d 432, 432 (Tex.1983); *Edwards v. Strong,* 213 S.W.2d 979, 981 (Tex.1948); *Wilson v. King,* 311 S.W.2d 957, 958–59 (Tex.Civ.App.—Austin 1958, writ ref'd). In particular, we have expressly approved the statement of the reason for the rule given in *Wilson:*

> The purpose of the Rules requiring a party to except to the charge is to give the Trial Court an opportunity to correct any errors, to the end that the case may be fairly submitted, and all defects in the manner of submission of special issues were waived by failing to except thereto. [Citations omitted.]

*Id.* at 959. Here neither the trial court nor Beaston's counsel had the opportunity to change the conditional submission structure of the court's charge, because State Farm made no objection before the verdict. This is precisely what Rules 272 and 274 are intended to prevent.

The failure to object to the conditional submission of the damages issue waives error as to form and substance of the submission. *Wilgus v. Bond,* 730 S.W.2d 670, 672 (Tex.1987); *Matthews v. Candlewood Builders, Inc.,* 685 S.W.2d 649, 650 (Tex.1985); *Strauss v. LaMark,* 366 S.W.2d 555, 557 (Tex.1963); *AAA Air Conditioning & Mfg. Corp. of Tex. v. Barr,* 186 S.W.2d 825, 826–27 (Tex.Civ.App.—Dallas 1945, writ ref'd); *Republic Bankers Life Ins. Co. v. Coffey,* 490 S.W.2d 231, 233 (Tex.Civ.App.—Amarillo 1973, writ ref'd n.r.e.); *Bell v. Aetna Cas. & Sur. Co.,* 394 S.W.2d 830, 833–34 (Tex.Civ.App.—Houston [1st Dist.] 1965, writ ref'd n.r.e.). The failure to object that the damages issue includes improper elements or is based on the wrong measure of damages waives error as to the form and substance of the damages issue. *See Tom Benson Chevrolet, Inc. v. Alvarado,* 636 S.W.2d 815, 822–23 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.); *Traylor v. Gray,* 547 S.W.2d 644, 658 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.); *McCreless Properties, Ltd. v. F.W. Woolworth Co.,* 533 S.W.2d 863, 867 (Tex.Civ.App.—San Antonio 1976, writ ref'd n.r.e.).

The majority errs in even reaching the "knowingly" issue because State Farm failed to object and thereby waived any complaint that the mental anguish element of damages had to be conditioned upon or required a finding of knowing conduct.

### III.

The majority asserts that "[i]n DTPA cases that do not involve personal injury, we have required a threshold finding of a culpable mental state as one of the prerequisites for mental anguish damages." 907 S.W.2d at 436. This misses the point of those cases, that mental anguish damages are recoverable only if the DTPA violation proved is analogous to a common law action allowing recovery of such mental anguish damages. This court has held that mental anguish is a common law element of damages in a large variety of circumstances not limited to physical injury or culpable mental state. Here the Insurance Code violation found by the jury is closely analogous to instances where the common law allows mental anguish recovery, because a central purpose of the interest protected by the Code is to avoid mental harm to the beneficiary.

Under the DTPA, the term "actual damages" means those damages that are recoverable under the common law. *Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931, 939 (Tex.1980). Article 21.21 likewise provides for the recovery of "actual damages." The threshold question is whether mental anguish damages are appropriate under the common law for the actionable conduct found by the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

907 S.W.2d 430, 38 Tex. Sup. Ct. J. 947
**(Cite as: 907 S.W.2d 430)**

jury. Only if mental anguish is not a common law element of **\*441** damages must we look to exceptions allowing mental anguish damages, such as proof of willful or grossly negligent conduct. *See, e.g., Luna v. North Star Dodge Sales, Inc., 667 S.W.2d 115 (Tex.1984); Duncan v. Luke Johnson Ford, Inc., 603 S.W.2d 777 (Tex.1980).*

The jury found State Farm engaged in unfair and deceptive acts prohibited by article 21.21. The jury further found mental anguish damages from the unfair and deceptive acts. The "unfair and deceptive acts" question was a broad submission. If there is any evidence that some specific conduct for which mental anguish damages are recoverable supported that broad finding, [FN1] the court of appeals' rendition of judgment on the jury verdict must be affirmed. *Prudential Ins. Co. v. Jefferson Assocs., 896 S.W.2d 156, 160 (Tex.1995); Brown v. American Transfer & Storage Co., 601 S.W.2d 931, 937–38 (Tex.1980).*

> FN1. Consistent, of course, with the other express jury findings.

The evidence considered favorably to Terri Beaston, for whom the jury answered the broad question affirmatively, supports the conclusion that Heaton, as State Farm's agent acting with the capacity to deceive the average consumer, failed to suggest changing from whole life to term insurance. The circumstances known to Heaton would objectively make one realize that his failure to make known the term life option would cause emotional distress to Terri Beaston while the couple struggled to pay the higher whole life premiums. Moreover, in the event of David Beaston's death, the purported lapse in coverage because of nonpayment of the higher premium would cause emotional distress associated with his death. Heaton *was informed* Terri would suffer heightened emotional distress associated with his death because of the financial strain of losing his income, something she abnormally feared.

There was evidence that Terri had an exagger-

ated fear of being unable to pay creditors in the event of David's death. The young couple had a life insurance policy before but let it lapse because of financial problems, which caused Terri great distress. She insisted that David obtain new life insurance coverage.

Ted Heaton was the agent who promised to take care of the Beastons' insurance needs. The Beastons did not have a clear understanding of the difference between term and whole life; they did not realize that term was much less expensive for the same coverage. Heaton could have suggested they exchange their whole life policies for the more affordable term, but he admitted he never even suggested the possibility to them. Heaton knew the Beastons' financial problems began in June 1983. He was in frequent contact with them about their late premium payments. He knew that Terri Beaston was "adamant" about keeping the policies in force. Terri was the one who made payments on both policies whenever she could, and Heaton knew she was doing everything she could to pay the premiums.

There was evidence that Heaton's failure to suggest the term option was an unfair practice under article 21.21. State Farm's own training manual informed Heaton that term was suitable for young couples who lacked the means to purchase whole life. The manual states that term insurance provides good protection until the policyholder can afford whole life. The testimony was that from mid–1983 up to the day David died, the Beastons fit the description of people for whom term insurance was well suited, and Heaton knew it. Heaton admitted that he would normally advise someone of this choice between term and whole life, but did not do so in this case. Terri Beaston testified that given a choice, she would have switched. If the Beastons had switched to any of the three term conversion policies State Farm offered, the premiums they actually paid for the whole life would have been more than sufficient to pay for term coverage through the date of David's death.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

907 S.W.2d 430, 38 Tex. Sup. Ct. J. 947
**(Cite as: 907 S.W.2d 430)**

The failure to offer the term option, given the surrounding circumstances, is most analogous to torts which recognize emotional harm as an element of common law damages, because emotional harm is the natural result of such wrongful conduct associated with the death of a spouse or family member. This court early recognized this principle in **\*442** *Stuart v. Western Union Telegram Co.,* 18 S.W. 351, 353 (Tex.1885), in which the court refused to limit the recovery to the fifty cents paid for the telegram sent but not delivered to inform that a family member was dying. The court instead allowed the $2,500 *emotional injury damages* found by the jury, stating that "[t]he wrongdoer knows he is doing this damage when he afflicts the mind by withholding the message of mortal illness ... injury to the feelings is actual damage ... the natural result of the wrongful act." [FN2]

> [FN2]. In those jurisdictions recognizing a "wrongful conception" or "wrongful pregnancy" cause of action, emotional distress is a principal element of damages precisely because it is the natural result of the wrongful conduct. *See, e.g., Boone v. Mullendore,* 416 So.2d 718 (Ala.1982); *Custodio v. Bauer,* 251 Cal.App.2d 303, 59 Cal Rptr. 463 (1st Dist.1967); *Bushman v. Burns Clinic Med. Ctr.,* 83 Mich.App. 453, 268 N.W.2d 683 (1978); *Weintraub v. Brown,* 98 App.Div.2d 339, 470 N.Y.S.2d 634 (2d Dept.1983); *Jean–Charles v. Planned Parenthood Asso.,* 99 App.Div.2d 542, 471 N.Y.S.2d 622 (2d Dept.1984); *Smith v. Gore,* 728 S.W.2d 738 (Tenn.1987); *C.S. v. Nielson,* 767 P.2d 504 (Utah 1988); *James G. v. Caserta,* 175 W.Va. 406, 332 S.E.2d 872 (1985).

The court also has reviewed judgments for emotional injury for mishandling of a corpse. *See, e.g., Clark v. Smith,* 494 S.W.2d 192 (Tex.Civ.App.—Dallas 1973, writ ref'd n.r.e.); *Classen v. Benfer,* 144 S.W.2d 633, 635 (Tex.Civ.App.—San Antonio 1940, writ dism'd

jdgmt correct). The court expressly cited these two holdings with approval, and has held expressly that emotional distress damages are allowed for wrongful death, because it is the "natural result" of this class of torts where the "nature of the torts assures that the claimants will suffer mental injury." *See Moore v. Lillebo,* 722 S.W.2d 683, 685 (Tex.1986).

State Farm does argue that all these cases are distinguishable and not properly analogous because they all involve "knowing" conduct, which the jury here expressly was not asked and did not find. The argument is incorrect. In *Stuart* the wrongful failure to deliver the telegram was committed negligently, not knowingly. What was "knowing" was that the emotional harm would follow if the act was not done, whether the omission itself was negligent or knowing. Likewise, in *Classen* the reinterment of the bodies into the new cemetery was performed negligently, resulting in the loss of a body. What was "knowing" was that emotional damages would surely result if one negligently lost the remains of a family member. In *Moore v. Lillebo,* the wrongful death was the result of negligence. What was "knowing" was that emotional harm would result from such negligence. We said that emotional reaction is the natural by-product of wrongful death, that it "destroys any pre-existing family relationship," and that for wrongful death emotional harm is usually the "principal element" of damages for surviving relatives. *Moore v. Lillebo,* 722 S.W.2d at 685. [FN3]

> [FN3]. These cases cannot properly be called "culpable mental state" cases, but the majority does not tell us how they fall into its newly-defined limitations. Are these precedents also overruled?

The evidence here is equally strong that Terri Beaston had communicated her "adamant" concern, in Heaton's own words, to keep the insurance policies in effect because of her expressed great fear of financial hardship in the event of David's death. State Farm's mere claim that the policy had lapsed caused additional psychic trauma to Beaston

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

907 S.W.2d 430, 38 Tex. Sup. Ct. J. 947
**(Cite as: 907 S.W.2d 430)**

following David's death. That this would occur during Beaston's grief over her husband's death was clearly "known" to Heaton and State Farm, and it was the natural result of their negligent failure to offer the term option to the Beastons. I would hold that under the evidence and jury findings of this case, emotional harm is an element of common law damages and recoverable regardless of whether the wrongful conduct was knowing.

For the foregoing reasons, I dissent.

Tex.,1995.
State Farm Life Ins. Co. v. Beaston
907 S.W.2d 430, 38 Tex. Sup. Ct. J. 947

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.





Supreme Court of Texas.
TEXAS LAND & LOAN CO.
v.
BLALOCK *et al.*

Feb. 11, 1890.

Appeal from district court, Galveston county.

West Headnotes

**Acknowledgment 12 ⚷56**

12 Acknowledgment
    12III Operation and Effect
        12k56 k. Grounds of Impeaching or Contradicting Certificate. Most Cited Cases

An officer's certificate of acknowledgment by a married woman reciting her privy acknowledgment, etc., cannot be contradicted, where it is not shown that plaintiff who advanced money on the faith of the conveyance to which the acknowledgment was attached had no knowledge or reason to believe that any of the recitals in the certificate were untrue.

**Appeal and Error 30 ⚷1054(1)**

30 Appeal and Error
    30XVI Review
        30XVI(J) Harmless Error
            30XVI(J)10 Admission of Evidence
                30k1054 On Trial Without a Jury
                    30k1054(1) k. In General. Most Cited Cases

The admission of improper evidence on a trial to the court without a jury is harmless where there is sufficient proper evidence on which to base the decision.

**Homestead 202 ⚷116**

202 Homestead
    202II Transfer or Incumbrance
        202k116 k. Creation of Lien. Most Cited Cases

Where property tendered as security for a loan is in fact the homestead of husband and wife, no designation or representation contrary to the fact will enable the parties to evade the law forbidding the incumbrance of homesteads with liens.

**Homestead 202 ⚷122**

202 Homestead
    202II Transfer or Incumbrance
        202k122 k. Estoppel to Assert Invalidity. Most Cited Cases

Under Const. art. 16, § 50, providing that "no mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor, or improvements made thereon," a trust deed for borrowed money given on land actually occupied by the borrower and his family as a homestead is invalid, though the borrower states in his sworn application for the loan that the land was not his homestead, and that he owned another tract therein described, which he and his family occupied as a homestead, and he is not estopped by such statement to deny the validity of the deed.

**Subrogation 366 ⚷23(6)**

366 Subrogation
    366k23 Persons Making Advances for Discharge of Debt or Incumbrance
        366k23(6) k. Advances for Discharge of Vendor's Lien. Most Cited Cases

Where a person loans money on a homestead, such loan being invalid, but, before paying over the money, he has part of it applied to discharge a vendor's lien on the land, he is entitled to subrogation to all the rights of the vendor.

**Subrogation 366 ⚷23(6)**

366 Subrogation
    366k23 Persons Making Advances for Discharge of Debt or Incumbrance

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

366k23(6) k. Advances for Discharge of Vendor's Lien. Most Cited Cases

Where a note secured by a deed of trust on a homestead was void in so far as it attempted to fix a lien on the homestead, and the money borrowed on the security of the deed was used to satisfy a vendor's lien on the land, the lender under his right to subrogation to the rights of such vendor was not entitled thereunder to recover attorneys' fees provided for in the note secured by the deed of trust.

**Vendor and Purchaser 400 ☞265(2)**

400 Vendor and Purchaser
   400VI Remedies of Vendor
     400VI(A) Lien and Recovery of Land
       400k262 Transfer of Property by Purchaser
       400k265 Rights and Liabilities of Subsequent Purchasers
        400k265(2) k. Bona Fide Purchasers. Most Cited Cases

A purchaser of land, with notice of former vendor's lien for the purchase money of the land, takes it subject to that lien.

*85 **12 *R. Waverly Smith* and *Davidson & Minor*, for appellant.

*86 *McLemore & Campbell*, for appellees.

*87 STAYTON, C. J.

On March 1, 1887, and for a long time prior thereto, James A. Blalock was the head of a family, consisting of himself, wife, and children, and had and at that date was with his family residing on a tract of land containing less than 200 acres. On day named, Blalock and wife executed a deed of trust on that land to secure to appellant a loan of $800, then made. Application for the loan was made by Blalock on February 24, 1887, was sworn to by him, and contained the statement 'that no portion of the above-described property is now or can become our homestead, or the homestead of any other per-

son, until after the loan applied for has been paid in full; that I am in actual possession of said lands; * * * that M. J. Blalock is my lawful wife; and that I was married to her on the 18th day of March, 1875. * * * The above lands do not form any part of my homestead. The following described property is the homestead of myself and family, and we are living on it and using and occupying the same as such, and I will further add that the same has been fully paid for, and is free from every lien, except as follows: Due the state, $320, two years hence; and our homestead is described as follows: Bastrop section school land No. 14, in Burnett county, Texas.' This application was made on a blank form furnished by appellant, and there is conflict in the evidence as to whether the persons who conducted the negotiations were the agents of appellant or appellee. The trust-deed contains the following declaration: 'The parties of the first part hereby declare that the property hereinbefore mentioned and conveyed to the party of the second part forms no part of any property by them owned, used, or claimed as exempted from forced sale under the laws of the state of Texas, and disclaim and renounce all and every claim thereto under any such law or laws, and hereby designate the following described property, to-wit: Bastrop section school land No. 14, in Burnett county, Texas, on which in good faith they reside, as their homestead, and as constituting all the property (of nature similar to that herein conveyed) used or claimed by them as exempt under said laws; and *88 we declare that we have never used the property herein conveyed, and are not now so using it; and the aforesaid designation is made for the purpose of securing a loan on the property conveyed, with the occupancy of which the party of the second and third parts are wholly unacquainted.' The property above designated as homestead at no time was ever occupied by **13 Blalock as a home. The borrowed money not having been paid, this suit was brought to enforce its payment through foreclosure of the lien claimed through a trust-deed. Blalock and wife, the trustee, and John Markward, who had bought the property, were made defendants. In defense, Blalock and wife alleged that the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

land was their homestead before and at the time the trust-deed was executed, and that for this reason the lien claimed was void. Markward adopted their answer, and further alleged that on November 9, 1888, he bought the land in ignorance of any lien or claim set up by appellant.

The cause was tried without a jury, and the court admitted evidence of Mrs. Blalock, and of the officer who took her acknowledgment, tending to show that she may not have known that recitals in reference to homestead, before copied, were contained in trust-deed. If that was true, there is no evidence tending to show that the agents or officers of appellant had any knowledge or reason to believe that she did not know the contents of the paper she executed when they received it and advanced money on it, and, in the absence of some such fact, the evidence of the witness should have been excluded. The uncontroverted fact, however, remains that Blalock and his family were occupying the land as their home, continuously, from a period long before until after all the facts transpired on which the rights of the parties depend. It was the homestead of the family. The constitution declares that 'no mortgage, trust-deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor, or improvements made thereon, as hereinbefore provided, whether such mortgage or trust-deed or other lien shall have been created by the husband alone, or together with his wife.' Article 16, § 50. There is no doubt that the application for the loan, and the recitals and declarations in the trust-deed, that the property was not homestead, went as far as words could go to assure the lender that it might safely lend its money without fear that lien would be defeated by the existence of homestead rights; and, after the many protestations made, the wonder is that the borrowers were not required to make, and did not make, a further statement that no agent or officer of appellant had capacity to know that land owned and occupied by a husband with his wife and children, as their sole place of residence, was their homestead. Discarding all evidence tending to show that the de-

clarations in the trust-**\*89** deed that the property was not homestead were placed there without the knowledge or consent of its makers, and after its execution,-which, in view of all the evidence, seems to us incredible,-how does the matter stand? The undeniable facts are that Blalock had such interest in the land as homestead rights would attach to, as against every person other than his vendor, to whom balance of purchase money was due; that, with his family, he was occupying the land as his sole home when the trust-deed was executed and money loaned, and so had been for a long time prior to that date; and that the land designated as homestead was not, and had not been, so occupied.

The fact of actual possession and use, as the home of the family, was one against which the lender could not shut its eyes; and this fact, coupled with the interest held by the borrower in the land, made the property homestead in fact and in law, on which the constitution declares no lien, such as claimed in this case, can exist. Every person dealing with land must take notice of an actual, open, and exclusive possession; and when this, concurring with interest in the possessor, makes it homestead, the lender stands charged with notice of that fact, it matters not what declarations to the contrary the borrower may make. It has been held that one remaining in possession of land, after having executed and permitted to be placed on record an absolute conveyance, could not rely upon his possession as notice of a secret agreement that the absolute conveyance, as between the parties to it, was only intended as a mortgage, and thus defeat the right of a subsequent innocent purchaser. That, however, is not this case. Here nothing was hidden. Possession was open, certain, and in character in no respect ambiguous. It was such as gave homestead right, and the lender cannot be heard to say that it did not know it. The constitution forbidding the fixing on the homestead of liens other than such as are thereby expressly permitted, no estoppel can arise in favor of a lender, who has attempted to secure a lien on homestead in actual use and possession of the family, based on declarations of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

husband and wife, made orally or in writing, contrary to the fact. To hold otherwise would practically abrogate the constitution. If property be homestead in fact and law, lenders must understand that liens cannot be fixed upon it, and that declarations of husband and wife to the contrary, however made, must not be relied upon. They must further understand that no designation of homestead, contrary to the fact, will enable parties to evade the law, and incumber homesteads with liens forbidden by the constitution. Mortgage Co. v. Norton, 71 Tex. 683, 10 S. W. Rep. 301, Pellat v. Decker, 72 Tex. 581, 10 S. W. Rep. 696; Kempner v. Comer, 73 Tex. 203, 11 S. W. Rep. 194.

At the time the deed of trust was executed and the money loaned there **\*90** was a vendor's lien on the land to secure $475 and accrued interest, and, although application for loan stated that the land was free from incumbrance, the lender knew better, and before paying the money to Blalock had so much as was necessary applied to discharge the lien. Under this state of facts, the court did not err in subrogating appellant to all the rights held by the holder of the note given for purchase money, and in foreclosing **\*\*14** the lien. Hicks v. Morris, 57 Tex. 658. It is insisted, however, as the note sued on provided for the payment of 10 per cent. as attorney's fees in case suit became necessary, that the court ought to have at least allowed 10 per cent. on the principal and interest due on purchase money. The court did not err in refusing this; for all appellant was entitled to recover, through enforcement of lien, was by reason of its right to subrogation, which could not extend to any sum the vendor of the land would not have been entitled to receive had he sued. The note given for purchase money had no provision for payment of attorney's fees.

Defendant Markward bought after the trust-deed was executed, and with knowledge of the facts, and cannot complain that the land was subjected in his hands to the payment of purchase money, or some equivalent thereto. Moreover, it seems that he has in his hands property intended as a part of the purchase price he was to pay to Blalock, in value more than sufficient to discharge the judgment for which the property in his hands is made liable. If there be any matter of error as to him, he has not presented it.

The improper admission of evidence, especially in a cause tried before the court, is no ground for reversal when, on the uncontroverted and vital facts, no other judgment could have been rendered than that entered. The judgment will be affirmed.

Tex. 1890
Texas Land & Loan Co. v. Blalock
76 Tex. 85, 13 S.W. 12

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



164 S.W.3d 656, 162 Oil & Gas Rep. 511, 48 Tex. Sup. Ct. J. 671
**(Cite as: 164 S.W.3d 656)**

**H**

Supreme Court of Texas.
VALENCE OPERATING COMPANY, Petitioner,
v.
Elmagene W. DORSETT, Respondent.

No. 03–0836.
Argued Sept. 29, 2004.
Decided May 20, 2005.

**Background:** Nonoperator owner of working interest in oil wells brought action against operator to recover for breach of contract by failing to allow thirty-day notice period to elapse before commencement of work and by enforcing nonconsent penalty against owner. The 71st Judicial District Court, Harrison County, Bonnie Leggat, J., entered partial summary judgment in favor of operator. Owner appealed. The Texarkana Court of Appeals, Morriss, C.J., 111 S.W.3d 224, reversed and remanded. Review was granted.

**Holdings:** The Supreme Court, Wainwright, J., held that:
(1) the model form operating agreement permitted operator to begin work before expiration of thirty-day period for nonoperator to notify other parties of decision whether to elect to participate in the cost of the proposed operation, and
(2) the penalty for the nonoperator's lack of consent was not liquidated damages, disapproving *Hamilton v. Tex. Oil & Gas Corp.*, 648 S.W.2d 316.

Reversed and rendered.

Brister, J., concurred and filed opinion.

West Headnotes

**[1] Appeal and Error 30 ⇒893(1)**

30 Appeal and Error
  30XVI Review

30XVI(F) Trial De Novo
  30k892 Trial De Novo
    30k893 Cases Triable in Appellate Court
      30k893(1) k. In General. Most Cited Cases
    Summary judgment is reviewed de novo.

**[2] Appeal and Error 30 ⇒934(1)**

30 Appeal and Error
  30XVI Review
    30XVI(G) Presumptions
      30k934 Judgment
        30k934(1) k. In General. Most Cited Cases

When reviewing a summary judgment, the Supreme Court takes as true all evidence favorable to the nonmovant and indulges every reasonable inference and resolves any doubts in the nonmovant's favor.

**[3] Appeal and Error 30 ⇒1175(1)**

30 Appeal and Error
  30XVII Determination and Disposition of Cause
    30XVII(D) Reversal
      30k1175 Rendering Final Judgment
        30k1175(1) k. In General. Most Cited Cases

When both parties move for partial summary judgment on the same issues and the trial court grants one motion and denies the other, as here, the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and, if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered.

**[4] Contracts 95 ⇒147(2)**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k147 Intention of Parties

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

95k147(2) k. Language of Contract. Most Cited Cases

The primary concern of a court in construing a written contract is to ascertain the true intentions of the parties as expressed in the instrument.

**[5] Contracts 95 🗝147(3)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k147 Intention of Parties
                95k147(3) k. Construing Whole Contract Together. Most Cited Cases

To achieve the objective of ascertaining the true intentions of the parties as expressed in the instrument, courts should examine and consider the entire writing in an effort to harmonize and give effect to all contract provisions so that none will be rendered meaningless.

**[6] Contracts 95 🗝152**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k151 Language of Instrument
                95k152 k. In General. Most Cited Cases

Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense.

**[7] Mines and Minerals 260 🗝101**

260 Mines and Minerals
    260III Operation of Mines, Quarries, and Wells
        260III(B) Mining Partnerships and Companies
            260k101 k. Associations, Joint-Stock Companies, and Other Joint Enterprises. Most Cited Cases

Model form operating agreement placed no temporal limitation on operator's ability to commence work on proposed oil drilling projects and, therefore, permitted operator to begin work before expiration of thirty-day period for nonoperator to notify other parties of decision whether to elect to participate in the cost of the proposed operation; the agreement required nonoperators to notify other parties of election within thirty days after receipt of notice and required the operator to commence work no later than ninety days after formally proposing the operation to the interest owners.

**[8] Damages 115 🗝83**

115 Damages
    115IV Liquidated Damages and Penalties
        115k83 k. Questions for Jury. Most Cited Cases

Whether a contract term is a liquidated damages provision is a question of law for the court to decide.

**[9] Damages 115 🗝78(6)**

115 Damages
    115IV Liquidated Damages and Penalties
        115k75 Construction of Stipulations
            115k78 Form and Language of Instrument
                115k78(6) k. Breach of Contract of Sale or Lease. Most Cited Cases

Penalty stated in model form agreement for nonoperator interest owner's failure to consent to drilling oil wells was not liquidated damages and was enforceable; the non-consent penalty allowed consenting parties to recoup costs before the non-consenting party could share production revenues in proportion to ownership interest, it rewarded consenting parties for undertaking a defined risk, and the non-consenting party did not breach the contract and was not being punished; disapproving *Hamilton v. Tex. Oil & Gas Corp.*, 648 S.W.2d 316.

**[10] Damages 115 🗝78(6)**

115 Damages
    115IV Liquidated Damages and Penalties
        115k75 Construction of Stipulations
            115k78 Form and Language of Instrument

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

164 S.W.3d 656, 162 Oil & Gas Rep. 511, 48 Tex. Sup. Ct. J. 671
**(Cite as: 164 S.W.3d 656)**

115k78(6) k. Breach of Contract of Sale or Lease. Most Cited Cases

Liquidated damages clauses fix in advance the compensation to a party accruing from the failure to perform specified contractual obligations, whereas non-consent penalties reward consenting parties for undertaking a defined risk.

**[11] Damages 115 ☞78(6)**

115 Damages
    115IV Liquidated Damages and Penalties
        115k75 Construction of Stipulations
            115k78 Form and Language of Instrument
                115k78(6) k. Breach of Contract of Sale or Lease. Most Cited Cases

**Damages 115 ☞80(3)**

115 Damages
    115IV Liquidated Damages and Penalties
        115k75 Construction of Stipulations
            115k80 Proportion of Sum Stipulated to Actual Debt or Damage
                115k80(3) k. Breach of Contract of Sale or Lease. Most Cited Cases

A working interest owner's election not to participate in proposed operations is not a breach, and, thus, non-consent penalty of model form operating agreement does not involve liquidated damages or an unenforceable penalty.

**\*658** Michael E. Warwick, Abney & Warwick, Marshall, Thomas A. Zabel, Burns Wooley Marseglia & Zabel, L.L.P., Houston, for petitioner.

Edwin E. Buckner, Law Offices of Edwin E. Buckner, Jr., Marshall, for respondent.

Everard A. Marseglia Jr., Burns Wooley Marseglia & Zabel, L.L.P., Morgan L. Copeland Jr., Catherine B. Smith, Ara L. Ayles, Vinson & Elkins L.L.P., Gary C. Johnson, Senior Vice President & General Counsel, Houston, for amicus curiae.

Justice WAINWRIGHT delivered the opinion of the Court.

In this case we construe the meaning of certain notice provisions of a commonly used oil and gas operating agreement. Working interest owner El-magene Dorsett sued Valence Operating Company in a dispute arising from a joint operating agreement. The trial court granted partial summary judgment against Dorsett on her breach of contract claims, finding that Dorsett failed to consent to participate in the wells at issue, and that a contractual non-consent penalty for that failure was enforceable against her. The court of appeals reversed and rendered judgment in favor of Dorsett, holding that Valence breached contract provisions that required Valence to give notice to Dorsett before commencing drilling operations. 111 S.W.3d 224. The determinative issue before us is whether the agreement requires a thirty-day notice period to expire before the operator can commence work on the proposed operations. Because the non-consent penalty is enforceable and because we find nothing in the agreement prohibiting Valence from commencing work on the proposed operations before the expiration of the notice period, we reverse the court of appeals and render judgment in favor of Valence.

**I. Factual and Procedural Background**

Elmagene Dorsett is a 4.05391 percent working interest owner in 677.04666 acres in the Mobley Gas Unit in Harrison County, Texas. In 1981, Dorsett, with three other minority working interest owners, and TXO Production Corporation, as operator and majority working interest owner, executed a modified 1977 American Association**\*659** of Petroleum Landmen Form 610 Model Form Operating Agreement.[FN1] The Model Form Agreement is a contract between oil and gas lease owners and interest holders for the exploration and development of designated oil and gas within the geographical area described in the Agreement. A.A.P.L. Form 610–1977, preamble (1977). The Model Form Agreement designates a single party as "operator" who is responsible for the management and control of drilling, development, and production activities. *Id.* preamble, art. V., VI.A., C. All other parties are

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

designated "non-operators." *Id.* preamble. The parties to the Agreement have the option on each project to share operating costs and liabilities, to own equipment, and, if exercised, to then benefit by sharing in production revenues in proportion to their respective percentages of ownership. In such cases, these participants are called "consenting parties." *Id.* art. I.G., VI.B. Parties who elect not to participate in a proposed operation, called "non-consenting parties," are subject to a "non-consent penalty" which operates as a temporary relinquishment of the interest owner's share of production revenue from the project to the consenting parties.[FN2] *Id.* art. I.H., VI.B. After the consenting parties recoup their investment costs and receive a limited return on their investments, the non-consenting parties share in production revenues in proportion to their ownership interests. *Id.*

> FN1. The parties modified several provisions of the Model Form Agreement, but none of the changes affect the outcome of this case.

> FN2. We do not agree that this non-consent penalty is, as its name suggests, a forfeiture or punitive provision, but we will use the industry's nomenclature.

The relevant portion of the Model Form Agreement is Article VI.B. on Subsequent Operations:

1. *Proposed Operations:* Should any party hereto desire to drill any well on the Contract Area ..., the party desiring to drill ... shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation.... Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to

participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

2. *Operations by Less than All Parties:* If any party receiving such notice as provided in Article VI.B.1. or VI.E.1. elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within sixty (60) days after the expiration of the notice period of thirty (30) days ... actually commence work on the proposed operation and complete it with due diligence....

....

... Upon commencement of operations for the drilling, completing, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non–Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting **\*660** Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non–Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting production taxes, royalty, overriding royalty and other interests existing on the effective date hereof, payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) 100% of each such Non–Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non–Consenting Party's share of the cost of operation of the well commencing with first production and continuing un-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

til each such Non–Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non–Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non–Consenting Party had it participated in the well from the beginning of the operation; and

(b) 300% of that portion of the costs and expenses of drilling reworking, deepening, or plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and 300% of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non–Consenting Party if it had participated therein.

....

If and when the Consenting Parties recover from a Non–Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non–Consenting Party shall automatically revert to it, and, from and after such reversion, such Non–Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non–Consenting Party would have been entitled to had it participated in the drilling, completing reworking, deepening or plugging back of said well. Thereafter, such Non–Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure, attached hereto.

A.A.P.L. Form 610–1977, art. VI.B. (1977).

In 1981, TXO drilled the initial test well, Mobley Well No. 1. In 1994, Valence acquired ownership of 94.28446 percent of the working interest in the unit from Marathon Oil Company (successor to TXO) and became unit operator. From 1996 to 2001, Valence drilled eight more gas wells in the unit. Valence provided Dorsett with written notice of its intent to drill each of the eight wells, as required by the Model Form Agreement, but in each case began preparatory work, and in some cases drilling, before thirty days had elapsed after Dorsett's receipt of the notice. Dorsett received the notices but did not consent to and did not contribute to any of the costs incurred in drilling the wells. Valence then imposed on Dorsett the non-consent penalty described in the Model Form Agreement.

Dorsett disputed the imposition of the non-consent penalty. Specifically, Dorsett contended that the Model Form Agreement**\*661** required Valence to allow the thirty-day notice period to elapse before commencing work on proposed operations. She argued that Valence's failure to do so constituted a breach of contract, thereby preventing enforcement of the non-consent penalty. She also contended that the non-consent penalty was an unenforceable liquidated damages provision. In 2000, Dorsett sued Valence for breach of contract, specific performance, and conversion. She asserted causes of action for damage to the surface of her land stemming from Valence's failure to accommodate surface use and negligence; she also requested a declaratory judgment of her rights under the Agreement and a full accounting.

The parties filed cross-motions for partial summary judgment. Dorsett moved for partial summary judgment on the breach of contract, accounting, and declaratory judgment claims and requested severance of her surface damage claims. Valence moved for partial summary judgment on the contract claims as well. The trial court granted Valence's motion for partial summary judgment on the breach of contract claims, finding that Dorsett failed to elect to participate in the eight wells and that the non-consent penalty was enforceable against her. The trial court then severed the contract claims. The court of appeals reversed and rendered judgment in favor of Dorsett, holding that Valence

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

failed to comply with the Model Form Agreement provisions for notice of proposed operations, thus making the non-consent penalty inapplicable to Dorsett. 111 S.W.3d at 235.

## II. Standard of Review

[1][2][3] We review the trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Knott,* 128 S.W.3d at 215; *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). When both parties move for partial summary judgment on the same issues and the trial court grants one motion and denies the other, as here, the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered. *See FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000).

## III. Notice Period

Dorsett argues that because Valence did not satisfy the Agreement's notice requirements, her share of new production could not be reduced pursuant to the penalty. Dorsett interprets the Model Form Agreement to require Valence to deliver notice at least thirty days before the commencement of proposed operations. Valence argues that the Agreement requires notice of proposed subsequent operations to be given to working interest owners, who then have thirty days to elect to participate in the drilling of the well. Under Valence's construction, the operator may commence work on the proposed operations during the thirty-day notice period or even before the thirty-day notice period begins. To support this interpretation, Valence argues that the phrase stating that the operator "shall, within sixty (60) days after the expiration of the notice period of thirty (30) days ... actually commence

work on the proposed operation and complete it with due diligence" illustrates that the provision's purpose is not to prohibit the early commencement of work, but to ensure that work is not unreasonably delayed after the **\*662** consent deadline. A.A.P.L. Form 610–1977, art. VI.B.2. (1977).

[4][5][6] In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003); *Gulf Ins. Co. v. Burns Motors, Inc.,* 22 S.W.3d 417, 423 (Tex.2000); *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *J.M. Davidson, Inc.,* 128 S.W.3d at 229; *Coker,* 650 S.W.2d at 393. Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996); *W. Reserve Life Ins. Co. v. Meadows,* 152 Tex. 559, 261 S.W.2d 554, 557 (1953); *see also Knott,* 128 S.W.3d at 219.

[7] The notice provision of the Model Form Agreement provides:

[T]he party desiring to drill, complete, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation.... Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation....

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

....

... [I]n order to be entitled to [impose the non-consent penalty], the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within sixty (60) days after the expiration of the notice period of thirty (30) days ... actually commence work on the proposed operation and complete it with due diligence.

A.A.P.L. Form 610–1977, art. VI.B.1.–2. (1977).

We agree with Valence that this provision places no temporal limitation on Valence's ability to commence work on the proposed projects. The Agreement clearly states that "[t]he parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation." *Id.* art. VI.1. This plain language in the Agreement describes Dorsett's right to receive notice of proposed operations and to elect to participate in those operations. It places no restrictions on when Valence may commence drilling or preparations for drilling. Dorsett does not dispute that she received notice of all of the proposed operations, nor does she contend that she elected to participate in the drilling of Mobley Wells 2 through 9. Her undisputed failure to consent to the proposed operations within thirty days was a "[f]ailure ... to reply within the period above fixed" and "constitute[d] an election by that party not to participate in the cost of the proposed operation," thus making the non-consent penalty applicable to Dorsett. *Id.*

In short, the thirty-day notice period sets a deadline for Dorsett to decide whether to participate in proposed operations. Nothing in the language of the Agreement forbids the operator from commencing**\*663** work before the end of the notice period. However, there is a temporal limit in the Agreement on Valence that sets a deadline, not a required start date, on Valence's commencement of

work. The Agreement requires the operator to commence work no later than sixty days after the expiration of the thirty-day notice period. A.A.P.L. Form 610–1977, art. VI.B.2. (1977). The distinction between the two notice periods in the Agreement retains the working interest owner's right to thirty days notice before being required to make a decision, while also requiring the operator to commence work no later than ninety days after formally proposing the operation to the interest owners.[FN3]

> [FN3.] The resolution of this case does not require us to determine whether the phrase "actually commence work," as used in the Model Form Agreement, requires the commencement of drilling or the commencement of other preparatory work no later than ninety days after formally proposing the operation. Therefore, we express no opinion on this issue.

This interpretation effectuates the written agreement of the parties. We recognize that this interpretation allows an operator to commence a new operation before the thirty-day notice period has expired; however, potential benefits may accrue to the owners for an operator's "early" commencement. For example, an early start may avoid detrimental occurrences such as the draining of an oil field by a neighboring operator or the expiration of an oil and gas lease. Moreover, the risk of early commencement of such operations falls entirely on the operator because if none of the working interest owners consent to participation within thirty days, the operator bears the full cost of operations. The parties do not identify any negative consequences to the working interest owners that arise from commencement of operations within the thirty-day notice period.

### IV. Non–Consent Penalty

Dorsett received notice of each of the proposed subsequent operations. She acknowledges that she did not consent to any of the proposed operations within thirty days of receiving notice. She therefore is a non-consenting party under Article VI.B.1. of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Model Form Agreement, and the non-consent penalty applies to her.

The relevant portion of the Model Form Agreement provides:

"Upon commencement of operations for the drilling, completing, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non–Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non–Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold ... shall equal the total of the following:

(a) 100% of each such Non–Consenting Party's share of the cost of any newly acquired surface equipment ... plus 100% of each such Non–Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non–Consenting Party's relinquished interest shall revert to it under other provisions of this Article ...; and

(b) 300% of that portion of the costs and expenses of drilling reworking, deepening, or plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and 300% of that portion of the **\*664** cost of newly acquired equipment in the well ..., which would have been chargeable to such Non–Consenting Party if it had participated therein."

A.A.P.L. Form 610–1977, art. VI.B.2. (1977). This clause allows consenting parties to recoup up to 100 percent of the non-consenting party's share of the costs of any new surface equipment and operation of the well and up to 300 percent of the non-consenting party's share of the costs and expenses of drilling and new equipment in the well, subject to deductions. After the consenting parties have recouped these costs, then the non-consenting party returns to sharing in production revenues in proportion to his or her ownership interest. *Id.; see also Nearburg v. Yates Petroleum Corp.,* 123 N.M. 526, 943 P.2d 560, 565 (App.1997) (explaining operation of the Model Form Agreement's non-consent penalty provision).

[8][9][10] Whether a contract term is a liquidated damages provision is a question of law for the court to decide. *Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991) (citing *Farrar v. Beeman,* 63 Tex. 175, 181 (1885)). Dorsett contends that the non-consent penalty is an unenforceable liquidated damages provision. We disagree. This clause is different from a liquidated damages clause. Liquidated damages clauses fix in advance the compensation to a party accruing from the failure to perform specified contractual obligations, whereas non-consent penalties reward consenting parties for undertaking a defined risk. *See Nearburg,* 943 P.2d at 567 ("[T]he non-consent penalty is the agreed-upon reward to [a consenting party] for taking the risk.... As a contractual arrangement, the carried interest is subject to negotiation and modification, and the parties' rights and obligations depend upon their contract."); Restatement (Second) of Contracts § 356 (1981) ("Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss."). The non-consent penalty provision in this oil and gas operating agreement is the mechanism utilized to allow the consenting parties the opportunity to recover their investments and receive defined returns from future operations. For such operations, they undertake a financial risk that the non-consenting parties do not. Here, the non-consenting party is not being punished for breaching a contract; she simply agreed not to participate in a return on an investment she did not make. Indeed, after the provision's require-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ments are met, she receives additional revenues from new wells for which she paid nothing. One Texas court of appeals, in its consideration of whether a non-consent penalty was enforceable, characterized the penalty as a liquidated damages clause and decided that it was enforceable against the non-consenting working interest owner. *Hamilton v. Tex. Oil & Gas Corp.,* 648 S.W.2d 316, 321 (Tex.App.El Paso 1982, writ ref'd n.r.e.). While *Hamilton* reached the correct result, we disapprove of its treatment of the non-consent penalty as a liquidated damages provision.

[11] There is a second reason why Dorsett's assertion is unpersuasive. Assuming, *arguendo,* that Dorsett was correct in claiming that the non-consent penalty is a liquidated damages clause, her argument still fails because, traditionally, liquidated damages are recoverable only where there has been a failure to perform contractual obligations. *Phillips,* 820 S.W.2d at 788; *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 592 S.W.2d 340, 342 n. 2 (Tex.1979). As the court in *Nearburg* noted, "a non-consent election cannot convincingly be characterized as a **\*665** breach.... Therefore, we do not regard the non-consent penalty provision as involving liquidated damages or an unenforceable penalty." *Nearburg,* 943 P.2d at 566. We have held that Valence complied with the terms of the Agreement by properly sending notices to Dorsett. Dorsett failed to consent to the proposed operations. Neither party breached the contract.

To interpret the provision as Dorsett suggests would not only contradict its plain language, but would vanquish the incentive for parties to consent and incur costs and liabilities for new projects. If all working interest owners shared equally in production revenues from subsequent projects, whether they consented or not, none would consent because there would be no incentive to do so. In fact, the incentives would strongly favor not consenting because, under Dorsett's approach, a non-consenting party would be able to reap the rewards of new operations without incurring any expense. The non-

consent penalty is designed to allow reasonable compensation for working interest owners who undertake the risk of developing new wells. *See Phillips,* 820 S.W.2d at 788. Other terms sometimes used to describe the non-consent penalty—"sole risk clause" and "risk charges"—more accurately convey this rationale. *See* 111 S.W.3d at 226 n. 1.

## V. Conclusion

We conclude that Valence provided timely notice to Dorsett of its proposed subsequent operations; consequently, Valence did not breach the Agreement. The non-consent penalty is not an unenforceable liquidated damages provision and is enforceable against Dorsett. Therefore, we reverse the court of appeals' judgment and render judgment that Dorsett take nothing.

Justice BRISTER delivered a concurring opinion.
Justice JOHNSON did not participate in the decision.
Justice BRISTER, concurring.

Casual readers may not understand how a court could possibly hold that a "non-consent penalty" is not a "penalty." Although fully joining the Court's opinion and judgment, I write briefly to explain.

The Court discloses in a footnote that "non-consent penalty" is industry vernacular. 164 S.W.3d at 659 n. 2. The term does not appear in the Operating Agreement, and interpretation of that contract is a question of law for the Court. *Lee Lewis Const., Inc. v. Harrison,* 70 S.W.3d 778, 783 (Tex.2001). What the parties call a clause is parol evidence, and thus inadmissible unless a contract is ambiguous. *Friendswood Development Co. v. McDade + Co.,* 926 S.W.2d 280, 283 (Tex.1996) (per curiam). This one is not.

Generally, a liquidated damages provision providing for a multiple of actual damages is an unenforceable penalty. *Phillips v. Phillips,* 820 S.W.2d 785, 789 (Tex.1991). But while the clause here is certainly liquidated,[FN1] it is not a liquidated-damages clause.[FN2]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

164 S.W.3d 656, 162 Oil & Gas Rep. 511, 48 Tex. Sup. Ct. J. 671
**(Cite as: 164 S.W.3d 656)**

FN1. *See* Black's Law Dictionary 494 (8th ed.2004) ("liquidated, adj. 1. (Of an amount or debt) settled or determined, esp. by agreement.").

FN2. *See id.* ("liquidated-damages clause. A contractual provision that determines in advance the measure of damages if a party breaches the agreement.").

The parties' contract provides unambiguously that Dorsett is not required to contribute to subsequent operations. Thus, there is no breach of contract if she opts out.

**\*666** The contract also provides unambiguously that those who do not consent nevertheless get additional revenues (after recoupment by those who do), for which they pay nothing. This is not a penalty but a bonus.FN3

FN3. *See id.* at 134 ("bonus. 1. A premium paid in addition to what is due or expected <year-end bonus>.").

The contract also provides unambiguously that those who do consent get 300% recoupment of certain costs, for which nonconsenting parties again pay nothing. These are not damages.FN4

FN4. *See id.* at 416 ("damages, n. pl. Money claimed by, or ordered to be paid to, a person as compensation for loss or injury <the plaintiff seeks $8,000 in damages from the defendant>.").

I recognize that in some situations receiving less is the economic equivalent of paying more. But bonuses for a star athlete or salesman are not intended to penalize their employers, but to increase returns for all concerned. Unless an oilfield can be completely emptied from existing wells, further development is not a zero-sum game.

Those in the oil industry widely use and rely on clauses like the one here, and certainly consider them enforceable. *See* John R. Reeves & J. Matthew Thompson, *The Development of the Model Form Operating Agreement: An Interpretive Accounting,* 54 Okla. L.R. 211, 254–55 (2001). Dorsett provides precedent in neither law nor logic suggesting that liquidated bonus clauses should be unenforceable, nor why she should get a bonus for a risk she never took. Accordingly, this is not a "non-consent penalty."

Tex.,2005.
Valence Operating Co. v. Dorsett
164 S.W.3d 656, 162 Oil & Gas Rep. 511, 48 Tex. Sup. Ct. J. 671

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.